UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| JANE DOE, | ) |
|     Plaintiff, | ) |
| v. | ) |
| MICHAEL O. BARBAZETTE, | ) |
| and | ) |
| JASON J. MARDOCCO | ) Case No.: 1:21-cv-1150 (AJT/JFA) |
| and | ) |
| JAMES BAUMSTARK | ) |
| and | ) |
| VINCENT SCIANNA | ) |
| and | ) |
| EDWIN C. ROESSLER | ) |
| and | ) |
| FAIRFAX POLICE OFFICERS ##3-10 | ) |
| and | ) |
| FAIRFAX COUNTY, VIRGINIA, | ) |
|     Defendants. | ) |

AMENDED COMPLAINT

Introductory and Jurisdictional Statement

1. Plaintiff Jane Doe brings this action for damages resulting from sex trafficking. Jane Doe was trafficked to the United States and forced to work as a prostitute, mostly in Fairfax County, Virginia. At least some of the defendants, at the time officers within the Fairfax County Police Department ("FCPD"), provided security to the trafficking ring that ensnared Jane Doe, secured sexual services from trafficked women, and may also have extorted money from the ring's leadership. During and after Jane Doe's trafficking, high ranking officers within the department conspired to cover up aspects of sex trafficking in Fairfax, and the complicity of county police officers in the work of the trafficking ring, thereby becoming themselves complicit in its work to the point of permitting two knowingly highly compromised officers to retire quietly on pensions. The officers complicit in this coverup included the then chief of police, who was the policy-making individual for Fairfax County with regard to law enforcement, including the county's approach to sex trafficking occurring within its borders. The result was the creation of a county custom, practice or usage of tolerating sex trafficking and suppressing investigation thereof over a period of time. This case arises under the federal Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§1589 *et seq*. This court has jurisdiction over the trafficking claims under 28 U.S.C. §1331, as all the defendants are in the United States.

Parties

2. Plaintiff Jane Doe is a resident of Virginia. She is the single mother of one child. The court has granted her motion for leave to proceed under her Jane Doe pseudonym, with her name being revealed to defendants under a protective order precluding its use absent court authorization. ECF 2, ECF11.

3. At all relevant times, defendants Michael O. Barbazette and Jason J. Mardocco were supervisory police officers in the FCPD, defendant James Baumstark was a captain in the FCPD, defendant Vincent Scianna was a lieutenant in the FCPD, and defendant Edwin C. Roessler was Fairfax County's Chief of Police.

4. At all relevant times, Fairfax Police Officers ##3-10 were police officers within the FCPD. As of this writing, Jane Doe has not learned their identity or details regarding their possible involvement in the sex trafficking ring or in the police cover-up of protection of the ring. She names them here as "Fairfax Police Offcers" to give notice of her intent to discover whether additional officers were complicit in the misconduct here at issue  To the extent such information is revealed in discovery, Jane Doe will move for leave to amend her complaint to name these officers properly.

5. Defendant Fairfax County is a political subdivision created and operating under the constitution and laws of the Commonwealth of Virginia. Its police department, FCPD, acts as its agent regarding law enforcement in the County, and its chief of police sets county policy regarding same. This includes setting county policy on dealing with human trafficking in the county and in dealing with officers found to have engaged in misconduct.

Claim For Relief

<u>The Fate of Jane Doe</u>

6. Jane Doe was born in Costa Rica in 1978. Jane Doe never completed high school and had a modest upbringing.

7. Sometime prior to October 11, 2010, a Costa Rican woman named Nicole approached Jane Doe in a friendly fashion. Nicole proposed to Jane Doe that she work as a nanny, a housekeeper, or a social escort in the United States. Nicole explained that as a social escort, Jane Doe would go on dates with wealthy men and attend lavish business dinners and events where she would be photographed. Nicole explained that the men would be charged an hourly rate, of which Jane Doe would receive a portion.

8. Unbeknownst to Jane Doe, Nicole was working at the behest of Hazel Marie Sanchez Cerdas ("Sanchez") to recruit women in Costa Rica for forced prostitution and commercial sex in the United States. At no time was Jane Doe told, nor did she believe, that she would be coming to the United States to provide commercial sex services.

9. In October 2010, Jane Doe received from Sanchez her travel itinerary and round-trip airline tickets. Jane Doe was to travel from San Jose, Costa Rica to Dulles Airport that month and return to San Jose two weeks later.

10. The second week of October, 2010, Jane Doe arrived in Virginia at Dulles Airport. She was met by a woman named Sonia, who worked for Sanchez. Sonia took Jane Doe by car to an apartment in Fairfax, Virginia.

11. When Jane Doe arrived at the apartment, she met Sanchez for the first time. Sanchez immediately confiscated Jane Doe's belongings and travel documents. Sanchez informed her that she would not be going on dates with men as an escort, but rather have sex with men each day for money.

12. Jane Doe objected to Sanchez's demand and stated that she would not work as a prostitute. Sanchez responded that she knew where Jane Doe's mother and son lived in Costa Rica, and that if she refused to work as a prostitute, she would have them harmed by her associates.

13. By reason of her fear of harm to her family in Costa Rica, Jane Doe was coerced into providing commercial sex beginning the very day of her arrival in Virginia.

14. Jane Doe remained at Sanchez's apartment in Fairfax, Virginia where she would engage in commercial sex with men as arranged by Sanchez. Sanchez posted advertisements for commercial sex with Jane Doe and other women on the internet, including the websites Backpage.com and Eros.com, unless she was warned not to post advertisements at certain times in order to avoid law enforcement sting operations. Commercial sex customers would contact Sanchez and arrange for meetings with the women, including Jane Doe. Jane Doe had to perform whatever sexual act was demanded by the customer. The money made from her engaging in the commercial sex went to Sanchez.

15. During the time that Jane Doe was being trafficked by Sanchez, she was required to have commercial sex with multiple men a day. If Jane Doe refused, Sanchez threatened to inform Jane Doe's family in Costa Rica that she was working as a prostitute.

16. During her trafficking, Sanchez allowed Jane Doe to return home to Costa Rica for various amounts of time with the understanding that she would be contacted and required to return to the United States to work as a prostitute. Sanchez threatened Jane Doe that she would have people watching Jane Doe and her family in Costa Rica. The threat sufficed to ensure that Jane Doe return to the United States.

17. In April 2015, while in Fairfax, Jane Doe seized the opportunity to escape the Sanchez ring. She had been in the grip of the Sanchez trafficking organization for five years.

FCPD Subversion of Sex Trafficking Interdiction in Fairfax

18. William Woolf had joined FCPD in 2002. He enjoyed a successful career, being promoted to detective in 2007 or 2008. In the period October 2013 to 2017, Det. Woolf was the sole FCPD officer assigned to a federally funded task force on human trafficking, officially named the Enhanced Collaborative Model Human Trafficking Task Force and colloquially known as the Northern Virginia Human Trafficking Task Force, or NVHTTF), combating sex trafficking.

19. While Fairfax County received half a million dollars in federally funds for county participation in the NVHTTF, during the period of his investigative work on sex trafficking in Fairfax, Woolf did not get sufficient institutional support from FCPD. Police officials regularly derided the notion that trafficked women were victims, insisting instead that they were simply prostitutes willingly engaged in unlawful commercial activity. Det. Woolf was told this, and disparagingly called a "social worker," by his superiors, including, at different times, defendants Barbazette and Baumstark and Lieutenant Jane Burns,[1] to the point that this became common terminology in the department.

20. During the period of Jane Doe's victimization by the Sanchez enterprise, repeated efforts were made within FCPD to keep alleged trafficking cases from Det. Woolf, who was repeatedly told by his superiors that his focus on trafficking and on trafficking victims was

---

[1]As of this writing, Jane Doe lacks sufficient information to add Lt. Burns as a defendant in this lawsuit. She reserves the right to do so depending on what is learned in discovery.

6

misguided. Instead of such cases being routed to him as the FCPD representative on the NVHTTF, they were at times sent to the FCPD's Child Exploitation Unit or to the Vice Unit, both of which typically addressed individual cases of abuse and prostitution, but not trafficking. This was done with no notice to him, and to the substantial detriment of his efforts to control sex trafficking in the county, which included the victimization of Jane Doe among others.

21. Starting in 2008, Det. Woolf's direct supervisor was defendant Barbazette, then a sergeant. While at first defendant Barbazette was indifferent, not to say hostile, to Det. Woolf's trafficking work, in 2014-15 he started demonstrating a substantial interest in Det. Woolf's interviews with the trafficking victims he worked with. He started joining Det. Woolf on interviews of trafficking victims, and on at least one occasion told Det. Woolf to give him a trafficking victim's telephone number. He also told Det. Woolf things about his personal life indicative of an inappropriate interest in women who were involved in commercial sex.[2]

22. Following the emergence of defendant Barbazette's interest in Det. Woolf's trafficking victims, Det. Woolf's investigative work started becoming markedly more difficult.

23. Det. Woolf, who was known on the street as a police officer who was sympathetic to the plight of trafficked women, had routinely obtained information from them in aid of his investigative work. One such technique was a "knock and talk" visit, in which Det. Woolf would be directed to a given location where he would find a trafficked woman prepared to provide information to him. Where such "knock and talk" visits had routinely been productive, following defendant Barbazette's new-found interest in his work, Det. Woolf would arrive at a

---

[2] Counsel declines to elaborate these revelations in a public record, but will make them available to the defense on request or as required by the court.

"knock and talk" location to find no one there. Such failures were to the detriment of his efforts to take effective law enforcement action against traffickers.

24. Defendant Barbazette became very hostile to Det. Woolf and made it difficult for him to do his work. He maintained unprecedented, strict control over Det. Woolf's investigative activities and routinely denied him standard investigative tools, *e.g.* travel when requested by his federal counterparts on the NVHTTF. He required a detailed daily report on all Det. Woolf's activities and regularly denied overtime work even when manifestly needed and coming at no cost to the county. These requirements added significantly to Det. Woolf's difficulties in taking effective law enforcement action against Fairfax sex traffickers.

25. On information and belief, instead of enforcing the laws against sex trafficking and prostitution, and in derogation of their duties as Fairfax County police officers, for a period of years during Jane Doe's abuse by the Sanchez enterprise, defendants Barbazette and Mardocco, possibly with the contemporaneous knowledge and assistance of other, currently unidentified, officers, actively facilitated Sanchez's sex trafficking venture by providing it with protection intended to prevent discovery of, and appropriate law enforcement intervention into, the Sanchez criminal enterprise.

26. On information and belief, defendants Barbazette and Mardocco would tip off Sanchez when the FCPD would be conducting sting operations on sex trafficking ventures in the county, including the Sanchez enterprise. This led repeatedly to surprisingly abortive investigative efforts when leads that had been reasonably expected to yield useful information on trafficking came up with nothing.

27. On information and belief, defendants Barbazette and Mardocco knew that Jane Doe had been trafficked for the purpose of being made to engage in commercial sex services by means of force, fraud or coercion.

28. On information and belief, in consideration for defendants Barbazette and Mardocco's provision of protective services to Sanchez's trafficking ring, Sanchez made trafficked women, including Jane Doe, available to them for sexual services gratis.[3]

29. At some point in 2014 or 2015, Det. Woolf reported defendant Barbazette's unusual and disruptive actions and orders to Barbazette's supervisor, defendant Cpt. Baumstark. In derogation of his sworn duties, and heedless of the cost to sex trafficking victims such as Jane Doe, Cpt. Baumstark offered Det. Woolf no assistance in relation to his increasingly compromised work on sex trafficking in Fairfax County, or in dealing with defendant Barbazette. Rather, Cpt. Baumstark ordered Det. Doe not to say anything to anyone about it. Cpt. Baumstark told Det. Woolf:

* "I'm a life guard and you are far off shore drowning, and I'm not going to try to save you."

* "You are on an island by yourself and left to fend for your self."

30. In his conversation with Cpt. Baumstark, Det. Woolf said that trafficking victims, who trusted him, had reported to him that FCPD police officers were extorting sex from the trafficking enterprises they were also protecting. Cpt. Baumstark expressed no interest in what Det. Woolf had reported. Rather, he directed Det. Woolf to forget it and ignore what he had been

---

[3] Discovery will reveal whether these defendants – or any county police officers – also extorted money from the Sanchez enterprise as well, as the price of silence.

told. On information and belief, nothing was done to follow up on the allegations of police corruption Det. Woolf had reported, to the detriment (among other things) to the victims of sex trafficking in the county, including Jane Doe.

31. The concerted effort within FCPD to thwart investigation into sex trafficking in Fairfax County continued past the time that Jane Doe liberated herself in 2015.

32. In or approximately 2016, Det. Woolf met with defendant Barbazette and defendant Baumstark, defendant Barbazette's supervisor, and others to discuss continued staffing of the NVHTTF. Det. Woolf expressed interest in continuing this work, but asked to be placed under a supervisor other than defendant Barbazette so as to be able to proceed properly with his work regarding sex trafficking. This request was not granted.

33. Defendant Barbazette was visibly furious with Det. Woolf for requesting another supervisor. He ordered Det. Woolf not to open any new trafficking investigations, and simply to close out his pending cases.

34. In or approximately early 2016 Det. Woolf was transferred to the Major Crimes Division. He was ordered, as he had been ordered by defendant Barbazette, not to investigate any more trafficking cases, only to close out any open cases. Det. Woolf did as ordered.

35. On information and belief, as of the time of Det. Woolf's transfer to Major Crimes trafficking cases stopped receiving the manpower and allocation of resources that had earlier supported this work.

### Det. Woolf is Threatened to Keep Silent About Sex Trafficking

36. Det. Woolf has a pilot's license and flies his own rented plane. In March or April 2016, defendant Scianna, then a lieutenant in FCPD, conducted an aggressive investigatory interview of Det. Woolf regarding his having flown to a sex trafficking witness interview – something Det/ Woolf had previously received authority to do.

37. At the time of this interview, Lt. Scianna had no supervisory authority over Det. Woolf, who worked in a separate Child Exploitation Unit from Lt. Scianna. Nor was Lt. Scianna part of the Internal Affairs Department that investigates claims of police misconduct and would ordinarily have been the arm of FCPD to investigate irregularities related to Det. Woolf's airplane travel. On information and belief, Lt. Scianna was specially designated by others, currently unidentified, to engage in irregular intimidation of Det.Woolf for the purpose of getting him to back off investigation into sex trafficking in Fairfax. On information and belief, this was with the knowledge and concurrence of Police Chief Roessler.

38. Lt. Scianna told Det. Woolf that if he continued to insist he had been given permission to fly to meet his witness, he would be branded a liar and his career at FCPD and in law enforcement would be over. This portion of the interview was recorded by Lt. Scianna.

39. After stating the above, Lt. Scianna turned off his recorder and said the following to Det. Woolf:

* "You know what this is really about, don't you."
* "If you keep your mouth shut and don't utter the words 'human trafficking' again, all this will disappear, everything will go away and all the paperwork will disappear."

* "You have six kids. You have to think about them."

* "If you don't cooperate we'll make sure you never work in law enforcement again."

Lt. Scianna told Det. Woolf that he would give him time to think about what he wanted to do.

40. Lt. Scianna's threats brought Det. Woolf to tears for the first time in his professional life. He felt torn between the career he loved and what he recognized as his professional responsibilities. Lt. Scianna told Det. Woolf he could stay in his office and compose himself, and that he could take the rest of the day off if he wished.

41. The following day, Det. Woolf, overwhelmed by the prospect of losing his job in law enforcement and fearful of Lt. Scianna's threat, informed Lt. Scianna that he would no longer talk about trafficking. He told Lt. Scianna: "I'm on board." Det. Woolf would work on child pornography and child runaway cases.

42. Two days after confirming to Lt. Scianna that he was "on board," Det. Woolf received a telephone call from a sender with a blocked number. On answering, he recognized the person on the other end as then-Police Chief Roessler. Det. Woolf had spoken with Chief Roessler on numerous occasions, and readily identified him. Chief Roessler said: "I'm on my way to a meeting. I need to make sure you're willing to play ball."

43. At the time of Chief Roessler's call, Det. Woolf had no matters pending before Chief Roessler. There existed nothing in relation to which he might have been asked if he was "willing to play ball," other than confirmation of his advice to Lt. Scianna that he was indeed willing no longer to speak of trafficking. On information and belief, Chief Roessler was calling to confirm that the information he had received to this effect from Lt. Scianna was accurate.

44. Det. Woolf answered: "yes sir," and Chief Roessler hung up the phone.

45. Det. Woolf struggled with the decision he had made, and found it unacceptable. He resigned from FCPD in September 2017 in order to be free to continue his efforts against human trafficking. Following his departure from FCPD, he served as full-time Director of Human Trafficking Programs for the United States Department of Justice, as Special Advisor for Human Trafficking to the White House, as Senior Advisor on Human Trafficking to the Office of the Assistant Attorney General, and as the founder and Excutive Director of the Just Ask Trafficking Prevention Foundation.

<u>The F.B.I. Investigates, Sanchez is Charged, and the FCPD Cover-up Continues</u>

46. Following her escape from the Sanchez organization, and after overcoming her fears of exposure and retaliation, Jane Doe reported her trafficking to the Federal Bureau of Investigation ("F.B.I."). She did not make a report to FCPD, as she was aware from other trafficked women that FCPD officers were complicit in the work of the Sanchez organization, and did not know whom she could trust within that organizaion.

47. Jane Doe's allegations were initially investigated by the F.B.I.'s Child Exploitation and Human Trafficking Task Force. In its investigation, the F.B.I. used a cell phone handed over by Jane Doe, who had shared it with other women in connection with their commercial sex work. The cell phone permitted access to the telephone numbers of many clients of the commercial sex ring.

48. The telephone numbers of defendant Barbazette, and, on information and belief, of defendant Mardocco, were among those found on the phone provided by Jane Doe.

49. In due course, Sanchez was charged with Interstate & Foreign Travel or Felony Transportation in Aid of Racketeering Enterprises under 18 U.S.C. §§ 1952(a)(2) & (3), based on her sex trafficking enterprise victimizing Jane Doe. In 2019, she plead guilty in United States District Court and was sentenced to five years in prison, which she served.

50. Given the apparent involvement of two Fairfax police officers in the Sanchez sex trafficking ring, in addition to having the Sanchez enterprise investigated by the F.B.I.'s Child Exploitation and Human Trafficking Task Force, the F.B.I. had the case examined by the F.B.I.'s Public Corruption Division, a unit that investigates corrupt practices of public officials. On information and belief, the Public Corruption Division investigated at least defendants Barbazette and Mardocco for involvement in the Sanchez sex trafficking enterprise.

51. For reasons internal to the decision-making processes of the Department of Justice in light of organizational priorities, burdens of proof, and the availability of other remedial options, and with the Sanchez trafficking ring dismantled, the F.B.I. referred the Barbazette/Mardocco corruption case back to the FCPD for appropriate follow up.

52. FCPD did not deal with defendants Barbazette and Mardocco as criminal suspects referred by the F.B.I. Rather, FCPD swept its officers' involvement in Fairfax sex trafficking under the rug and permitted them quietly to resign from the department, retaining their ability to continue working as public safety officers.[4] On infortmation and beloiefr, tyhis was with the knowledge and approval of then-Chief Roessler. Defendants Barbazette and Mardocco retained their pensions, paid out of public funds.

---

[4]FCPD acted in accordance with an established departmental practice of permitting accused officers quietly to resign, enabling them to regain employment in public safety positions. *See,* most recently, *Wilson v. Freitag*, 1:21-cv-800 (E. D. Va. 2021).

### Conspiracy and the Implication of Fairfax County

53. As set forth above, over a period of years, including but not limited to the years in which Jane Doe was being victimized by the Sanchez trafficking enterprise, defendants Barbazette, Mardocco, Baumstark, Scianna, and Roessler, and on information and belief others, engaged in a conspiracy to obstruct the investigation and exposure of sex trafficking taking place within Fairfax County, notwithstanding the county's receipt of millions of dollars in federal funds to identify and prosecute traffickers. By their actions set forth above, each of these defendants thereby affirmatively facilitated the ongoing victimization of Jane Doe and other victims of the Sanchez enterprise until Jane Doe undertook to blow the whistle to the FBI. Defendants also conspired to cover up the fact that Fairfax County police officers were actively participating in, and benefitting sexually if not financially from, the work of a local sex trafficking ring.

54. As set forth above, over a period of years including when Jane Doe was being victimized by the Sanchez enterpeise, the defendants, including the Fairfax Chief of Police, actively suppressed investigation into and exposure of sex trafficking in Fairfax, including threatening the county's sole designated sex trafficking officer. In so doing, they, and specifically the Chief of Police, established and pursued, over a period of years, a custom, practice or usage of covering up the very sex trafficking that caused grievous injury to Jane Doe. As the county's duly authorized policy-making designee on law enforcement matters, Chief Roessler thereby implicated Fairfax County as a party to this conspiracy, to the ongoing injury of Jane Doe.

55. The principal beneficiaries of defendants' conspiracy of cover-up and silence were sex trafficking rings operating in the county, including specifically the Sanchez enterprise that victimized Jane Doe, which ring was finally shut down as a result of federal, not county, law enforcement efforts.

56. The secondary beneficiaries of this conspiracy were defendants Barbazette and Mardocco, who were permitted quietly to resign, not prosecuted, and awarded their taxpayer-paid pensions, their involvement with the Sanchez sex trafficking ring notwithstanding.

57. As a result of the defendants' actions complained of herein, Jane Doe suffered severe physical and emotional injury over a period of years, and emotional distress continuing to date.

Causes of Action

Count I: Defendants Barbazette and Mardocco

Trafficking For Purposes of Forced Labor in Violation of 18 U.S.C. §1589

58. As set forth above, defendants knowingly participated in the sex trafficking ring of which Jane Doe was a victim by providing protective services for the sex trafficking venture, thereby knowingly facilitating her being subjected to forced labor in violation of 18 U.S.C. §1589. Pursuant to 18 U.S.C. § 1595, defendants are liable to her for her resulting damages.

Count II: Defendants Barbazette and Mardocco

Trafficking by Force, Fraud or Coercion in Violation of 18 U.S.C. §1591

59. As set forth above, defendants knowingly solicited and obtained commercial sex services from Jane Doe, a victim of sex trafficking, when each defendant knew or should have

known that Jane Doe was made to engage in commercial sex services by means of force, fraud or coercion in violation of 18 U.S.C. §1591.  Pursuant to 18 U.S.C. §1595, defendants are liable to her for her resulting damages.

Count III: Defendants Barbazette and Mardocco

Benefitting from Trafficking in Violation of 18 U.S.C. §1593A

60.  As set forth above, defendants knowingly benefitted, sexually if not financially, by participating in the trafficking and prostitution of Jane Doe in violation of 18 U.S.C. §1593A.[5] They are liable to her for her resulting damages pursuant to 18 U.S.C. § 1595.

Count IV: All Defendants

Conspiracy to Violate the Trafficking Victims Protection Reauthorization Act

61.  As set forth above, defendants conspired with each other and others to violate the Trafficking Victims Protection Reauthorization Act,18 U.S.C. §1594(b), and each defendant committed overt acts in furtherance of this conspiracy by (1) providing protection to the Sanchez enterprise and securing sexual services thereform (Barbazette and Mardocco), and by (2) knowingly subverting efforts to investigate and prosecute the traffickers, including defendants Barbazette and Mardocco, and thereby affirmatively facilitating the continued victimization of Jane Doe (and other victims) by the Sanchez enterprise, as set forth above.  Defendant Fairfax County participated in this conspiracy via the actions of its employees and agents including

---

[5] Discovery will reveal whether defendants also extorted money from Sanchez for their protection of the sex trafficking venture.

specifically Chief Roessler, its designated policy-maker for law enforcement matters, via the custom, practice or usage he directed and participated in to suppress investigation into sex trafficking. All defendants are liable to Jane Doe for her resulting damages pursuant to 18 U.S.C. §1595.

Wherefore, Jane Doe requests an order of the court granting her the following relief:

* Compensatory damages against all defendants, jointly and severally, appropriate to the proof at trial.
* Punitive damages against each defendant but the county appropriate to the proof at trial;
* Her costs, including reasonable attorneys' fees; and
* Such other relief as is proper, including, if needed, an order barring any sort of retaliation by defendants or their privies against Detective Woolf for his testimony in this case.

Jane Doe requests trial by jury.

> Respectfully submitted,
> Jane Doe,
> By counsel

Dated: December 17, 2021

Counsel for Plaintiff:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
Jane Doe\Pldgs\2021-1218-AmendedComplaint

//s// Nickera S. Rodriguez
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
nsr@robinhoodesq.com

Certificate of Service

I, Victor M. Glasberg, certify that on December 17, 2021, I filed the above Amended Complaint with the clerk of the court using the ECF system.

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

Counsel for plaintiff