UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA


(Alexandria Division)


JANE DOE,                        )
                                )
       Plaintiff,             )
                                )
v.                            )  Case #1:21-cv-1150 (AJT/JFA)
                                )
FAIRFAX POLICE OFFICER #1, *et al.*  )
                                )
       Defendants.

---

## OPPOSITION TO THE SUPERVISORY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Victor M. Glasberg, #16184
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
nsr@robinhoodesq.com

Counsel for Plaintiff

Table of Contents[1]

I.    Doe's Statement of Facts Material to Defendants' Motions. . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  Sanchez Ran a Sex Trafficking Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   B.  Sanchez Coerced The Women She Trafficked into Prostitution by Threat  . . . . . . . . . 5

   C.  Doe Was Victimized by Sanchez's Trafficking Operation . . . . . . . . . . . . . . . . . . . . . 5

   D.   Doe Has Adduced Admissible Evidence That ███████████
                              ██████████████ Benefitted From Sanchez's Venture. . . . . . . . . . . . . . . . 7

   E.  Doe Has Adduced Evidence That ████████████████
       Interfered and Conspired to Interfere With Enforcement of
       The Trafficking Victims Protection Reaauthorization Act. . . . . . . . . . . . . . . . . . . . . 10

II.   Response to Defendants' Allegedly Uncontested Material Facts . . . . . . . . . . . . . . . . . . . 13

   Averment #24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   Averment #25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   Averment #31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   Averment #32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   Averment #33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   Averment #50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

---

[1]In accordance with the Court's order of October 4, 2022, (ECF 193), plaintiff Doe files separate briefs in opposition to the motions of (1) defendants Barbazette and Mardocco and (2) the supervisory defendants.  Through Section I(C), at 8, and for most of Section III, at 17-24, Doe's briefs are identical.  In Section II, Doe addresses the movants' allegedly material uncontested facts, some of which differ as between the two defense briefs.  Only the instant brief addresses the claims against defendant Vincent Scianna.  Both briefs are supported by the identical documentary appendix filed herewith.  In the instant brief, except on page 2, the term "defendants" refers to defendants Roessler, Baumstark and Scianna.  On page 2, the term refers to all defendants in the case

III.    Defendants' Motions for Summary Judgment Must Be Denied . . . . . . . . . . . . . . . . . . . 16

Count II:  ███████████
            Interference With Enforcement of TVPRA
            18 U.S.C. §§1590(b) and 1591(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            ██████████████████████████████ . . . . . . . . . . . . . 18

            Defendant Scianna . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Count III:  ██████████
            Conspiracy to Interfere With Enforcement of the TVPRA
            18 U.S.C. §1594(b) and (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            As to  ████████████████████████████ . . . . . . . . . 21

            As to  ████████████ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Exhibits to Both Motions for Summary Judgment (Filed Under Separate Cover)</u>

1.     Doe declaration

2.     Alvarado declaration

3.     Doe interrogatory response

4.     FCPD Internal Affairs report on ███████

5.     FCPD Internal Affairs report on ███████

6.     Sanchez deposition (excerpts)

7.     Woolf declaration

8.     Sanchez plea

9.     Sanchez Statement of Facts

10.    Sanchez plea colloquy

11.    Scianna deposition (excerpts)

12.    Bacon declaration

13(a).  Epstein, *Discounting Women*

13(b).  Tuerkheimer, *Incredible Women*

14.    Alvarado discovery chart

15.    FCPD criminal investigative report on ███████

16.    FCPD criminal investigative report on ███████

17.    Roessler email to Woolf

18.    Doe deposition (excerpts)

19.    Barbazette deposition (excerpts)

20.    Woolf deposition (excerpts)

21.     - Sanchez emails

22.    FBI report (excerpts)

Defendants' motions for summary judgment should be summarily denied, with no hearing being necessary. Stunningly characterizing as "irrelevant"[2] material information from a known witness having critical, first-hand knowledge of the trafficking of plaintiff Jane Doe by Hazel Sanchez, and of the complicity in the Sanchez enterprise of four of the five named defendants, defendants' motions do not and cannot avoid that material facts remain in dispute, rendering summary judgment unavailable under elementary principles of FED. R. CIV. P. 56. As to the fifth defendant, Vincent Scianna, reasonable inferences from material factual contentions similarly preclude entry of summary judgment. This case should proceed to trial.

## I. Doe's Statement of Facts Material to Defendants' Motions

As required by Rule 56, at Part III of this memorandum, beginning at page 12, Doe responds to defendants' proffered "uncontested" facts. Defendants' factual default relative to their motions is so massive, however, that in order to present a coherent context for Doe's rejection of defendants' proffers, Doe first reviews, in orderly fashion, admissible evidence she will present at trial. As will appear, defendants rely on contentions which, whatever use they may be at trial where credibility will be at issue, are useless on summary judgment. At the same time, the defendants simply ignore dispositive evidence that dooms their motions.

---

[2]*See, e.g.,* Objections to Plaintiff's Proposed Trial Witnesses (ECF 180) at 1.

A. <u>Sanchez Ran a Sex Trafficking Operation</u>[3]







-3-





B.  Sanchez Coerced The Women She Trafficked into Prostitution by Threat

Some women trafficked by Sanchez, including Doe, came to the United States understanding that Sanchez could set them up for dates with wealthy men, and that *if they so chose*, they could also have sex with these men, get paid, and remit a portion of the pay to Sanchez.  PX 1 at ¶¶4-7.  But no sex worker has been identified who volunteered to become Sanchez's sex slave, forced to have sex, per Sanchez's demands, with up to 17 men per day, every day, and to do whatever the clients demanded, no matter how harmful or demeaning.  They acquiesced out of fear that they or someone in their family would be killed or hurt if they did not cooperate.  The account of witness Alvarado, PX 2 at ¶¶7-10, 16, complements the account of Doe, PX1 at ¶¶9-10,  in setting out aspects of the fear and compulsion under which these women worked for Sanchez until they finally escaped     Doe in 2015, Alvarado in 2016.

C.  Doe Was Victimized by Sanchez's Trafficking Operation

Like Ms. Alvarado, PX2 at ¶4, Doe was originally approached by a Costa Rican agent of Sanchez's to come to the United States to serve as a nanny.  The agent who approached Doe, a woman named Nicole, told her that Sanchez could also arrange for her to go out on fancy dates with wealthy men, and that if she liked her dates and it pleased her to do so, she could have sex

with her dates and be paid.  Having sought and received assurance from Nicole that this would

happen only if she wanted and agreed to it, Doe sent photos of herself in a sundress and in a

bikini for Sanchez to advertise her availability as an escort for such dates.  Doe understood that if

she had sex with a date secured for her by Sanchez, Sanchez would retain a portion of the money

paid by the date.  She was assured that she would not be required to have sex against her will.

She did not know where in the United State she would end up, and did not understand Sanchez's

proposed arrangements to be unlawful.  PX 1 at ¶5.[5]

Things did not turn out for Doe as Nicole had promised.  *See* PX1 at ¶¶9-11.  On her

arrival in the States, Sanchez brought her to an apartment in Fairfax, took her passport,

threatened her child were she not to provide sex to Sanchez's clients, and immediately started

bringing in men paying for sex.  Doe worked twelve hours each day, and sometimes later.  She

was prohibited from eating during working hours.  She was ordered not to leave the apartment.

Doe's sworn response to an interrogatory requesting information about her damages states the

following    none of which has been challenged:

---

[5] Before coming to the States, Doe, who has an ninth grade education, had no knowledge
of American laws on prostitution, which is lawful in Costa Rica, whence Doe comes, as it is in
Nevada. (Bills have been introduced in several American states and cities to decriminalize
selling sex, e.g.. https://olis.oregonlegislature.gov/liz/2021R1/Measures/Overview/HB3088;
https://www.mainelegislature.org/LawMakerWeb/summary.asp?ID 280080622;
https://komonews.com/news/local/seattle-city-council-repeals-problematic-prostitution-loitering-
law-affecting-minorities. *See generally*,
< https://www.insidehook.com/article/sex-and-dating/sex-workers-on-girlfriend-experience >;
<https://thenevadaindependent.com/article/the-indy-explains-how-legal-prostitution-works-in-ne
vada >. ) After fleeing Sanchez, Doe detailed to the FBI and to United States immigration
authorities her initial communications with Sanchez and all her commercial sex work in the
United States.  She was adjudged by both as a victim of trafficking by Sanchez and therefter one
█████████████, and thereupon secured a T-visa as a victim of crime.  PX 1 ¶¶19-20. (Doe's
dealings with ████ are addressed in Doe's motion *in limine* filed herewith, at 4-8.)

> My principal claim for damages is based on the physical abuse and
> emotional pain and suffering I endured for years while being
> trafficked.  I was forced to have sex with men up to (on some
> occasions) 17 times a day.  Sanchez required that I do what they
> demanded, and they often engaged in abusive behavior, including
> inserting objects and drugs provided by them or by Sanchez into
> my vagina, dropping hot candle wax on my body, and engaging in
> rough sex.  This happened hundreds of times.  I was forced to have
> sex while I was pregnant, and had a miscarriage as a result.  I
> frequently suffer pain when having sex.  I had no such pains before
> my trafficking by Sanchez.  I suffered devastating emotional
> distress as a result of what I was put through. . . .

PX 3 #24.  It is beyond credulity that Doe voluntarily submitted to such abuse, and there is no

evidence that she did.  Nor is there evidence that she profited financially from her sex work.

While she could earn thousands of dollars in a day for Sanchez, she was paid a fraction thereof

on the occasions she was directed temporarily to return to Costa Rica.  PX 1 ¶11.  Again, there is

no evidence to the contrary.



   D.  Doe Has Adduced Admissible Evidence That ██████████████
       ███████████████████ Benefitted From Sanchez's Venture

   It is undisputed that ████████████████████ had multiple contacts with

Sanchez and secured sexual services from her and innumerable other, unidentified, sex workers

over a period of years.  Exhs. 4, 5.  They deny, however, awareness that Sanchez was running a

sex trafficking ring.  ██████████████████████ deny having had any contact with

Sanchez or knowing of her sex trafficking ring.  It will be the prerogative of ████████

████████ so to contend at trial.  But their say-so is insufficient on summary judgment.  Apart

from Doe's identification of ████████████ as clients of the Sanchez ring, PX 1 ¶¶22-28,  Ms.

Alvarado, another of Sanchez's victims, has categorically identified ████████████████ as

clients who were aware of the nature of Sanchez's operation from what they saw with their own eyes, in her presence, and who provided the venture with protection.  PX 2, ¶¶ 32-52.[6]   The resulting credibility conflict is grist for a jury, not summary judgment.

Given counsel's styling of Ms. Alvarado's testimony as "irrelevant,"[7] it is appropriate to note that two months before discovery closed, Doe's counsel made full disclosure of her availability, areas of knowledge, and full contact information     details unknown to Doe herself, who years before had known her fellow trafficking victims solely by the names assigned them by Sanchez.  PX 1 ¶2.  It is with the instant filing that Doe will learn for the first time of Ms. Alvarado's knowledge as it relates to the involvement with the Sanchez operation of four of the five defendants.  Doe learned in July 2022 only that Ms. Alvarado, years before known to her as Vanessa, had contacted her counsel and identified herself as one of Sanchez's victims.  *See* PX 2 ¶58. Doe's counsel immediately disclosed this information, plus Ms. Alvarado's address and telephone number, to defendants.  Counsel disclosed that Ms. Alvarado had information about the Sanchez venture, its operation and the provision of protection to the venture.  The disclosure specified that ██████████ were clients of the Sanchez venture regarding which Ms. Alvarado

---

[6]At her deposition, Sanchez invoked the Fifth Amendment to refrain from answering whether she knew ██████████████████████████, whether she recognized them in photographs, whether they were her clients or clients of other women in her commercial sex venture, and whether they offered or provided any kind of protection from law enforcement.  PX 6 at 27:5- 40:3.  At a hearing on Sep. 23, 2022, Magistrate Judge Anderson denied defendants' motions to compel Sanchez to answer, observing that this will be a matter for trial.  ECF 172, *see also* ECF 194.

[7]Objections to Plaintiff's Proposed Witnesses,  ECF 180 at 1.

had information.[8]  Doe remained ignorant of these details.[9]  And so, apparently, did defendants, as they ignored the disclosures.  Doe also made disclosure of numerous FBI documents and other details supporting Ms. Alvarado's contentions.  PX 14.  Defendants did not follow up on Doe's disclosures of first-hand evidence ███████████████████████ to Sanchez.[10]

Whatever the reason, on the instant motion the result is defendants' problem, not that of Doe, who made all necessary and appropriate disclosures and discovery required of her.

---

[8]PX 14 sets forth an itemization of Doe's multiple disclosures and discovery at issue.  Doe will file the referenced disclosure and discovery documents should defendants take issue with her summary offered herewith under FED. R. EVID. 1006.

[9]At her deposition, Doe could not respond, because she did not know, who Cindy Alvarado or Zadie Fernandez were, since she had known the other trafficked women years earlier only by the names used by Sanchez.  The undersigned explained why he had nevertheless produced the names and contact information for these potential witnesses:

> I deem it my obligation to provide contact information, whether
> useful or not, for any person who might be responsive as a matter
> of disclosures, if I come up with it, regardless of whether my client
> has come up with it or even knows it.  So those entries are entries
> that I've submitted as a matter of disclosures of people who know
> whatever or may know whatever it is that is referred to in that
> category of disclosure.  The Plaintiff may not know these details,
> but I think I've got to make the disclosure.

On being asked, the undersigned confirmed that the woman Doe had known as "Vanessa" was the Cindy Alvarado identified, with full contact information, in Doe's July 11, 2022 disclosures as soon as she became known to counsel. PX 18 at 279:3 - 280:12.

[10] Ms. Alvarado was objected to as a witness on the ground that her testimony would be irrelevant.  ECF 180 at 1.  (It is possible that counsel made a deliberate choice not to alert Ms. Alvarado to what she might face on cross-examination at trial.  It is not unheard of to decline to depose key witnesses whom one proposes to try to impeach in front of a jury.)

E. Doe Has Adduced Evidence That ██████████
    Interfered and Conspired to Interfere With Enforcement of
    The Trafficking Victims Protection Reaauthorization Act

Doe will not try to prove that ██████████████████████████████

She presents here, however, and will present at trial, evidence sufficient to implicate defendant

Scianna in an effort to interfere with enforcement of the Trafficking Victims Protection

Reauthorization Act ("TVPRA"), ████████████████████████████

████████████████████████████████████████████████

██████████████████. Specifically, Doe relies on the evidence of William Woolf, the

former Fairfax police detective uniquely charged, in the period 2013-16, with investigating sex

trafficking.  Det. Woolf will testify at trial that he was disparaged and discouraged by defendants

Barbazette, Baumstark and Roessler relative to his sex trafficking investigatory work.  He will

testify that this intimidation culminated in his feeling so threatened that he gave this work up

shortly after having confirmed, on demand by then-Chief Roessler, that he was "on board" with

defendant Scianna's insistence that he abandon this work.  Specifically, Woolf has confirmed in

deposition, and will testify at trial:

*       That defendant Barbazette was hostile to him and made it difficult for him to take

        effective law enforcement action against Fairfax sex traffickers. ████████████

████████████████████████████████████████

██████████████████████████████.[11]

---

[11]At the time, Det. Woolf had no information ████████████████████████

\*        That when he presented his difficulties with defendant Barbazette to Barbazette's

supervisor, defendant Baumstark, and told him as well that trafficking victims

who trusted him had reported to him that FCPD police officers were protecting

and extorting sex from sex trafficking enterprises, defendant Baumstark directed

him to forget it and ignore what he had been told.[12]

\*        That in February and March 2016,  defendant Scianna interviewed Det. Woolf,

who held a pilot's license, about having flown a private plane on police business,

something he had done notwithstanding having been directed not to do.

Defendant Scianna recorded his interviews.  After the final interview, defendant

Scianna turned off the recording device and said the following to Det. Woolf:

"You know what this is really about, don't you.   If you keep your mouth shut and

don't utter the words 'human trafficking' again, all this will disappear, everything

will go away and all the paperwork will disappear. You have six kids.  You have

to think about them."

PX 7 ¶¶ 8-11, 14.

Defendant Scianna has denied having said the above, or anything that might have been

misinterpreted as such, to Det. Woolf.  PX11 at 94:16-96:3.  But a second officer who attended

the interview, former Lt. James Bacon, confirms that defendant Scianna did indeed say those

words after turning off the recording device.  PX 12 at ¶10.  Whether defendant Scianna made

these grossly inculpatory statements is grist for the jury, not this motion.

---

[12] At the time, Det. Woolf had no information ██████████████████████

Det. Woolf will testify that fearful of defendant Scianna's threat, he told defendant Scianna: "I'm on board."  Det. Woolf will testify that about two days later, he received a telephone call from then-Police Chief Roessler, who told him "I need to make sure you're willing to play ball."  Det. Woolf will testify that he had no "ball-playing" issues pending with Chief Roessler other than those broached by defendant Scianna; that he answered "yes sir," and that Chief Roessler hung up.[13]  PX 7 ¶¶17-18.  Shortly thereafter, Det. Woolf confirmed to Lt. Bacon as well that he was no longer going to work on sex trafficking cases.   PX 12 at ¶11.   After departing the Fairfax Police Department shortly thereafter, Det. Woolf turned his full time and attention to sex trafficking issues, serving as Director of Human Trafficking Programs for the United States Department of Justice, as Special Advisor for Human Trafficking to the White House, as Senior Advisor on Human Trafficking to the Office of the Assistant Attorney General, and as the founder and Executive Director of the Just Ask Trafficking Prevention Foundation. PX 7 ¶ 21.[14]

All the above will be adduced as evidence at trial.  Defendants' motions for summary judgment are presented as though the above did not exist, and that is fatal to their motions.

---

[13]At the time, Det. Woolf had no information ███████████████████

[14] Defendants emphasize that when he resigned, Det. Woolf was under the cloud of an investigation regarding excuses he had inappropriately made as to why he had to cancel a speaking appearance in another state.   At best for defendants, this yields credibility issues to be addressed in due course by a jury.  Now, on summary judgment, what the Court has before it is what Det. Woolf says he was told by four of the defendants.

II.  Response to Defendants' Allegedly Uncontested Material Facts

Defendants' motion is predicated on proffers belied by the admissible evidence summarized above that they have simply ignored.  Another large swath of defense proffers presents collateral data that may, if admitted, avail defendants at trial, but on this motion emerges as inconsequential given the admissible evidence Doe presents herewith.  Specifically, defendants' allegedly material uncontested facts fall into several categories, as follows:[15]

1.  Uncontested and material: 1 - 7, 14, 18, 20, 49-52, 55, 56.

The parties are agreed that these facts bear upon the merits of the motion at bar.

2.  Uncontested and immaterial: 8-13, 15-17, 19, 21-23, 26-31, 34-48, 53, 54, 57-63.  Doe respectfully submits that these averments, some of which may raise credibility issues at trial, have no bearing on the merits of the motion at bar.

3.   Contested and material: 24, 25, 31, 32, 33, 50.  Doe contests these averments, as follows:

Averment #24.  While Det. Woolf "continued to work on trafficking cases," his work along these lines was grossly truncated in comparison to what it had been before.  He states:

---

[15]Several allegedly material uncontested facts presented by the supervisors are inappropriately nuanced in a manner to favor the defense.  Doe challenges such averments here only if the inappropriate nuance is sufficient to make the averment unfairly misleading, since on summary judgment, reasonable inferences are to be drawn in favor of the party opposing the motion, not the moving party.  Averments uncontested by Doe for purposes of this motion may be contested at trial.

With a single exception, following my discussions with Lt. Scianna and Chief Roessler, the only sex trafficking work I did on behalf of FCPD was supportive work in response to requests by FCPD colleagues, whether in person or via email.  I stopped all pro-active work along these lines, with one exception no longer served as an FCPD sex trafficking investigator, and brought no more trafficking cases to court.  A fortuitous exception was when a patrol officer called for assistance from a detective in an apparent trafficking case involving a 17-year old high school girl.  This was in October 2016.  I happened to be the detective on duty and responded to the call.  I did everything I could to work up the case so as to retain a legitimate and defensible involvement in it, despite having been taken off this work.  I recall feeling how ironic it was when I received kudos from my superiors for my efforts on this case.

PX 7 ¶19.

Averment #25.  Doe agrees that Woolf did not "know" Sanchez or work up a criminal investigation against her.   However, the cited reference does not support the claim that "[d]uring his employment with the FCPD Woolf received no information upon which a criminal investigation could have been initiated as to either the Plaintitff or Sanchez."   Woolf states:

I do not recall whether, during my tenure at FCPD,  I came across Hazel Sanchez Cerdas as principal of a sex trafficking operation. Normally, true names were not used, and the participants operated under pseudonyms or nicknames.   Many of the trafficked persons I worked with, and many of the persons trafficking them, were from Central or South America and spoke with a Spanish accent.  My work involved developing relationships of trust with cooperating sex workers, who would then give me information on the basis of which I could proceed with an effort to expose and charge the ringleaders.  I never charged Hazel Sanchez Cerdas. ***  The names Andrea Fairfax, Sonia, Vicky, Lorena, Vanessa, Demaris, Valerie, Gigi, Margarita, Nicky, Diana, and Paloma sound familiar as Fairfax sex workers, but I cannot place them.

PX 7 ¶¶6, 7.

-14-

Averment #31.  Doe lacks direct evidence that defendants Scianna and Roessler communicated about Scianna's March 2016 warning to Woolf to stop talking about sex trafficking.  Reasonable inferences from the circumstances set forth at 8-10, *supra*, suggest that such communication took place, and are sufficient to render the matter one for the jury rather than for the Court on summary judgment.  *Richardson v. Combs*, 40 Bank. 148 (W.D. Va. 1984), *aff'd,* 838 F.2d 112 (4th Cir. 1988).

Averment #32.  The cited reference does not support the claim that *according to Doe*, an effort was made to get Woolf "to stop speaking publicly" about human trafficking.  Does's claim, set forth in ¶35 of the second amended complaint (ECF 61) at ¶35, is that the effort was to get him "to back off investigation into sex trafficking in Fairfax."  Det. Woolf himself testified that he understood defendant Roessler to require him not only not to talk publicly about human trafficking, but not to do "anything related to human trafficking that would be public or externally facing."  Supervisor's SJ PX 4 at 271:16 - 272: 7.  Thereafter, Det. Woolf told his former supervisor that he was no longer going to be working on sex trafficking, PX 12 ¶11, and stopped all proactive trafficking work, responding only in-house to his colleagues, as requested. *See* the portion of Woolf's declaration, PX 7 ¶19, quoted in relation to averment #24, *supra* at 14.

Averment #33.  Woolf's "interpretation" of what he was being directed no longer to do was not limited to "giving media interviews or conducting training or community-based presentations on human trafficking," although it included those things.  *See* response to averment #32, *supra.*  As he told his former supervisor, PX 12 ¶11, he understood that he was done with sex trafficking at FCPD.  Det. Woolf's "interpretation" caused him to stop all outward-facing sex

trafficking work and limit his work in that regard to in-house support when requested by his

FCPD colleagues.  He turned over the approximately 40 sex trafficking leads he had been

pursuing to his replacement as the department's new sex trafficking investigator, Det. John

Spata.  It was only after he left the police department that he returned to what had driven him in

his professional work.  PX 4 ¶¶20, 21.

     <u>Averment #50</u>.



the FBI simply informed FCPD that the United States Attorney's Office,

having found no probable cause that a corruption case had occurred, was not going to prosecute

against those officers.  Supervisor's Exh. 23 at 39:3-8.  The FBI remanded the case to the

officers' department for further action.[16]


     III.  <u>Defendants' Motions for Summary Judgment Must Be Denied</u>

     Respectfully, Doe submits that defendants' motion should be summarily denied, as their

proffered "undisputed material facts" are either disputed, or collateral and immaterial for

purposes of Rule 56,  given Doe's evidence set forth here, dispositive on defendants' motion.

---

[16]The Court can take judicial notice that numerous factors other than the merits bear upon the government's decision whether to prosecute, and if so, for what crimes.  In this case, a corruption case developed by federal authorities against two police officers was referred for appropriate action to their own police force (from which the officers promptly resigned with pensions intact), even as the federal authorities proceeded against the trafficking ring's principal, whom the officers frequented.  *See also,* Doe's Motion *in Limine* filed herewith, at 8-10.

The motions simply ignore, wholesale, material averments, presented by competent witnesses, that preclude entry of summary judgment on their behalf.   This is a matter of elementary law under FED. R. CIV. P. 56 and need not be belabored.

The parties' conflicting versions of reality must be tested by a jury.  This is beyond cavil as to ████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[17] ███████████████████████████ what is dispositive here is that on summary judgment, all facts and reasonable inferences must be construed in favor of Doe, the party opposing the motion.  It is for a jury to decide who is telling truth regarding the disciplinary interview addressing Det. Woolf's having flown an airplane on police business.  Det. Woolf and former Lt. James Bacon both avow that Lt. Scianna did indeed say, off the record, what Lt. Scianna categorically denies having said in any way, shape or form, to the effect that the potential difficulties arising out of Det. Woolf's private plane flight would "disappear" if Det. Woolf dropped his pursuit of sex trafficking.  Lt. Scianna's statement must be read in the context of Det. Woolf's testimony regarding the efforts of defendants Barbazette and Baumstark to inhibit his sex trafficking work;  in the context of the follow up telephone call from defendant Roessler seeking confirmation that he was "playing ball";  ██████████████████

████████████████████████████████████████████████████████████

---

[17]Whatever weaknesses or inconsistencies in Doe's identifying evidence are focused on by defendants, her credibility is a matter for the jury to assess, properly informed regarding the traumatizing nature of sexual exploitation   *see, e.g.,* Epstein *et al., Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, and Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount,* both attached as Exhibit 13.  (Doe's expert on sex trafficking will address these matters.)  Regardless of any assaults on Doe's credibility, that of Ms. Alvarado has not been put at issue.  Her detailed declaration, PX 2 ¶¶ 35-52, suffices, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████; and in the context, finally, of Det.

Woolf's confirmation to Lt. Bacon shortly thereafter that he was abandoning his sex trafficking

work.[18]

Given the Court's adjudications of the motions to dismiss in this case (ECF 60 & 70), and

given the factual record before the Court, it is unnecessary to dwell at length on the legal

sufficiency, for summary judgment purposes, of Doe's claims.

Count II:  All Defendants
           Interference With Enforcement of TVPRA
           18 U.S.C. §§1590(b) and 1591(d)

███████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

---

[18]This was demonstrably not the result of Det. Woolf's losing interest in that issue, witness his subsequent employment and activities. Following his departure from FCPD, he held high-level positions in the United States Department of Justice and the White House, all addressing sex trafficking.  PX 7 ¶2.



[20]

Defendant Scianna

As to him, the issue is whether, after turning off the device recording his questioning of Det.

Woolf about his unauthorized flying of his plane, he told Det. Woolf, off the record:  "You know

what this is really about, don't you.  If you keep your mouth shut and don't utter the words

---

[19]Numerous FCPD general orders mandate the self-evident obligations of law enforcement officers to enforce the law.  This no arcane principle; the orders are publicly available online, *see* https://www.fairfaxcounty.gov>GeneralOrders>GOs.  *See*, *inter alia*, ##201 (General Responsibilities); 204 (Administrative Activities); 205 (Orders); 301 (Internal Investigations); 303 (Criminal Investigations of Department Employees); 501 (Investigative responsibilities); 530.7 (Crime Analysis Unit); 538 (Crime Prevention Unit); see also #001 (Truthfulness).

[20]None of this should come as a surprise to the defense.  As set forth at 9-10 *supra* and in Ms. Alvarado's declaration, PX 2 ¶ 58, Doe's counsel, having unexpectedly learned the name, address, and phone number of this accessible witness,                          immediately disclosed this to defendants. PX 14.

'human trafficking' again, all this will disappear, everything will go away and all the paperwork will disappear. You have six kids.  You have to think about them."

Defendant Scianna categorically denies having said this or anything that might have been misinterpreted as such.  PX11 at 94:16-96:3.  Det. Woolf and Lt. James Bacon say otherwise. PX 7 ¶ 15; PX 12 ¶¶ 8, 10.   The following day, fearful of defendant Scianna's warning, Det. Woolf told him: "I'm on board"  and thereafter confirmed same in an unsolicited call from then-Chief Roessler.  PX 7 ¶18.  He also told Lt. Bacon that he was abandoning his sex trafficking work   work that had consumed his professional life for some years, and to which he returned full-time upon leaving the police department not long thereafter.  PX 12  at ¶11; PX 7 at ¶21.

It is conceded that defendant Scianna was not in Det. Woolf's chain of command, not in the Internal Affairs unit investigating reported violations by officers, and not otherwise involved professionally in addressing sex trafficking. PX 11 at 107:12-20.  Given Det. Woolf's account of discouragement and interference with his sex trafficking work, PX 7 ¶¶8-11, and the confirmation call about "playing ball" he then received from Chief Roessler, it is a fair inference to be drawn that defendant Scianna gave him this off-the-record warning as part of a concerted effort to shut Det. Woolf's sex trafficking work down.   Given that Det. Woolf was the sole designated sex trafficking investigator within FCPD, a jury could readily find that this off-the-record warning constituted interference with the enforcement of the TVPRA.[21]

---

[21]Why defendant Scianna would deny making his off-the-record statement is clear enough.  More of a mystery is why he denied when Det. Woolf became emotional.  According to defendant Scianna, Det. Woolf teared up immediately on being reprimanded for having flown his plane against direct orders.  PX 11 at 120:12-18.  This is not true.  At all times during the recorded interview, Det. Woolf was calm and professional. This is not simply a matter of recollection by Det. Woolf, PX 7 ¶ 14 and Lt. Bacon, PX 12 ¶9.   The recorded interview reveals nothing of the sort.  If defense counsel contest this on rebuttal, the undersigned will file the

Count III: ███████████
        Conspiracy to Interfere With Enforcement of the TVPRA
        18 U.S.C. §1594(b) and (c)

███████████████████████████████

As set forth in Count III of the Second Amended Complaint (ECF 61 at 15), defendants

conspired "with each other *and others*" to obstruct, interfere with and prevent the enforcement of

the TVPRA. ████████████████████████████

█████████████████████.[22] ████████████████████

███████████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████

        ██████████████████████████████

███████████████████████████████████

████████████████████████████ A conspiracy plaintiff need not allege    or even

produce direct evidence of    "a meeting of the minds" among the defendants, only of specific

circumstances that permit the reasonable inference "that each member of the alleged conspiracy

recordings of the interview with the court, which can then listen to over an hour of interview,
waiting in vain for Det. Woolf's alleged emotionalism.   It was after the recording was turned off
and Det. Woolf told what this was "really about," and that the charges would go away if he
would abandon his sex trafficking work, that he teared up.  That defendant Scianna misrepresents
both these material points bears not only mightily on his credibility, but supports the inference of
his acting in concert with others to terminate Det. Woolf's sex trafficking work.

[22] ████████████████████████████████
████████████████ | | ████████████
████████████████████████

-21-

shared the same conspiratorial objective." *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 658 (4th Cir. 2017).  Indeed, "it is not necessary to prove that each participant in a conspiracy know the exact parameters of the plan, [only that] they must at least share the general conspiratorial objective." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983), cited with approval in *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 421 (4th Cir. 1996).

"[A] common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *T. G. Slater & Son., Inc. v. Donald P. and Patricia A. Brennan LLC,* 385 F.3d 836, 845 (4th Cir. 2004) (claim that defendants "or others" conspired to deprive plaintiff of a fee states conspiracy claim).  *Cf. Commercial Bus. SYS., Inc. v. Bellsouth Servs., Inc.*, 249 Va. 39, 48 (1995) ("A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means.")

> [T]he elements of a conspiracy are rarely established through means other than circumstantial evidence, and summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided.  \*\*\*  The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy.

*Solomon v. Petray,* 795 F.3d 777, 789  90 (8th Cir. 2015).

> [T]he question of the existence of a conspiracy to deprive the plaintiff of his [] rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims.

*Holmes v. Slay,* 895 F.3d 993, 1001 (8th Cir. 2018); *see also United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 19891), *cert. denied,* 493 U.S. 809 (1989).

Doe's factual rejoinder to defendants' motion is more than sufficient to send to the jury the issue of the conspiracies ███████████████████████████████████████

### As to Defendant Scianna

The argument for defendant Scianna's participation in a conspiracy to interfere with enforcement of the TVPRA is based on the same facts and inferences supporting the claim of his personal liability for that interference.  Det. Woolf has testified that shortly after being warned off sex trafficking by defendant Scianna, he received a call from Chief Roessler asking him if he was going to "play ball" and that at the time he had no issues then pending with Chief Roessler, and was aware of no "ball playing" at issue other than his complying with the directive given him by defendant Scianna to drop his sex trafficking work.[23]  Given the context in which defendant Scianna's warnings emerged, it is a fair inference to be drawn that defendant Scianna's warning was made in concert with others keen to shut down Det. Woolf's investigatory work, as promptly confirmed by the Chief Roessler's telephonic inquiry.  This is more grist for a jury, not something to be decided as a matter of law by the Court.

---

[23] It was not in March 2016 but seventeen months later that Chief Roessler ordered Det. Woolf no longer to speak to the press about sex trafficking, something Det. Woolf had continued to do in what he deemed his non-police capacity, as principal of his non-profit organization addressing sex trafficking.  PX 17; PX 7 ¶21.  In March 2016, what was at issue was defendant Scianna's off the record threat following his interview of Det. Woolf. PX 7 ¶18.

-23-

<u>Conclusion</u>

For these reasons, defendants' motion for summary judgment should be denied.

Respectfully submitted,

JANE DOE,

By counsel

Dated:   October 28, 2022

Counsel for Plaintiff:

<u>//s// Victor M. Glasberg</u>
Victor M. Glasberg, #16184
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
<u>vmg@robinhoodesq.com</u>
<u>nsr@robinhoodesq.com</u>
**DoeJane2021Peadings\2022-1028-OppSuperMSJ**

-24-

<u>Certificate of Service</u>

I, Victor M. Glasberg, hereby certify that on this 28th day of October 2022, I electronically filed the foregoing Opposition to The Supervisory Defendants' Motion for Summary Judgment with the clerk of the court.

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

Counsel for Plaintiff