UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case #1:21-cv-1150 (AJT/JFA) |
| | ) |
| FAIRFAX POLICE OFFICER #1, *et al.* | ) |
| | ) |
|     Defendants. | ) |

<u>DECLARATION OF CINDY VANESSA ALVARADO</u>

I, Cindy Vanessa Alvarado, declare under penalty of perjury that the following is true and based on my direct personal knowledge:

<u>Background</u>

1. I was born in San Jose, Costa Rica in 1982. I have lived continuously in the United States since May 2012 and have been a permanent resident since June 2021. I live in West Palm Beach, Florida. I am a Survivor Mentor with the Fort Lauderdale Independence, Training & Education (FLITE) Center, a non-profit institution offering comprehensive services for youth aging out of foster care. I counsel and mentor victims of human trafficking, and provide training and education on trafficking.

2. In approximately 2005, I was working in a real estate call center in San Jose, Costa Rica, where I met Griselle Mouta. Ms. Mouta was in a relationship with the son of Hazel Sanchez. In approximately 2006, Ms. Mouta introduced me to Ms. Sanchez. I recall that Ms. Sanchez's mother lived two houses away from where I lived.

PLAINTIFF'S EXHIBIT 2

3. In about 2009, when Ms. Mouta's daughter Madison was of age to begin formal schooling, Ms. Mouta moved to Virginia. She and I kept in contact with each other. At the time, I thought of her as my friend.

4. In the Fall of 2010, I was 28 years old. I had been battling throat cancer and had lost my job at the call center. I confided in Ms. Mouta regarding these problems. She told me that she and Ms. Sanchez were planning to travel to New York for some time, and that she was looking for someone to look after her daughter in Virginia while she was away. Ms. Mouta told me that Ms. Sanchez would pay me $1,000 to work as her granddaughter's nanny, pay for my airfare, and pay any costs associated with obtaining my visa. I agreed, and thereupon received an airline ticket from Ms. Sanchez.

5. On December 13, 2010, I flew into Dulles Airport. I expected to be picked up by Ms. Mouta, but she did not show up. I called her repeatedly over the course of 2½ hours, but was unable to reach her. I did not know what to do or where to go.

6. I finally heard someone calling my name. It was Ms. Sanchez. For reasons I did not understand, she appeared to be upset. She asked me for my passport, stating that she wanted to see my photograph. She did not return the passport to me. She then escorted me to her car. I assumed Ms. Sanchez was taking me to her home to see Ms. Mouta.

7. As Ms. Sanchez drove, she circled the same roundabout repeatedly. I asked her whether she was lost and she told me that she was not. Ms. Sanchez's phone then rang, and she told me that she had been waiting for what had just come through on her phone. She told me to take the phone and that what had come through on the phone was for me to see.

8. I took Ms. Sanchez's phone as instructed and opened a series of text messages. They consisted of photographs of my children, then 7 and 8½ years old, inside their classrooms in Costa Rica, and also of their father. There were also photographs of my then-boyfriend and my children leaving my house, and of my then-boyfriend at his workplace. I was astonished to see these photos on Ms. Sanchez's phone.

9. After asking me if I had viewed all the photos, Ms. Sanchez told me I had not been brought to the United States to babysit her granddaughter, as there were many people already in the United States who could babysit. She said I was brought to Virginia to provide sex to her friends and make them happy. I was horrified and scared. Ms. Sanchez made it clear, and I understood, that the photographs she had shown me of my children, their father and my boyfriend constituted implied threats that if I did not do what she told me to do, my loved ones would be harmed. I later learned that the photographer was Ms. Sanchez's brother, Rodolfo.

10. Ms. Sanchez drove me to her home. When we arrived, she introduced me to her husband, David Shaw. Ms. Sanchez told me that I could never have sex with Mr. Shaw. She told me that if he ever tried to offer me money for sex, I should inform her immediately.

11. Ms. Sanchez took me to an apartment complex in Fairfax, Virginia, called Avalon. It was about ten minutes from her home. The apartment was a 3-bedroom, 2-bathroom unit on the first floor.

12. Ms. Sanchez brought me into a bedroom inside the apartment. The room was dark except for a lamp emitting a red light. Ms. Sanchez opened a closet full of lingerie and high heels. Ms. Sanchez chose a flimsy outfit for me and began applying makeup to my face.

13. I continued to express my bewilderment at what Ms. Sanchez was saying and doing. I told her I did not understand what was going on. She told me not to be stupid and naive. She said that she was trying to give me a lucrative profession in the United States. She said that she had paid a lot of money to bring me from Costa Rica and that I owed her. She told me that she would break me down, and that she had someone to do it. She told me that I would henceforth be known as Valerie.

14. Soon thereafter, someone knocked at the door of the apartment and a man came in. Ms. Sanchez introduced me to the man as Valerie and told him to have fun. I was forced to have sex him. He was followed by several other customers that day.

15. I had sex with many customers each day. When I objected, Ms. Sanchez would make statements such as, "you don't want anything bad to happen to your kids, right?" I understood these statements to be threats of harm to my children if I did not participate in her sex business.

16. I did not know what to do. I was scared for myself and especially scared for my children. I did not have my passport. I felt compelled to do what Ms. Sanchez ordered me to do, which was to have sex with as many men as she arranged for me, and to do what they wanted. So I complied. Some days I had sex with more than a dozen men in a day, and on some occasions, considerably more.

17. In December 2010, on the last day of my initial stay in Virginia, Ms. Sanchez took me to a mall and bought clothing for me and my children. She told me that the items she purchased were my payment for the services I had provided to her clients. She told me that I would be informed when to return to the United States.

18. Ms. Sanchez returned my passport and provided me with a ticket to Costa Rica. When I arrived at my home, a man waiting outside my house called my name and introduced himself as Ms. Sanchez's brother, Rodolfo. He told me that Ms. Sanchez was pleased with my services; that he was the one who had taken the photos of my children, their father, and my boyfriend; that he would take care of my children in my absence; and that he lived two miles away from my house. He handed me a plane ticket to return to the United States in January.

19. Following my return to Costa Rica, I went to the police to report what was happening to me. The police told me that they would do nothing to help me, as prostitution was legal in Costa Rica. They were not concerned that I was being forced by threats against my children. I felt even more helpless after having been turned down by the police.

20. Out of fear for my children and myself, I returned to Virginia as directed and continued providing sexual services for Ms. Sanchez's clients. Ms. Sanchez took my passport and once again kept it from me until directing me to return to Costa Rica again. Whenever I returned to Costa Rica, Rodolfo would deliver plane tickets to my home and tell me when to be at the airport for my next trip. The documents he gave me showed that the tickets were purchased with a credit card held by Ms. Sanchez or her husband Mr. Shaw.

21. On my first trip to Virginia in December 2010, I was the only woman working for Ms. Sanchez out of the Avalon apartments in Fairfax. However, on subsequent trips, there were several of us working and living in the apartment at one time. Women were being constantly sent back to Costa Rica and arriving from there. I was hardly ever there with Jane Doe, whom I knew as Diana, as Ms. Sanchez kept us apart after it was clear to her that Diana had sought to assist and protect me, as I note below.

<u>The Mechanics of Sex Trafficking</u>

22.  Ms. Sanchez set up most of the appointments with the clients we were forced to service.  Ms. Sanchez used websites, including but not limited to Backpage.com and Eros.com, to place advertisements of myself and other women, including herself.  Attached hereto as Exhibit 1 is such an ad for "Paloma," one of the women who worked with me in the Avalon apartments, and Ms. Sanchez, who was known as "Andrea."

23.  Ms. Sanchez charged higher prices for services for customers who booked through Eros.com.  Eros.com was a paid service, and Eros clientele were generally wealthier men with careers as government professionals, lawyers, and doctors. Ms. Sanchez arranged for a professional photographer in Richmond to photograph women whom she planned to post on Eros.com.  The women who were photographed were driven from Richmond by Ms. Sanchez's son, Eddie.  I was not featured on Eros.com.

24.  Backpage.com was not a paid subscription service.  Its clientele were typically less wealthy and less well-groomed than clientele from Eros.com.  Ms. Sanchez charged less for services on Backpage.com than she did on Eros.com, and the clients were sometimes less attractive and had poor hygiene.  Women who did not behave in accordance with Ms. Sanchez's orders had their ads placed on Backpage.com as punishment.

25. Ms. Sanchez typically placed internet ads for sexual services every morning when she came to the apartment.  If she was busy, Ms. Mouta placed the ads.   They would often post ads as well in the afternoon.   On some occasions, when neither Ms. Sanchez nor Ms. Mouta was able to place the ads, Ms. Sanchez directed me to do so.  I did so out of fear.

26. We were directed not to leave the apartment, and did as we were told. We were not allowed to cook in the apartment during working hours. Normally, we were required to eat before 8 AM and after 8 PM. Overnight clients were seen elsewhere.

27. Clients paid in accordance with how much time they spent with us. Sometimes they took us on "dates," following which we typically had sex, either in Ms. Sanchez's apartment or a place of the client's choosing. In Virginia, the in-house hourly rate for Eros.com clients was usually $400. We did not keep any of the money that clients paid for our services. Ms. Sanchez would come by the apartment at mid-day and again at night to collect the money paid by the clients. The sex workers, myself included, routinely made several thousand dollars a day for Ms. Sanchez. We kept none of it.

### Women in Trafficking Ring/ Jane Doe

28. I began to meet other women on my second trip to the U.S., in January 2011. Ms. Sanchez did not allow us to be friendly with each other, however, and generally we acted accordingly out of fear. I never learned the true names of most of the women with whom I lived and worked. We knew each other by the names given us by Ms. Sanchez and posted online.

29. If Ms. Sanchez became aware that women became friendly, they were no longer allowed to work in the apartment at the same time. For this reason, I was kept separate from Diana ("Jane Doe"), who befriended me and told me that Ms. Sanchez was dangerous and that I should do what she demanded, for fear of retaliation. I recall that she explained the eating rules to me as well. Another sex worker told me that she knew Ms. Sanchez since childhood in Costa Rica, that she was very dangerous, and that she had threatened to harm her mother if she did not

do as Ms. Sanchez demanded. Like the information I received from Diana, this intensified my fear of Ms. Sanchez. All the sex workers had similar stories and fears.

30. Ms. Sanchez occasionally manufactured email messages supposedly coming from the women working for her. In front of my eyes, she would log into another woman's email account and write emails to herself as if she were that women. The emails would solicit sex work. Ms. Sanchez would then reply back to the email herself, using her name Andrea. Ms. Sanchez explained that she wanted to establish that the women were engaging in prostitution voluntarily.

31. All of us working for Ms. Sanchez were scared of her and of what she would do if we failed to cooperate with her. I recall Ms. Sanchez's telling me and some of the other women at one point that Diana ("Jane Doe") claimed to have become pregnant and no longer wanted to work for her. Ms. Sanchez told us she was going to show us what happens if we did not want to work for her anymore. In front of me and other women, she sent emails to Diana's ex-husband, to the father of her son, and to the principal Costa Rican TV stations, stating that Diana was a prostitute in the U.S. That was not the worst of what she did to uncooperative women, as I later found out myself.

Ms. Sanchez's Clients

32. Ms. Sanchez told me that before opening her own business, she worked as a prostitute for Jose Defitt Martinez out of New York City, and that when he moved his business to Fairfax, Virginia, Ms. Sanchez and her husband followed. She continued to see clients for Mr. Defitt.

33. Ms. Sanchez told me that while working for Mr. Defitt in Fairfax, she had a client named Ed to whom she expressed a desire to set up her own commercial sex operation. She told me that Ed agreed she should do so, and in or around 2010 helped her negotiate her way out of working for Mr. Defitt. That is when she set up her own prostitution business. She told me that Ed suggested that she secure a lease under her husband's name rather than her own name, and that she did so.

34. The clients whom Ms. Sanchez booked for me and other women worked in various professions. Most men came for individual sex, but there were also "parties," where we were expected to hang out with minimal clothing on while the men would take drugs and drink alcohol and after a while pick one woman or more to have sex with.

35. We had several clients who said they were Fairfax County Police officers. Ms. Sanchez often bragged to me and the other women working for her that she had the protection of the Fairfax police. She said that these officers provided her with protection so that she could avoid detection and continue operating her prostitution ring. I recall several of these police officers specifically, and address them below.

36. I recall one client who used to call me "baby girl." Initially, I called him "boy," but Ms. Sanchez told me that his name was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

37. I had sex with ▮▮▮▮▮▮▮ at least two times while working for Ms. Sanchez in Virginia. I remember him in particular because he wanted me to perform sexual acts that were extreme and hurtful. I did not see him more often. He told me that I was "too delicate" for his liking and that Ms. Sanchez had to bring a "breaker" in for me. A "breaker" is a man who demands extreme sexual services from women. If the woman can make it through the experience, she will presumably not have an issue providing the same sexual services with other men. ▮▮▮▮▮▮▮ also complained to Ms. Sanchez in my presence about my services.

38. ▮▮▮▮▮▮▮ did not tell me he was a police officer. It was Ms. Sanchez who told this to me. She also told me that since ▮▮▮▮▮▮▮ worked the streets in his role as a police officer, he could provide thugs to intimidate a sex worker if she misbehaved. I did not know if this was true, but I had no reason to disbelieve it, and it scared me.

39. ▮▮▮▮▮▮▮ told me he would help me if I got arrested. Specifically, he said that if I were arrested, he could help ensure that my deportation proceedings be completed rapidly so I would not have to sit in jail for months on end.

57. ▮▮▮▮▮▮▮ came to the apartment to have sex with other women who worked for Ms. Sanchez. I saw him going into bedrooms with other women at various times. I recall ▮▮▮▮▮▮▮ wearing pants I recognized as being part of a uniform worn by other Fairfax police officers who came to the apartment for sex. I remembered the dark color and material of the pants distinctly, as I was often directed by Ms. Sanchez or a client to sit on a client's lap, and the texture of the pants left a distinct imprint on my bare legs.

▮▮▮▮▮

40. When I first started working for Ms. Sanchez, I met a client I knew as ▮▮. I saw him for sex on several occasions. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

41. When I first met ▮▮ at the apartment where we worked, Ms. Sanchez introduced him as a regular client. When he entered, he and Ms. Sanchez hugged. I inquired of Ms. Sanchez whether she knew him personally. In response, she smiled and said that he was one of her "protectors." She told me to go with him and make him happy.

42. When we entered the bedroom, ▮▮, who had begun to undress, said that he was the protector not only of Ms. Sanchez, but of all the women who worked for her, as he worked in the police department. He said he would keep us out of jail and from being deported.

43. ▮▮ cautioned me to do what Ms. Sanchez required of me, stating that she was "crazy" and that if I did not do as she said, I would be harmed. He cautioned me not to say anything about what Ms. Sanchez was doing to anyone in Costa Rica, because Ms. Sanchez had people there who worked for her. After he finished telling me these things, we had sex.

44. I saw ▮▮ as a client at least one more time. I also saw him on several occasions when he would come by the apartment after we had finished seeing clients, and drink alcohol with Ms. Sanchez. This happened with some of Ms. Sanchez's clients every now and then. On these occasions, we were required to flirt with the clients, wearing scanty clothing. We had to permit the men to touch us wherever they pleased. ▮▮ came over for such drinking sessions with Ms. Sanchez on a few occasions. I recall one time when ▮▮ came over and I had to sit on his lap while he and Ms. Sanchez drank. I recall his wearing the same dark, textured, uniform

-11-

style pants as ▓▓▓ wore. After drinking alcohol with Ms. Sanchez, ▓ would sometimes select a woman with whom to have sex.

45. Ms. Sanchez told me that ▓ called her on at least two occasions to inform her about police activity near the apartment where we worked. Ms. Sanchez did not say that the police activity was aimed at us, but she was spooked. She told the women not to take calls from any new clients. On another occasion, while I was in Ms. Sanchez's car with her, she answered an incoming phone call via her car's Bluetooth connection, which broadcast the call and thus allowed me to hear the person making the call. The caller stated: "It's ▓." I recognized the speaker as ▓. ▓ told Ms. Sanchez that she needed to get all the women temporarily out of the apartment because the police department might be engaged in some actions nearby. He did not say that we were to be raided, but he told Ms. Sanchez that to be safe, she should not have her women work that day. He then hung up the phone. I recall hearing, on speaker-phone, at least two other calls from ▓ with similar warnings. No police activity ever disturbed our work, however. I remember wondering if ▓ was telling the truth about the police activity, or simply making himself important in Ms. Sanchez's eyes.

46. I saw ▓ in his police uniform on one occasion. Ms. Sanchez had arrived at the apartment late, and was rushing to place ads for the day. Repeated calls started coming in from the same number, but Ms. Sanchez, who was busy posting ads, did not pick up the phone. The caller's name that repeatedly flashed on the phone was ▓. I told Ms. Sanchez that ▓ was calling. Through the apartment window, which overlooked the parking lot of the apartment complex, I could see a police cruiser. I told Ms. Sanchez that I believed ▓ was outside. She directed me to answer the phone if ▓ called again and to put it on speaker phone. The phone

rang again and I did as directed, without saying anything. I recognized ▮ on the line. ▮ told Ms. Sanchez that he needed to see her immediately in person. Ms. Sanchez replied that she was busy but he was insistent. Shortly thereafter, there was a knock at the door. Ms. Sanchez answered the door and ▮ was standing outside in his police uniform. The two spoke to each other in hushed tones very briefly. Ms. Sanchez then told me to finish placings the ads and left with him.

▮▮▮▮▮▮

47. One of the clients Ms. Sanchez secured for her sex workers and her parties was a man we called "Babyface," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

48. "Babyface" told us that he was a police officer and that we had to behave well with him because he and others at the police department protected us. He said this in front of me, Ms. Sanchez, and other sex workers. He never selected me for sex and I had no conversations with him beyond a perfunctory "hello." He was never a client of mine, only of other women.

49. I saw "Babyface" at the apartment for Ms. Sanchez's after-hours "parties." He came for these parties about two or three times. I do not recall his coming during regular working hours for appointments with women.

███████

50. One of Ms. Sanchez's clients was a man I knew as ███ █ is the one who, Ms. Sanchez told me, helped her create her own commercial sex operation. ████████████████████████████████████████

51. I saw █ and Ms. Sanchez together at the apartment on several occasions. █ would have sex with Ms. Sanchez, and he also selected other women to have sex with at the apartment. He said that he was not attracted to me and he never selected me for sex.

52. During the time I worked for Ms. Sanchez in Virginia, █ came to the apartment perhaps four times. He typically came to the apartment after hours and hung out with Ms. Sanchez. The two would drink alcohol in the apartment together. I recall one occasions when █ had come to drink with Ms. Sanchez. There were several sex workers present. Ms. Sanchez directed me to sit on █'s lap and I did so. The other women were watching TV. Ms. Sanchez became very talkative, as she regularly did when drinking or doing drugs. She instructed the women who were watching the television to turn it off and to introduce themselves to the visitor, whom she introduced as "█," saying that he was her good friend and helped protect us. On one occasion, █ told us himself that he was a police officer.

Florida

53. Starting in May 2011, together with Ms. Mouta I left Northern Virginia and began working for Ms. Sanchez in Florida. We lived out of hotels such as the La Quinta Inn or Best Western in Tampa. Ms. Mouta paid off the housekeeping staff and the front desk receptionist with a portion of our earnings so that we could work out of the hotels.

54. Ms. Sanchez continued to direct our work from Virginia, and also from Costa Rica where she also went at different times.  Ms. Mouta and Ms. Sanchez would communicate nearly every other day by telephone.  Ms. Mouta would put Ms. Sanchez on speaker-phone, so as to be able to demonstrate to me that it was Ms. Sanchez who was given us directions, and that she __ Ms. Mouta – was not making them up herself.  Ms. Sanchez would typically say that she required a certain amount of money by a given day.  She would direct Ms. Mouta to deposit it in a bank account from which she could make withdrawals. We would then earn this money with sex work, following which Ms. Mouta or, sometime, I, would deposit the money as directed.  While I was no longer seeing Ms. Sanchez in person, she continued to direct my work as she had done in Virginia.  I continued being scared of her and doing what she ordered.  For this reason I also accompanied Ms. Mouta, as directed by Ms., Sanchez, to do sex work in Las Vegas, Jacksonville, Atlanta, Charlotte, and Charleston.

<u>I Escape</u>

55. During the years 2014-16, unable to identify a safe way out of Ms. Sanchez's clutches, I made repeated attempts to commit suicide, and was  hospitalized as a result.  In June 2016**,** on feeling suicidal once again, I called 911, explained that I was a prostitute and felt suicidal, and begged for someone to save me.  I was living in Lake Worth, Florida at the time.  I was taken by ambulance to the hospital**,** where I spoke with hospital staff regarding my situation. A male nurse explained about human trafficking to me. I knew nothing about human trafficking at the time, only that I had been treated horribly by Hazel Sanchez and could not take it any more.

56. After being discharged from the hospital, I called 911 and met with Lake Worth police officers. I again explained that I had been forced to work as a prostitute against my will for years on end. The officer with whom I spoke told me that I was a victim of human trafficking, and arranged for a meeting with the local FBI office.

57. On or about June 27, 2016, I had my initial meeting with the FBI at the FBI office in West Palm Beach, Florida. I continued to cooperate with the FBI on all matters concerning Ms. Sanchez's sex trafficking enterprise through her arrest and sentencing. I am known in the documentation of the criminal case against Ms. Sanchez as "C.V.A."

58. In July 2022, I learned, through the local press, of Jane Doe's lawsuit arising out of her experience with Hazel Sanchez. I undertook to identify her lawyer, and was able to do so with assistance. On July 6, 2022, I contacted Mr. Glasberg by phone and provided him with information about my experience with Ms. Sanchez, including some of the details set forth in this declaration. He told me at the outset that he would have to provide counsel defending Jane Doe's case with my name and contact information, and said that when he did so, I would be subpoenaed to a deposition at which I would have to testify fully regarding my own experiences. He said the deposition would take place in Florida or be conducted via Zoom, and occur no later than September 9, 2022. I told him that I was prepared to do this, as I have made it my mission to use my own experience as a basis for advocating for other survivors of human trafficking. I flew to Virginia the next day – paying my own way – and was debriefed by Mr. Glasberg and two members of his staff over the following two days, Friday July 8 and Saturday July 9. Mr. Glasberg advised me on Monday, July 11 that he had provided my name and contact information

to defense counsel, as a person with knowledge of the Sanchez operation and the protection it received from the police. He repeated that I should expect to hear soon from defense counsel or their representatives. I never did, however, nor was I ever subpoenaed to a deposition.

Dated: September 29, 2022

DoeJane\Witnesses\Alvarado\2022-0928-DecAlvarado

_____
Cindy Vanessa Alvarado

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case #1:21-cv-1150 (AJT/JFA) |
| | ) |
| FAIRFAX POLICE OFFICER #1, *et al.* | ) |
| | ) |
|     Defendants. | ) |

Exhibit 2- Attachments

# FILED UNDER SEAL