**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:21cv1150(AJT/JFA) |
| | ) | |
| FAIRFAX POLICE OFFICER #1, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW SUPPORTING**
**DEFENDANTS BARBAZETTE AND MARDOCCO'S**
**MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS OF**
**PLAINTIFF'S EXPERT KIMBERLY MEHLMAN-OROZCO**

Defendants, Michael O. Barbazette ("Barbazette") and Jason Mardocco ("Mardocco"), by counsel, in support of their Motion *In Limine* to Exclude the Testimony and Opinions of Plaintiff Jane Doe's ("Doe") expert Kimberly Mehlman-Orozco ("Mehlman-Orozoco"), state as follows:

**INTRODUCTION**

Doe has asserted multiple claims against Barbazette and Mardocco contending that they received benefits, obstructed law enforcement, and conspired to do so in violation of the Trafficking Victims Protection Reauthorization Act ("TVRPA"). *See* Second Amended Compl., ECF No. 61. Both men, former officers of the Fairfax County Police Department ("FCPD"), have ████████████████████████████████████████████ But both deny knowing that Sanchez allegedly operated a sex trafficking venture or meeting anyone connected to Sanchez's alleged operations, including Doe. To support her theories of liability, Doe has designated Kimberly Mehlman-Orozco as an expert to opine on whether Barbazette and/or Mardocco knew or should have known that Doe was a trafficking victim and whether Doe's

1

version of events are consistent with trafficking.[1]

This Court should exclude Mehlman-Orozco's opinions and preclude her from testifying because her testimony and opinions are irrelevant to the issue of particular knowledge, her methodology and reliance on unsubstantiated assumptions render her conclusions unreliable, and her testimony violates the "common knowledge" rule. Mehlman-Orozco's testimony and opinions are thus inadmissible as a matter of law.

## ARGUMENT

Under Federal Rule of Evidence 104(a), district courts are tasked with determining "preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence," including the admissibility of expert testimony under Federal Rule of Evidence 702. As the Supreme Court made clear in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* Rule 702 compels district courts to perform the critical "gatekeeping" function concerning the admissibility of expert scientific evidence. 509 U.S. 579, 589 (1993). For an opinion to be admissible, the expert testimony must be (1) "helpful to the jury in understanding the evidence or determining a fact at issue," (2) "'based on sufficient facts or data,'" (3) "'the product of reliable principles and methods,'" and (4) "reliably applied . . . to the facts of the case." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021); Fed. R. Evid. 702.[2]

---

[1] It is difficult to discern exactly what opinions Mehlman-Orozoco is being proffered to offer which have any bearing on this case – as opposed to sex trafficking generally. Defendants have culled both of her reports and her deposition and have identified only these two opinions. If Mehlman-Orozoco is being proffered to provide any other opinions, defendants object due to the lack of disclosure.

[2] Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; **(b)** the testimony is based

"The objective of that [gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "[I]f an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded. But even if relevant, an opinion must also be sufficiently reliable." *Sardis*, 10 F.4th at 281.

It always remains the burden of the proponent of the expert testimony—here, Doe—to show that the evidence is admissible—that is, both relevant and reliable. *Vertullus Holdings LLC v. W.R. Grace & Co.-Conn.*, SAG-18-3298, 2021 U.S. Dist. LEXIS 164153, at *18 (D. Md. Aug. 11, 2021); *see also Daubert*, 509 U.S. at 592 n.10. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Further, by negative implication, "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance." *Scott v. Sears, Roebuck, & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986). The Fourth Circuit applies the "common knowledge" rule, which finds expert testimony to be unnecessary when reaching the expert's opinion "is something that can sufficiently be done by the jury without help from an expert." *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995). This rule applies to both an expert's opinion that might help the jury determine the facts of the case and an expert's opinion that might help the jury interpret certain evidence. *Minnesota Lawyers Mut. Ins. Co. v. Batzli*, 2010 U.S. Dist. LEXIS 14487, 2010 WL 670109, at *2 (E.D. Va. Feb. 19,

---

on sufficient facts or data; **(c)** the testimony is the product of reliable principles and methods; and **(d)** the expert has reliably applied the principles and methods to the facts of the case.

2010) ("Where lay jurors are fully able to understand and appreciate the implications of the evidence admitted, proffered expert testimony will not assist the jury in determining a factual issue, and is therefore inappropriate."). The admission of "common sense" expert testimony is dangerous because "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Scott*, 789 F.2d at 1055.

Mehlman-Orozco's opinions and testimony are irrelevant, unreliable and violate the "common knowledge" rule; thus they should be excluded. *See Sardis*, 10 F.4th at 281.

### A. Relevance: Mehlman-Orozco's testimony and opinions are irrelevant because they do not address the specific issues in this case.

Mehlman-Orozco's opinions are irrelevant because they are not sufficiently connected to the issues in this case.

#### 1. Legal Standards

General knowledge about a subject area touching a theme in the case is not sufficient to be relevant to particular, discrete issues. *See Eline v. Town of Ocean City*, 7 F.4th 214, 223 (4th Cir. 2021) (holding that Dr. Herbenick's "expertise and experience" in her area of study "does not make her testimony or opinions relevant to the discrete issue in th[e] case"—the particular views of the public regarding a particular phenomenon connected with her area of study). The Supreme Court has articulated this expression of relevance in terms of "fit"—"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. The Fourth Circuit has required that expert testimony "fit" the issues in a particularized manner. *See Eline*, 7 F.4th at 223; *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 319 (4th Cir. 2018) (requiring the "Guild to tailor its expert evidence to . . . the specific Cypriot and Chinese coins that the Guild sought to import"); *Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624 (4th Cir. 2018) (requiring that the expert

testimony be dose-specific rather than general); *United States v. Suado Mohamed Ali*, 753 F.3d 176, 192 (4th Cir. 2013) (holding that the expert's testimony was not relevant because it did not address the disputed issue of the defendant's knowledge).

The Fourth Circuit's interpretation of relevance aligns neatly with the Supreme Court's statement in *Kumho Tire*, which elaborated on *Daubert*: "[T]he question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" 526 U.S. at 156 (quoting 4 J. McLaughlin, *Weinstein's Federal Evidence* P702.05[1], at 702-33 (2d ed. 1998)). Both the Supreme Court and the Fourth Circuit are clear that general knowledge is not sufficient for an expert's testimony to be relevant. Rather, the expert must also have specialized knowledge that is sufficiently particularized to elucidate the "particular issues in the case." *Id.*

### 2. Mehlman-Orozco's irrelevance

Mehlman-Orozco's knowledge is solely general knowledge about human trafficking globally and nationally. She has no direct knowledge about the Defendants, nor does she have knowledge about any aspect of this case beyond what Doe told her.

Mehlman-Orozco's first expert report is full of general knowledge about human trafficking. Ex. A. She then analyzes Doe's case according to her general factors, but this is based solely on what Doe told her in interviews. *Id.* at 11-22; Ex. B, at 26:9-13. But when she attempts to opine on Barbazette and Mardocco's connection to Doe, she stays in the realm of generalities. Because other people knew that Doe was being trafficked, she says, Barbazette and Mardocco should have known too. Ex. A at 30. But when pressed, Mehlman-Orozco admits that she has no knowledge of whether Barbazette and Mardocco ever met Doe or saw advertisements of her services, both of which are prerequisites for having known that Doe was a trafficking victim.

14   Q Are you aware of any facts to suggest that

15 Barbazette ever met Doe?
16 A No.
17 Q Are you aware of any facts to suggest that
18 Mardocco ever met Doe?
19 A Facts that he definitively met Doe, or he --
20 they definitively met Doe, no.

Ex. B at 124:14-20.

18 Q All right. So but when you say Barbazette
19 ███████████████ again, you don't know that he
20 ever saw Doe, correct?
21 A I don't know -- there -- I have no admissions
22 that he saw Doe, or she does not allege that he saw
1 her, so I don't have any evidence to that effect. But
2 I would say, again, it's unlikely based off of my
3 answer.

7 A Yes.
8 Q And he did not say, and you have seen no
9 evidence to suggest that ███████████████
10 ██████, he ever came across, or saw, or knew of Doe,
11 have you?
12 A Any statements made by him, no.
13 Q Or anybody else? Sanchez hasn't said that
14 ███████████████████████████, has she?
15 A No, not to my knowledge.
16 Q And Doe hasn't told you that she ever met
17 Barbazette, has she?
18 A No, ma'am, she has not.
19 Q Would your answers to all those questions be
20 the same with respect to Mr. Mardocco?
21 A Yes.
22 Q Are you aware of any facts to suggest that
1 Barbazette had sexual encounters with Doe at any time?
2 A No, I'm not aware of any statements or any
3 facts to suggest that.
4 Q And are you, in fact, aware that she has
5 denied that she ever had sexual relations with
6 Barbazette?
7 A I am not aware that she denied it. I am
8 aware that she does not recall either of them, or does

9  not remember seeing either of them.
10  Q And are you aware of any facts to suggest
11  that Mardocco had sexual encounters with Doe at any
12  time?
13  A No. The same answer.
14  Q The same answer? Are you aware that she has
15  denied having sexual encounters with him?
16  A Yes, ma'am.

Ex. B at 126:18–128:16. Mehlman-Orozco further admitted that any opinions she had about

Barbazette and Mardocco were based on general knowledge about general commercial sex

consumers, not Barbazette and Mardocco specifically:

15  Q . . . I
16  just want to know factually do you know of anything to
17  suggest that either Mardocco or Barbazette knew that
18  Doe was being rotated to different locations?
19  A So and again, it's consistent with the other
20  answer. *It's more based off of general knowledge and*
21  *information as opposed to specific* because *some of the*
22  *commercial sex consumers* who reviewed the alleged
1  trafficking enterprise, did note that they were
2  transferred to different establishments and you know,
3  them being moved across locations.
4  Q But there's nothing to suggest, that you're
5  aware of, that Mardocco or Barbazette had knowledge
6  that was occurring, if it was, correct?
7  A *Mardocco or Barbazette specifically? No.*
8  Q Okay. And when you say in the third box, "It
9  was evident to commercial sex consumers and the
10  defendants that there was at least one, referring to a
11  controller, Hazel Marie Sanchez Cerdas." Do you see
12  that?
13  A Yes.
14  Q And do you have any specific factual
15  information to show or establish that Mardocco or
16  Barbazette knew that Sanchez was controlling Doe?
17  A Again, *this isn't based off of specific*
18  *information applied to either of them, but based off of*
19  *the general information about what commercial sex*
20  *consumers were aware of,* of this particular trafficking
21  enterprise.

7

Ex. B at 172:15–173:21 (emphasis added).

Mehlman-Orozco also admitted that she had little knowledge of Sanchez's alleged trafficking ring: she had never interviewed anyone else connected with it and, though she had reviewed the government's pleadings in Sanchez's criminal case, she had not reviewed the FBI investigations nor the discovery materials from the Sanchez trial.

> 9  A Did I see any statement made by her [Sanchez] that she
> 10  trafficked Doe or any other person? I do not recall,
> 11  no.
> 12  Q Okay. Other than speaking with Doe, have you
> 13  spoken with any other person who has provided any
> 14  information to suggest that Doe was a victim of
> 15  Sanchez's sex trafficking venture?
> 16  A Have I spoken to any other person other than
> 17  Doe? No.
> 18  Q Have you spoken with any person, other than
> 19  Doe, who contends to have been a victim of Sanchez's
> 20  alleged sex trafficking venture?
> 21  A No, ma'am.

Ex. B at 62:9-21.

> 19  Q Okay. On the third line, it starts at the
> 20  end of the third line, "The Government and U.S.
> 21  Probation Office are curiously unbothered by the
> 22  complete absence, in 272,000 pages of discovery of
> 1  documentary evidence, not an email, not a text message,
> 2  nothing supporting coercion." Do you see that?
> 3  A Yes.
> 4  Q Did you ever review the 272,000 pages of
> 5  discovery that are referenced there?
> 6  A I did not, but I think it was established
> 7  that there -- her --
> 8  Q That's not my question.
> 9  A -- that her identification --
> 10  Q I --
> 11  A -- documents were taken. So --
> 12  Q Okay. I just want to know if you reviewed
> 13  the 272,000 pages of discovery?
> 14  A No, ma'am.

Ex. B at 55:19–56:14.



Ex. B at 182:15–183:2.

Mehlman-Orozco attempted to cure the generality of her opinions in her addendum to her expert report. Ex. C. But again her opinions regarding Barbazette and Mardocco's knowledge are too general, basically restating what she said in the first report. *Id.* at 14-16. She specifically faults the officers for not asking Doe detailed questions about whether she was trafficked: "[I]t is abundantly clear that Defendant[s] Mardocco [and Barbazette] failed to interact with identified sex workers as possible victims of trafficking, despite [their] training." *Id.* at 15, 16. But this opinion assumes the first point of which she, by her own admission, lacked knowledge—that Mardocco or Barbazette ever met Doe in the first place. Dep. at 124:14-20.

That opinion also assumes a level of training for both Mardocco and Barbazette that Mehlman-Orozco cannot address with direct knowledge. She admitted that she did not have such knowledge herself; rather, she relied on the reports of William Woolf ("Woolf").

> 13  Q You did not interview Billy Woolf?
> 14  A No, I did not.
> 15  Q Did you rely upon any information that he
> 16  provided in support of the opinions which you offer in
> 17  this case?
> 18  A I think I relied upon it -- upon it to the
> 19  extent that I cited it. . . .
> . . .

2  But I wouldn't say I overwhelmingly relied
3  upon it.

Ex. B at 35:13–36:3

4  Q Well, certainly what you've just told me
5  would not inform you as to any training which Billy
6  Woolf may have given to Barbazette, correct?
7  A That is correct.
8  Q And what you've just told me would not inform
9  you the extent of any training, if any, which Woolf
10  gave to Mardocco, correct?
11  A That is correct.

Ex. B at 37:4-11.

19  So I interpret in reading this paragraph,
20  under penalty of perjury, that he did name two people
21  that he had personally trained.
22  Q Okay. Which would not include Mardocco,
1  correct?
2  A Correct.

Ex B at 38:19–39:2.

12  Q Okay. As you sit here today, you cannot
13  point to any document which would detail whether
14  Mardocco received any training in human sex
15  trafficking, or if so, what that was, correct?
16  A I can't point to any document right now, no.
17  Q Have you read Mardocco's answers to
18  interrogatories where that very question was asked of
19  him and he responded?
20  A I don't believe I reviewed those documents.

Ex B at 40:12-20.

5  Q You assumed from reading that [Woolf's report] that Michael
6  Barbazette had been trained on sex trafficking. Am I
7  understanding you correctly?
8  A Yes.
9  Q Do you know anything about the nature of that
10  training for Barbazette?
11  A Specifically?
12  Q Yes.

> 13  A No.
> 14  Q And do you know how many courses he attended?
> 15  A Not off the top of my head, no.
> 16  Q Do you know where he attended any courses?
> 17  A No.
> 18  Q Do you know when?
> 19  A I do not.

Ex. B at 44:5-19.

> 8   Q All right. And did you ever ask to speak
> 9   with Barbazette or Mardocco to find out any information
> 10  that they might be able to provide to you before you
> 11  wrote this initial report of yours?
> 12  A No, I did not.

Ex. B 46:8-12. And as stated more fully in Defendants' Memorandum of Law Supporting [Their]

Motion in Limine to Exclude the Testimony and Opinions of Plaintiff's Expert William Woolf,

ECF No. 240, Woolf's opinions on that subject are not within his direct knowledge and are not

reliable in their foundation either. Mehlman-Orozco has no independent knowledge of her own

regarding the officers' levels of training and no reliable or admissible evidence upon which she

may base an opinion.

    Because Mehlman-Orozco cannot testify to the particular facts in issue and her expert

knowledge is too generalized to "assist the jurors 'in deciding the particular issues in the case,'"

*Kumho Tire*, 526 U.S. at 156, it does not have the proper "fit" required by *Daubert*. Thus, her

testimony and opinions should be excluded as irrelevant. *Sardis*, 10 F.4th at 281 ("[I]f an opinion

is not relevant to a fact at issue, *Daubert* requires that it be excluded.").

### B.  Reliability: Kimberly Mehlman-Orozco's testimony and opinions are unreliable because her methodology of relying on others' unsubstantiated testimony and reports is flawed, and her opinions rely on a chain of unsubstantiated assumptions.

    Kimberly Mehlman-Orozco's testimony and opinions are unreliable for two reasons. First,

her methodology is flawed because her data comes only from Doe and from Woolf's unreliable

report. Second she does not have sufficient knowledge to apply her general knowledge to the specific circumstances of the case, and thus her testimony relies solely on unsubstantiated claims and assumptions.

### 1. Legal Standards

When reviewing the reliability of an expert's testimony, courts must ask whether the expert's opinion is supported by adequate validation to render it trustworthy. The Supreme Court listed the following four factors to help determine reliability in *Daubert*: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community. *Daubert,* 509 U.S. at 593-94. These factors, however, "neither necessarily nor exclusively appl[y] to all experts in every case." *Kumho Tire,* 526 U.S. at 141. Rather, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful. *Id.* at 142, 150-51.

Where a court chooses not to apply the foregoing factors, its focus must remain upon the reliability of the expert's principles and methodology, rather than the correctness of her conclusions.[3] *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017) ("To determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology."). An expert must be able to explain how and why she reached her given conclusions. *See United States v. Garcia*, 752 F.3d 382, 396 (4th Cir. 2014) (reversing the trial court and excluding the expert because "[t]he record [wa]s replete with instances of Agent Dayton providing no explanation for her interpretation, other than a token reference to her expertise"); *see also Lewis v. Johnson &*

---

[3] Although, as the Supreme Court pointed out, "conclusions and methodology are not entirely distinct from one another." *Joiner,* 522 U.S. at 146.

*Johnson*, 601 F. App'x 205, 209 (4th Cir. 2015) (excluding expert where his report did not explain how he chose the samples on which he based his opinion and did not indicate whether his analysis had been "controlled for error or bias"); *McEwen v. Balt. Wash. Med. Ctr. Inc.*, 404 F. App'x 789, 791 (4th Cir. 2010) (excluding experts where they "failed to present a reliable basis for their conclusions" and could not "meaningfully account for [other studies] at odds with their testimony").

Experts' opinions must be based soundly on facts and not on unsubstantiated or baseless assumptions. "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see Sardis*, 10 F.4th at 281 ("[D]istrict courts must ensure that an expert's opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation.'" (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999))); *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 481-82 (4th Cir. 2018) (excluding expert where his opinion was not supported by any "research, data, or scientific theories" or "relevant testing"); *Bryte v. Am. Household, Inc.*, 429 F.3d 469, 476-78 (4th Cir. 2005) (excluding expert where his opinion did not adequately exclude alternative sources of causation, thus making his report too "speculative"); *Perry v. Scruggs*, 17 F. App'x 81, 87 (4th Cir. 2001) (excluding expert where his opinion was based on hearsay and "speculative" assumptions, and there was no support for his underlying facts and figures).

Mehlman-Orozco's conclusions are unreliable because they are the result of unreliable methodology and unsubstantiated assumptions.

### 2.  Mehlman-Orozco's unreliable methodology

The flaws in Mehlman-Orozco's methodology are apparent when examining her reports and her admissions in her deposition. She relied too much on what Doe told her for the specifics

of the case, and she assumes Doe's truthfulness. Dep. at 26:9-13. The other sources Mehlman-Orozco may have tangentially relied on were equally flawed in various ways, either from bias, incomplete information, or their own inherent unreliability.

Of the 60 reference footnotes in her first expert report, only 11 do not refer to either general knowledge about human trafficking or to Doe's statements in interviews. Ex A. The vast majority of Mehlman-Orozco's information is thus either not specifically relevant to the case or from Doe, whose truth she took at face value without verification. Of the remaining 11 footnotes, two rely on Woolf's expert statement, which as stated above and in the applicable memorandum of law, is not a reliable source because of Woolf's lack of personal knowledge and reliance on assumptions. One footnote relies on a statement by "John Doe," Doe's husband. Three rely on the U.S. government's sentencing memorandum in Sanchez's trial, a document that presents the facts selectively to support the government's position, as evidenced by comparison with Sanchez's sentencing memorandum. The remaining footnotes rely on the police IAB investigation of Barbazette and Mardocco. Some of that information is outdated: for example, the investigation notes suggested ██████████████████████████████████████████████████████████, but later FBI investigation proved that this was not true. Ex A. at 24 n.50; Ex. B at 182:15–183:2.

Mehlman-Orozco's addendum report is not much better. Of the 33 footnotes there, only four are not general information about human trafficking. Ex C. One of those four is again to Woolf's report, and the other three are to the investigation of Barbazette and Mardocco. The body of her report cites much more from those investigation reports, but none of those citations directly substantiates her opinions (*see infra* on assumptions).

Mehlman-Orozco relied solely on Doe for the great majority of all specific reference points in this case, as she has no personal knowledge herself, and the remainder of her sources are either

unreliable, outdated, or irrelevant. Thus, her methodology is unsound. Her explanations are akin to those of the experts in *Garcia* or *Lewis*, who could not explain their opinions other than by their credentials and who could not indicate whether their analysis had been "controlled for error or bias." *Garcia*, 752 F.3d at 396; *Lewis*, 601 F. App'x at 209. Courts are not required to accept such an *ipse dixit* of the expert, *Joiner*, 522 U.S. at 146, and this Court should reject Mehlman-Orozco's testimony and opinions as unreliable.

### 3.   Mehlman-Orozco's unsubstantiated assumptions

Mehlman-Orozco's opinions are the result of a chain of unsubstantiated assumptions. Such opinions are inherently unreliable as a matter of law. *Sardis*, 10 F.4th at 281; *Tyger Constr. Co.*, 29 F.3d at 142 ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."); *Perry*, 17 F. App'x at 87 (excluding expert opinion based on hearsay and "speculative" assumptions, with no support for the underlying facts and figures).

The first assumption in this chain is that Mardocco and Barbazette had training in combatting human trafficking. *See* 2d Expert Rep. at 15, 16 ("despite his training"). Mehlman-Orozco admitted that she has no knowledge of what training they might have, and she never interviewed them or reviewed their discovery answers to find out. Dep. at 37:4-11; 40:12-20; 44:5-19; 46:8-12. She also relied almost exclusively on Woolf's report for this point, but admitted that the report does not specifically state that Woolf trained Barbazette and that the report says nothing about Mardocco's level of training. Dep. at 35:13–36:3; 38:19–39:2; 44:5-13.

Second, Mehlman-Orozco assumes that the Defendants generally (including the IAB officers interviewing Barbazette and Mardocco) conflate prostitution with human trafficking because they do not see human trafficking as a problem, even though they knew or should have known that they were interacting with human trafficking victims. Ex C at 11-14. Reframing this

statement—"They should have known that the prostitutes were human trafficking victims because they knew they were interacting with prostitutes"— exposes the key assumption: that all prostitutes are human trafficking victims. Mehlman-Orozco herself admits that some prostitutes are not human trafficking victims; rather, some are consenting and choose to prostitute themselves.

> 13   Q Is there a difference in your mind between a
> 14   sex trafficking victim and a consenting sex worker?
> 15   A Of course.

Ex. B at 75:13-15.

> 12   A So at a very basic level, I would say a
> 13   consenting sex worker is somebody who is an adult, who
> 14   has chosen to engage in the exchange of sex for
> 15   something of value, and is not actively being coerced,
> 16   deceived, threatened, defrauded, and -- or exploited.

Ex. B at 78:12-16; *see also* Ex. A at 6 (defining "consenting sex worker"). And further assuming that Barbazette and Mardocco would have automatically known the difference between a trafficking victim and a consenting sex worker assumes their level of training, which has not been reliably established.

The third assumption Mehlman-Orozco makes is that Barbazette and Mardocco should have known[4] Doe was being trafficked ███████████████████████████ ███████ Ex. C at 9-11. Not only does this assume that all prostitutes are trafficking victims, but it further assumes that Barbazette and Mardocco saw any advertisements for Doe or other women alleged to be fellow victims. ████████████████████████████████████,

---

[4] Defendants submit that Mehlman-Orozoco also cannot opine that Barbazette and/or Mardocco "should have known" that Doe was being trafficked, because such would amount to an improper legal opinion. *United States v. McIver*, 470 F.3d 550, 561-562 (4th Cir. 2006) (testimony that "states a legal standard or draws a legal conclusion," is inadmissible). Whether defendants knew or should have known Doe was allegedly being trafficked is one of ***the*** primary legal conclusions to be drawn in this case based on the facts presented.

██████████████████████████████ this does not address whether they saw ads for Doe. And if they did not see such ads for Doe, then there is no basis to conclude that they knew Doe was a trafficking victim because of shared information in the postings. If they did not see postings for her, they would never have discovered the information on those postings. If they did not see postings for her and for other victims, they would never have discovered that the information was shared. Mehlman-Orozco admits that she does not know what they did or did not see; she can only assume.



Ex. B at 114:3-16.





Ex. B at 117:10–118:6.



Ex. B at 119:2-13.



Ex. B. at 126:18–127:3.



Fourth, Mehlman-Orozco assumes that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ She does not know whether either of these conditions are true; she can only assume.



Ex. B at 139:2-14.





Ex. B at 142:17–144:13

   5  Q All right. I'm not going to agree with you
   6  that there's a difference between general facts and
   7  specific facts, but using your terminology, can you
   8  tell me any specific fact which supports your
   9  contention that Mardocco actually knew that Jane Doe
  10  was being trafficked?
  11  A Not a specific fact.
  12  Q And would that be the same with respect to
  13  Barbazette?
  14  A Yes, ma'am.

Ex. B at 193:5-14; *see also* Ex. B at 172:15–173:21. Both defendants claim that they  never saw Doe, and Mehlman-Orozco has no basis for disputing .

     Finally, Mehlman-Orozco assumes that the Defendants provided Sanchez with police information to prevent law enforcement from shutting down her trafficking ring. But she never did the research to find out whether such suspicions were true, and thus she did not know that the FBI had cleared Mardocco of those suspicions. Ex. B at 182:15–183:2. She also based her assumption on the different

████████████████████████████████████████████████████████ but she gives no reason for attributing that difference to illegal tipoffs. As her opinion here does not sufficiently exclude other causes, it is too "speculative" to be reliable. *Bryte*, 429 F.3d at 476-78.

In sum, Mehlman-Orozco's opinions are built on assumption after assumption, all of which are unsubstantiated by the record or by any research or data. There is "simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Thus, her opinions and testimony are unreliable and ought not to be admitted as a matter of law. *See id.*; *Garcia*, 752 F.3d at 396; *Tyger Constr. Co.*, 29 F.3d at 142.

### C. Mehlman-Orozoco's proffered opinions violate the "common knowledge" rule and should be excluded.

As set forth above, "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance." *Scott*, 789 F.2d at 1055. The admission of "common sense" expert testimony is dangerous because "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Id.*

In this case, Mehlman-Orozoco is unaware of any facts to establish that Barbazette and/or Mardocco "knew" that Sanchez was running a sex trafficking venture. Ex. B. 173:14-176:8, 193:1-14. She cannot therefore provide any assistance to the jury on that point. She has been proffered, however, to testify about what defendants "should have known" in that regard and the "fact" that what Doe has reported to her is "consistent with" trafficking. Any testimony in this regard violates the "common knowledge" rule.[5]

18 U.S.C. 1589(a), the section of the TVPRA under which defendants have been sued, provides:

---

[5] *See also*, fn. 4, *infra*.

(a)Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
(2) by means of serious harm or threats of serious harm to that person or another person;
(3) by means of the abuse or threatened abuse of law or legal process; or
(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

To determine if Doe has been "victimized" under this section, the jury will have to evaluate whether she was forced to engage in sexual relations with clients of Sanchez by force, physical restraint, threats of physical restraint, serious harm, threats of serious harm to Doe or another, abuse of law or threat of abuse of law, etc…. Doe certainly provides a narrative to "fit" herself within these parameters. She claims that she was forced to engage in sexual relations with clients of Sanchez, at her direction, against her will. She claims to have been locked in an apartment, unable to leave, make phone calls or eat. She claims that Sanchez threatened her and her son and family to coerce her to engage in unwanted sexual acts with Sanchez's clients. If the jury believes Doe, it does not need Mehlman-Orozoco to opine that she – an expert on sex trafficking – believes that Doe has described a situation consistent with sex trafficking.[6] The jury will have ample facts from which it can draw a common sense and reasoned conclusion that Doe fits within the parameters of the statute.[7] To allow Mehlman-Orozoco to pile on her "expert" opinion in this

---

[6] Again, defendants reiterate that such an opinion should not be allowed at all because Mehlman-Orozoco has done nothing to evaluate Doe's situation other than talk to Doe. Having failed to consider all the variables as to whether Doe's situation was or was not consistent with sex trafficking, Mehlman-Orozoco's opinions are unreliable and inadmissible.

[7] Contrast this with cases, for instance, where an expert has been permitted to testify that defendants' behavior is consistent with collusion and inconsistent with competition. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 U.S. Dist. LEXIS 62394 * 14 (D.

regard violates the "common knowledge" rule and risks having the jury place undue weight upon testimony which is not necessary for the jury to render its decision.

**<u>CONCLUSION</u>**

Based upon all of the above, Defendants Michael O. Barbazette and Jason Mardocco respectfully request that this Honorable Court grant their Motion *In Limine* to Exclude the Testimony and Opinions of Plaintiff's Expert Kimberly Mehlman-Orozco, enter an Order precluding all testimony by Kimberly Mehlman-Orozco and any reference to her opinions or reports, and grant such other and further relief as the interests of justice require.

**MICHAEL O. BARBAZETTE and
JASON MARDOCCO
By Counsel**

_____/s/_____
Heather K. Bardot, Esquire
Virginia State Bar No. 37269
McGAVIN, BOYCE, BARDOT,
  THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030-2514
(703) 385-1000 Telephone
(703) 385-1555 Facsimile
hbardot@mbbtklaw.com
*Counsel for Defendants Barbazette and Mardocco*

---

Md. May 1, 2013). It may well be difficult for a jury to examine behavior and determine if it "looks like" collusion or competition. Here, however, the jury will not be tasked with determining whether alleged behavior by Sanchez fits within the definition of one amorphous term or another. If the jury believes Doe, Sanchez subjected Doe to harms not permitted by 18 U.S.C. 1589(a).

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of November, 2022, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Victor M. Glasberg, #16184
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbia Street
Alexandria, VA 22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
*Counsel for Plaintiff*

Kimberly P. Baucom, VSB 44419
Jamie Greenzweig, VSB 75066
12000 Government Center Parkway
Suite 549
Fairfax, Virginia 22035
(703) 324-2704 Telephone
(703) 324-2665 Facsimile
Kimberly.baucom@fairfaxcounty.gov
Jamie.Greenzweig@fairfaxcounty.gov
*Counsel for Defendants, Baumstark, Scianna,*
  *Roessler and Fairfax County, Virginia*

                    _____/s/_____
                    Heather K. Bardot, Esquire (VSB No. 37269)
                    McGAVIN, BOYCE, BARDOT,
                      THORSEN & KATZ, P.C.
                    9990 Fairfax Boulevard, Suite 400
                    Fairfax, Virginia 22030-2514
                    (703) 385-1000 Telephone
                    (703) 385-1555 Facsimile
                    hbardot@mbbtklaw.com
                    *Counsel for Defendants Barbazette and Mardocco*