**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

JANE DOE,
Plaintiff,

v.                                                    Case No.:  1:21cv1150(AJT/JFA)

FAIRFAX POLICE OFFICER #1, *et al.*,
Defendants.

**Expert Report of Dr. Kimberly Mehlman-Orozco**
**CEO of Break the Chain LLC**
**15920 Fairway Drive**
**Dumfries, Virginia 22025**
**(703) 362-9405**

*Kejneo*
_____

**SUBMITTED BY DR. KIMBERLY MEHLMAN-OROZCO under penalty of perjury on July 7, 2022[1].**



---

[1] I may prepare graphic or illustrative exhibits based on the information reviewed and/or my analyses for use at trial. I reserve the right to amend my analysis, opinions, and this report should additional information be made available.

## Table of Contents

I.      **INTRODUCTION** ................................................................................................................. 4

II.     **DEFINITIONS** ..................................................................................................................... 6

III.    **SUMMARY OF OPINIONS** ........................................................................................... 8

IV.    **HUMAN TRAFFICKING OVERVIEW** ....................................................................... 9

V.      **INDICATORS OF HUMAN TRAFFICKING FOR LAW ENFORCEMENT** ......... 11

      *APPLICATION TO JANE DOE* ............................................................................................. 12

      *OTHER OPERATIONAL INDICATORS* ............................................................................... 15

VI.    **JANE DOE** ....................................................................................................................... 19

      *BACKGROUND* .................................................................................................................. 20

      *ALLEGED HUMAN TRAFFICKING* .................................................................................... 22

VII.   **ADVERTISEMENTS SUGGESTIVE OF SEX TRAFFICKING NETWORK** ..... 26

VIII.   **CONCLUSION** ............................................................................................................... 30

**APPENDICIES** ........................................................................................................................ 31

      APPENDIX A – CURRICULUM VITAE ............................................................................. 31

      APPENDIX B – EXPERT WITNESS TESTIMONY ........................................................... 45

      APPENDIX C – ACKNOWLEDGEMENT OF PRO BONO WORK FOR  HUMAN TRAFFICKING
      SURVIVORS ....................................................................................................................... 48

      APPENDIX D – LETTER OF REFERENCE ON EXPERT WITNESS TESTIMONY ......... 49

      APPENDIX E – MATERIALS REVIEWED AND CONSIDERED....................................... 50

      APPENDIX F – 2022 FEE SCHEDULE .............................................................................. 51

      APPENDIX G – DELPHI OPERATIONAL INDICATORS ................................................. 52

      APPENDIX H –COMMERICAL SEX CONSUMER REVIEWS OF "PALOMA" .............. 53

**Table of Tables**

Table 1. Strong Indicators of Sexual Exploitation of Adults Applied to Jane Doe ..................... 12
Table 2. Medium Indicators of Sexual Exploitation of Adults Applied to Jane Doe ................. 13
Table 3. Application of Polaris Project's Assessment Tool to Jane Doe's Case ......................... 16

**Table of Figures**

Figure 1. Commercial Sex Advertisement Posted by Hazel in 2016 ........................................... 26
Figure 2. Listing for "Diana" on The Erotic Review with Hazel's Email .................................... 27
Figure 3. Listing for "Karina" on The Erotic Review with Hazel's Email .................................. 27
Figure 4. Listing for "Paloma" on The Erotic Review with Hazel's Email ................................. 28
Figure 5. Potential Advertisement Network of Present Case ....................................................... 29

# I.    INTRODUCTION

I, Dr. Kimberly Mehlman-Orozco, am the Chief Executive Officer (CEO) of Break the Chain, LLC. I have been engaged by DANIEL JASON RUSSO regarding FAIRFAX POLICE OFFICER #1, *et. al*. (Case Number: 1:21cv1150(AJT/JFA)). I have accepted this appointment *pro bono*.[2]

Over the past fifteen years, I have accumulated a variety of work experiences that contribute to my qualifications as an expert on human trafficking (see Appendix A for a copy of my Curriculum Vitae). As the CEO of Break the Chain, LLC and former CEO of Mahn, Mehlman & Associates, LLC, I regularly serve as an expert witness for human trafficking cases (see Appendix B for list of cases). I also provide pro-bono expert witness services for human trafficking survivors (see Appendix C for letter of reference).

I am the author of a book on the different forms of human trafficking, which is used to train law enforcement on recognizing the indicia, entitled *Hidden in Plain Sight: America's Slaves of the New Millennium*. For this book, I performed extensive primary and secondary research, including:

(1) Conducted a systematic review of approximately 300 human trafficking cases;
(2) Performed content analyses on nearly 1,000 media reports of human trafficking arrests;
(3) Conducted approximately 100 qualitative interviews of human trafficking victims; and
(4) Conducted approximately 2,000 qualitative interviews with human traffickers.

My book was incorporated into the curriculum used by ERASE Child Trafficking to train law enforcement in the United States on human trafficking identification and investigation. The book also received a variety of advanced praise from experts within the field.

In addition, I formally served as an adjunct human trafficking subject matter expert for RAND Corporation, a nonprofit institution that helps improve policy and decision-making through research and analysis. In that capacity, I worked on three study proposals:

(1) Research design to evaluate the National Human Trafficking Hotline;
(2) Development of an evidence based human trafficking risk assessment tool for organizations working with minors; and
(3) Evaluating the outcomes of housing services for adult and juvenile human trafficking survivors.

In these capacities, I have had the opportunity to train various law enforcement agencies around the country on my human trafficking research for investigations, including Homeland Security

---

[2] I will require and am entitled to compensation for deposition testimony at my 2022 rate, detailed in Appendix F.

Investigations in Buffalo, NY[3]; Montebello Police Department in Montebello, California; the North Carolina State Bureau of Investigation; and the Royal Canadian Mounted Police in Halifax, Nova Scotia. I have also presented my research at various human trafficking summits and conferences and served on the Greater Prince William County Human Trafficking Task Force (GPWCHTTF) as the data collection sub-committee chair, as well as on the Prince George's County Human Trafficking Task Force.

In addition to my work on human trafficking, I have received formal training, as well as quantitative and qualitative research experience, during my graduate coursework at George Mason University. Specifically, I served as a research associate on the Trinidad and Tobago Crime Reduction Project, which involved government-sanctioned surveys of both police officers and members of the community in Trinidad. I also led participant outreach for the Office of Juvenile Justice and Delinquency Prevention (OJJDP) Census of Juveniles on Probation.

In addition to my practical and research experience, I also formally taught about human trafficking as part of my course material at George Mason University and at University of Maryland, College Park, the #1 criminology department in the nation.

I hold a Ph.D. in Criminology, Law and Society from George Mason University, as well as a M.S. in Justice, Law, and Crime Policy and a B.S. cum laude in Administration of Justice.

My research on the efficacy of anti-trafficking interventions has been published in the *Journal of Social Inclusion*, which was guest edited by leading human trafficking expert Siddharth Kara, a Harvard University Lecturer and author of "Sex Trafficking: Inside the Business of Modern Slavery." My qualitative interviews with convicted human traffickers were also published in the journal *Trends and Organized Crime*. My research has also been published through magazines such as the Diplomatic Courier and in media outlets, such as USA Today, Politico, The Houston Chronicle, The Hill, The Washington Post, The Baltimore Sun, The Crime Report, Thomson Reuters, and others.

Additionally, I serve as a peer-reviewer for empirical research articles on human trafficking, for example with the Journal of Human Trafficking and American Journal of Evaluation.  I also serve as a peer-reviewer for grant applications for human trafficking research. Most recently, in June 2022, I am serving as an invited peer-reviewer for the U.S. Department of Justice, Office of Justice Programs, National Institute of Justice Research and Evaluation on Trafficking in Persons. Previously, I was invited by the Office of Justice Programs and National Institute of Justice to serve as a peer-reviewer for FY 2020 Research on Law Enforcement Responses to Sex Trafficking of Minors.

My Curriculum Vitae can be referenced in *Appendix A.*

---

[3] Around the same time when I was invited to train Homeland Security Investigations in Buffalo, NY in 2013-2014, I spoke with and emailed Sergeant James Cox, Fairfax County Police; Captain Chris Marsh, Fairfax County Police; and Lieutenant David M. Lauler, CFEI, CFII, CVFI, Code Enforcement United Supervisor of the Fairfax County Fire Marshal's Office about how to use online advertisements for commercial sex to catalyze human trafficking investigations.

## II.   DEFINITIONS

**Human trafficking**: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[4]

**Sex Trafficking**: the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age[5]

**Sex Trafficker:** a person who induces an adult to perform a commercial sex act through the use of force, fraud, coercion, abduction, threat, or deception; or induces anyone who has not attained 18 years of age to perform a commercial sex act.

**Sex Trafficking Victim:** a person who is induced into a commercial sex act through force, fraud, coercion, abduction, threat, or deception; or any person induced into a commercial sex act, who has not attained 18 years of age.

**Consenting Sex Worker:** an adult who chooses to engage in sexual activities in exchange for payment, without being forced, defrauded, coerced, abducted, threatened, or deceived.[6]

**John:** A man who patronizes sex workers. Also referred to as a monger, hobbyist, or trick.[7]

**Two-Call System:** Commercial sex exchange tactic to evade third party detection. The commercial sex consumer will call twice for in-call commercial sex providers: first, to set up an appointment time and obtain general directions to the in-call location, and second, to obtain specific information on which hotel room or apartment the sexual services will be provided.[8]

**Coercion:** the term "coercion" means: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of the legal process.[9]

**Serious Harm:** any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to

---

[4] 22 U.S. Code § 7102.Definitions: https://www.law.cornell.edu/uscode/text/22/7102
[5] TVPRA under 22 U.S.C. § 7102
[6] Gira Grant, Melissa. (2014). Playing the Whore: The Work of Sex Work. Verso.
[7] Mehlman-Orozco, Kimberly. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger.
[8] Mehlman-Orozco, Kimberly. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger.
[9] Ibid. 22 U.S. Code § 7102.Definitions: https://www.law.cornell.edu/uscode/text/22/7102

compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.[10]

**Venture:** Defined in Section 1591(e) as "any group of two or more individuals associated in fact, whether or not a legal entity[11].

**Trauma Bond:** an emotional attachment between an abuser and a victim, which typically forms through a cyclical pattern of abuse, perpetuated through intermittent reinforcement of rewards and punishments.

**In-call:** Any location where the commercial sex consumer travels to the commercial provider for services, such as the sex worker's place of residence or hotel room.

**Outcall:** Any location where the commercial sex worker or victim of sex trafficking travels to the consumer for services, such as the "John," 'hobbyist,"  or "monger's" place of residence or hotel room. Also known as TOS or "Take Out Service."

---

[10] 18 U.S. Code § 1589 (c)(2)
https://www.law.cornell.edu/definitions/uscode.php?width=840&height=800&iframe=true&def_id=18-USC-908443408-986701303&term_occur=2&term_src=title:18:part:I:chapter:77:section:1589
[11] " 18 U.S.C. § 1591(e)(5)" *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018)

# III.   SUMMARY OF OPINIONS

a.  Human trafficking is a clandestine crime.

b.  Human trafficking victims are frequently misidentified.

c.  As a consequence of misidentification, human trafficking victims are typically erroneously criminalized.

d.  Human traffickers use a variety of tactics to recruit, control, and exploit victims, including the use of faux relationships, drugs, threats, and violence.

e.  Jane Doe's narrative is consistent with a victim of human trafficking.

f.  To a reasonable degree of social scientific probability, the Defendants knew or should have known that Jane Doe was a victim of sex trafficking.

g. To a reasonable degree of social scientific probability, the Defendants knowingly benefitted from Jane Doe's sex trafficking victimization.

h. To a reasonable degree of social scientific probability, had the Defendants timely and properly implemented policies and procedures common and reasonably accepted by law enforcement concerning human trafficking identification, investigation, and intervention, it is more likely than not that the injuries suffered by Jane Doe would have been significantly mitigated or prevented.

## IV.   HUMAN TRAFFICKING OVERVIEW

Human trafficking generally refers to the recruitment, transportation, transfer, harboring or receipt of persons, by means of threat, force, coercion, abduction, fraud, or deception, for the purpose of exploitation. Juveniles, unlike adults, cannot consent to exploitation and therefore are considered victims of trafficking if they were exploited. This definition encompasses two general forms of human trafficking: labor trafficking and sex trafficking.

Labor trafficking is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery[12].

Sex trafficking, on the other hand, is defined as when a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age[13].

The modern concept of human trafficking didn't start becoming internationally popularized until the year 2000.

On October 28, 2000, the U.S. Congress enacted the Trafficking Victims Protection Act (TVPA), which set up formidable actions to combat trafficking in persons. Specifically:

1. Coordinate and monitor anti-trafficking activities through an interagency task force;
2. Prevent human trafficking through vocational training, education, and human trafficking public awareness campaigns;
3. Protect human trafficking survivors by not detaining them in correctional facilities, providing them with medical care and other assistance, and protecting them and their families from revictimization and/or deportation; and
4. Strengthening prosecution and punishment of human traffickers[14].

Less than two months after the TVPA was adopted in the United States, the United Nations met in Palermo, Italy, and adopted the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime—colloquially known as the Palermo Protocol. The purpose of the protocol was threefold:

---

[12] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. H.R. 3244 (2000). http://www.state.gov/j/tip/laws/61124.htm
[13] *Ibid.*
[14] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. H.R. 3244 (2000). http://www.state.gov/j/tip/laws/61124.htm

1. To prevent and combat trafficking in persons, paying particular attention to women and children;
2. To protect and assist the victims of such trafficking, with full respect for their human rights; and
3. To promote cooperation among states' parties in order to meet those objectives[15].

Since 2000, there has been a substantial increase in public awareness of human trafficking. There are more anti-trafficking task forces, hotlines, and survivor services than ever before. However, there are still critical gaps between the human trafficking narrative, reality, and policy.

Although more people are aware of the human trafficking concept, few understand how this crime manifests in real life, and there is little empirical data to support empirically generalizable information. Typically, victims are coerced, defrauded, and deceived into an exploitive situation, where they are manipulated into complacency. Many organizations and anti-trafficking authorities provide information on how to identify the red flags of human trafficking, yet even trained law enforcement and service providers frequently misidentify victims.

---

[15] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime. (2000).

# V.   INDICATORS OF HUMAN TRAFFICKING FOR LAW ENFORCEMENT

Although there is little reliable empirical data on the efficacy of anti-trafficking interventions, and victim misidentification is common, there are a number of operational indicators of human trafficking that are actively used by law enforcement and victim service providers to facilitate victim identification in certain circumstances[16].

For example, in 2009 the International Labour Office published the results from a Delphi survey that was used to identify operational indicators of human trafficking. The Delphi methodology involved two successive electronic surveys of human trafficking experts: a first survey in April 2008 to collect indicators from the expert group; and a second one in July 2008 to establish a rating of the indicators. Experts were selected from the 27 EU Member States from police, government, academic and research institutes, NGOs, international organizations, labor inspectorates, trade unions and judiciaries.

Findings from the survey suggested there are six "dimensions" of trafficking indicators: (1) deceptive recruitment, (2) coercive recruitment, (3) recruitment by abuse of vulnerability, (4) exploitive conditions of work, (4) coercion at destination, and (5) abuse of vulnerability at destination. The indicia for every dimension were ranked "strong," "medium," or "weak" for each type of trafficking: (1) trafficking of adults for labor, (2) trafficking of adults for sex, (3) trafficking of children for labor, and (4) trafficking of children for sex.

The six dimensions of trafficking were assessed independently from the others and the result of the assessment was positive if the dimension included at least: (1) Two strong indicators, or (2) One strong indicator and one medium or weak indicator, or (3) Three medium indicators, or (4) Two medium indicators and one weak indicator.

After an assessment was done for each dimension, the final analysis involved combining the six elements to identify potential victims of trafficking—in the case of adults, the presence of deception, coercion, abuse and exploitation and in the case of children simply the presence of exploitation.

A full scale test of these indicators took place in Moldova in the second half of 2008, using a sample of migrants. The final analysis of the dataset gave the ratio of migrants to victims of deceptive or coercive recruitment, exploitation, and coercion at destination. Based on the results, migrants were qualified as successful migrants (no deception, no exploitation, no coercion), exploited migrants (exploitation without deception or coercion), victims of deception and exploitation (without coercion) and victims of trafficking for forced labor (deception, exploitation, and coercion).

A full list of the indicia from the Delphi Survey is included in Appendix G. A sample of

---

[16] These operational indicators are most appropriate for members of law enforcement or victim service providers conducting trauma informed interviews of at-risk populations. These operational indicators are inappropriate for use by businesses in normal day-to-day operation.

relevant "Strong Indicators" for sexually exploited adults are listed below:

- *Deceptive recruitment:* being deceived about the nature of the job or location.
- *Coercive recruitment:* violence, abduction, forced marriage, forced adoption or selling of the victim, debt bondage, or threats of violence.
- *Abuse of vulnerability:* no identified strong indicators.
- *Exploitation:* no identified strong indicators.
- *Coercion at destination:* confiscation of documents, debt bondage, forced tasks or clients, isolation, confinement, surveillance, threats of violence against victim, or violence against victim.
- *Abuse of vulnerability at destination:* no identified strong indicators.

### Application to Jane Doe

Conservatively, the evidence presented in this case suggests that there were a minimum of five out of eleven strong indicators of sex trafficking present in Jane Doe's case: one for deceptive recruitment and four for coercion at destination (see Table 1).

**Table 1. Strong Indicators of Sexual Exploitation of Adults Applied to Jane Doe**

| Strong Indicator | Present Case |
|---|---|
| *Deceptive Recruitment* | • Evidence suggests that Jane Doe was deceived about the nature of her job[17]. |
| *Coercive Recruitment* | Evidence does not suggest that Jane Doe was coercively recruited. |
| *Abuse of Vulnerability* | Not applicable. The Delphi Survey identified no strong indicators for this element. |
| *Exploitation* | Not applicable. The Delphi Survey identified no strong indicators for this element. |
| *Coercion at Destination* | • Evidence suggests that Jane Doe's identification documents were confiscated[18].<br>• Evidence suggests that Jane Doe was forced to perform sex tasks without her consent (e.g. fellatio and intercourse without protection. Sexual acts for free. Sexual acts for little to no pay)[19].<br>• Evidence suggests that Jane Doe was confined and possibly surveilled[20]. |
| *Abusive of* | Not applicable. The Delphi Survey identified no strong indicators for this element. |

[17] Both in her 2019 declaration and in my 2022 interview, Jane Doe recalled being told that she was to work in the United States as an escort, accompanying men to dinner or events, without sex, unless she chose to on her own volition.
[18] Both in her 2019 declaration and in my 2022 interview, Jane Doe reported that Hazel took her passport and personal belongings and would not return her identification until shortly before their return trips back to Costa Rica. This fact is also referenced the Government's Position on Sentencing for Hazel Marie Sanchez Cerdas on 8/2/2019 (Case 1:19-CR-65-LO), among other documents.
[19] Both in her 2019 declaration and in my 2022 interview, Jane Doe reported being forced to perform demeaning and offensive sexual tasks, being forced to allow men to put drugs on her body and in her orifices, being forced to have sex without protection, and other demeaning sexual tasks.
[20] In her 2019 declaration, Jane Doe stated that Hazel would share specific details of Jane Doe and her son's whereabouts, which Jane Doe believed meant she and her family were being surveilled. Moreover, as referenced in the Government's Position on Sentencing for Hazel Marie Sanchez Cerdas on 8/2/2019 (Case 1:19-CR-65-LO), Jane Doe's trafficker would tell victims, including Jane Doe, that she knew where their families lived. In my 2022 with Jane Doe, she reported being confined to the apartment where she was sold for sex, as well as several other locations where she was sold for sex: a hotel room, an apartment in Herndon, and an apartment in New York. Jane Doe reports her transportation was controlled by Hazel and she was required to travel upon her request. This was also corroborated by her 2019 declaration, where she stated "The only places I knew were the places where Hazel made us have sex for money" (page 4).

12

| Vulnerability at Destination | |
|---|---|
|  |  |

A sample of  relevant "Medium Indicators" for sexually exploited adults are listed below:

- *Deceptive recruitment:* deceived about conditions of prostitution, deceived about content of legality of work contract, deceived about family reunification, deceived about housing and living conditions deceived about legal documentation or obtaining legal migration status, deceived about travel and recruitment conditions, deceived about wages/earnings, and deceived through promises of marriage or adoption.
- *Coercive recruitment:* Confiscation of documents; isolation, confinement, or surveillance; threat of denunciation to authorities; threats to inform family, community, or public; violence on family (threats or effective); and withholding money.
- *Abuse of vulnerability:* Abuse of difficult family situation; abuse of illegal status; abusive of lack of education (language); Abusive of lack of information; control of exploiters; Difficulties in the past; Difficult to organize the travel; Economic reasons; False information about law, attitude of authorities; False information about successful migration; Family situation; General context; Personal situation; Psychological and emotional dependency; Relationship with authorities/legal status.
- *Exploitation:* Bad living conditions; excessive working days or hours; Hazardous work; Low or no salary; No respect for labor laws or contract signed; No social protection (contract, social insurance, etc.); Very bad working conditions; and Wage manipulation.
- *Coercion at destination:* Forced into illicit/criminal activities; Forced to act against peers; Forced to lie to authorities, family, etc.; Threat of denunciation to authorities; Threat to impose even worse working conditions; Threats to inform family, community, or public; Under strong influence; Violence on family (threats or effective); and withholding of wages.
- *Abuse of vulnerability at destination:* dependency on exploiters; difficult to live in an unknown area; economic reasons; family situation; personal characteristics; and relationship with authorities/legal status.

Conservatively, the evidence presented in this case suggests that there were a minimum of 41 medium indicators of sex trafficking present in Jane Doe's case: four for deceptive recruitment, six for coercive recruitment, twelve for abusive of vulnerability, six for exploitation, seven for coercion at destination, and six for abuse of vulnerability at destination (see Table 2).

**Table 2. Medium Indicators of Sexual Exploitation of Adults Applied to Jane Doe**

| Medium Indicator | Present Case |
|---|---|
| *Deceptive Recruitment* | - Evidence suggests that Jane Doe was deceived about the conditions of her prostitution.<br>- Evidence suggests that Jane Doe was deceived about her housing and living conditions.<br>- Evidence suggests that Jane Doe was deceived about her travel and recruitment conditions.<br>- Evidence suggests that Jane Doe was deceived about wages/earnings. |
| *Coercive Recruitment* | - Evidence suggests that Jane Doe's identification documents were confiscated. |

13

|  | |
|---|---|
|  | • Evidence suggests that Jane Doe was confined and surveilled.<br>• Evidence suggests that Jane Doe was threatened with denunciation to authorities.<br>• Evidence suggests that Jane Doe was threatened with informing her family and community[21].<br>• Evidence suggests that Jane Doe's family were threatened, specifically her son.<br>• Evidence suggests that Jane Doe had her money withheld. |
| *Abuse of Vulnerability* | • Evidence suggests that Jane Doe's alleged trafficker(s) abused her difficult family situation[22].<br>• Evidence suggests that Jane Doe's alleged trafficker(s) abused her lack of education (language)[23].<br>• Evidence suggests that Jane Doe's alleged trafficker(s) abused her lack of information.<br>• Evidence suggests that Jane Doe was under the control of her alleged exploiters.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) abused her difficulties in the past.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) organized her travel, specifically buying her plane tickets and directing her when to travel.<br>• Evidence suggests that Jane Doe was vulnerable for economic reasons.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) provided false information about law.<br>• Evidence suggests that Jane Doe had a vulnerable family situation[24].<br>• The general context of Jane Doe's commercial sexual exploitation provides indicia of trafficking.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) exploited her personal situation.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) abused illicit relationship with law enforcement authorities to control and exploit Jane Doe. |
| *Exploitation* | • Evidence suggests that Jane Doe experienced bad living conditions during her exploitation[25].<br>• Evidence suggests that Jane Doe experienced excessive working days or hours during her alleged exploitation.<br>• Evidence suggests that Jane Doe experienced hazardous work during her alleged exploitation. |

[21] Both in her 2019 declaration and in my 2022 interview, Jane Doe reported that Hazel threatened to tell her family about the sex work we did. In her 2019 declaration, Jane Doe stated "Hazel manipulated us by threatening to tell our families back home about the sex work we did. Eventually she did tell my family what I was doing in the United States. Shen she did this, I felt worthless, ashamed, and shunned by those who once loved me" (Page 3).

[22] Specifically the tabloid coverage of Jane Doe's divorce and custody battle to recruit and control her.

[23] Jane Doe only completed 6th grade at the time of her exploitation and, according to the Government's Position on Sentencing for Hazel Marie Sanchez Cerdas on 8/2/2019 (Case 1:19-CR-65-LO), Jane Doe's trafficker would specifically target women who spoke little to know English, creating language barriers upon their arrival to the United States (page 2).

[24] According to the Government's Position on Sentencing for Hazel Marie Sanchez Cerdas on 8/2/2019 (Case 1:19-CR-65-LO), Jane Doe's trafficker would specifically target women with vulnerable family situations, stating: "The victims that Sanchez obtained for prostitution were in vulnerable positions, with some victims having recently gone through painful divorces, child custody problems, and financial difficulties" (pages 1-2).

[25] During her 2022 interview, Jane Doe reported going periods without eating, being denied medical treatment, being denied the ability to speak with her son, and being forced to sleep on the uncleaned sheets where she commercial sexual exchanges occurred.

| | |
|---|---|
| | • Evidence suggests that Jane Doe was compensated with low salary during her alleged exploitation.<br>• Evidence suggests that Jane Doe did not have a contract during her alleged exploitation.<br>• Evidence suggests that Jane Doe did not have insurance during her alleged exploitation. |
| *Coercion at Destination* | • Evidence suggests that Jane Doe was forced into illicit/criminal activities during her alleged exploitation.<br>• Evidence suggests that Jane Doe was forced to lie to authorities and to her family.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) threatened denunciation to authorities.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) threatened to inform her family or the public.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) held her under strong influence.<br>• Evidence suggests that Jane Doe's alleged trafficker(s) threatened violence against her family (son).<br>• Evidence suggests that Jane Doe's alleged trafficker(s) withheld a significant portion of her wages. |
| *Abusive of Vulnerability at Destination* | • Evidence suggests that Jane Doe was dependent on her alleged exploiters.<br>• Evidence suggests that Jane Doe found it difficult to live in the unknown area where she was exploited.<br>• Evidence suggests that there were economic reasons that led to Jane Doe's exploitation.<br>• Evidence suggests that there was a specific family situation that led to Jane Doe's exploitation.<br>• Evidence suggests that there were personal characteristics that led to Jane Doe's alleged exploitation.<br>• Evidence suggests that Jane Doe's immigration status and her trafficker's relationship with law enforcement authorities led to Jane Doe's alleged exploitation. |

*Other Operational Indicators*

In addition to the Delphi Operational Indicators for human trafficking identification, there were a number of other "best practices" protocols available for law enforcement before and during Jane Doe's victimization; for example, anti-trafficking non-profit Polaris Project released a Comprehensive Human Trafficking Assessment Tool in 2011[26]. Since Polaris Project worked

---

[26] Note: 2011 Tool can be found here:
https://humantraffickinghotline.org/sites/default/files/Comprehensive%20Trafficking%20Assessment.pdf  Also, Polaris Project is based in Washington D.C. and was the named recipient for an Office of Victims of Crime grant for the Northern Virginia Human Trafficking Task Force in 2013. The purpose of the award was to support a comprehensive approach to combating human trafficking in all forms; sex trafficking and labor trafficking of foreign nationals and U.S. citizens (male and female, adults and minors). Polaris worked with the County of Fairfax (Northern Virginia Human Trafficking Task Force) to 1.) conduct proactive, victim-centered trafficking investigations; 2.) offer a comprehensive array of restorative services to meet each victim's identified needs; 3.) support the prosecution of trafficking crimes on state and federal levels; and 4.) enhance community capacity to identify trafficking crimes and provide culturally appropriate, trauma-informed services to all trafficking victims identified within the geographic region of Fairfax, Prince William, Loudoun, Fauquier, Stafford, and Arlington counties, and the cities of Alexandria, Fairfax, Falls Church, and Fredericksburg. As such, it is more likely than not

collaboratively with Fairfax County Police and had informed Fairfax County Police anti-trafficking interventions in 2011, it is more likely than not that Fairfax County Police were aware of this Comprehensive Human Trafficking Assessment Tool[27].

Some of the questions in the Polaris Project's Comprehensive Human Trafficking Assessment Tool were specifically geared toward identifying potential victims of sex trafficking in "Residential Brothels". Based on this Assessment Tool, Jane Doe's situation was clearly at high-risk of being a victim of sex trafficking (see, for example, Table 3).

**Table 3. Application of Polaris Project's Assessment Tool to Jane Doe's Case**

| Question | Application to Jane Doe |
|---|---|
| *Did you live in the residence where you worked?*<br>   • *If yes, were you ever allowed to leave without being monitored?*<br>   • *If no, were you transported to and from the place that you lived and the residence? Were you monitored at the place that you lived?* | ████████████ |
| *Were you rotated to different residences? How often were you moved?* | ████████████ |
| *Were there multiple controllers or was there one central controller?* | ████████████ |
| *How many individuals were compelled to engage in commercial sex at the establishment? What were their ages?* | ████████████ |
| *How many times a day were you and these other individuals made to engage in commercial sex?* | ████████ On average, she reported eight men, beginning at 10:00am and ending around 10:00pm, but as man as 17 men per day. |
| *What were the demographics of the customers/Johns at the establishment?* | ████████████ |

---

that, as a member of the task force, Fairfax County Police knew about the assessment tool published in 2011, as well as other "best practices."

[27] See, for example, Jackman, Tom. December 11, 2011. UPDATE: NoVa's Asian massage parlors raided. The Washington Post. https://www.washingtonpost.com/blogs/the-state-of-nova/post/update-novas-asian-massage-parlors-raided/2011/12/18/gIQAGrlb4O_blog.html

[28] According to Jane Doe and various documents, this was up to 17 men per day, but on average eight men per day.

| | |
|---|---|
| *Where did the commercial sex take place? Did it take place in the same place where you and others were made to sleep?* | ███████████████████ |
| *Did customers/Johns of the establishment pay you directly or pay a controller? Was there a token system?* | Commercial sex consumers were aware that when Jane Doe's alleged trafficker was present, they would pay Hazel directly. When Jane Doe's alleged trafficker was away, Jane Doe was instructed to place the money in a kitchen drawer. |
| *Was there a specific procedure for entering the establishment (e.g. calling a number from outside)?* | ███████████ ";" ████ |
| *Did you receive tips directly from customers/Johns that came to the residence? Were you able to keep these tips? Could you spend the money the way you wanted to?* | ███████; however, she reports that she was given approximately $3,000 each time she returned home to Costa Rica, of which she spent $500 to $600 on her return flight. |
| *How did the controllers advertise the commercial sexual services?* | Jane Doe was advertised on a variety of online platforms, including private websites, Preferred 411, Backpage, Craigslist, among others. ███████████ Note, the advertisements used the same contact information (email and phone) to advertise multiple women, suggesting they were not independent. |

Ultimately, even though there is a dearth of empirical research on the sensitivity and specificity[30] of human trafficking operational indicators, members of law enforcement[31] interacting with persons involved with the commercial sex industry are well-positioned to collect information that could be used to potentially identify and rescue victims at high-risk of sex trafficking. Extant human trafficking cases in the United States reveal a clear theme on sex trafficking characteristics, which include: confiscation of identification/travel documents; commercial sex advertisements that advertise multiple providers with same contact information; multiple commercial sex providers living at the same residence; rotation[32] of commercial sex providers and advertisement of "new girls;" control of housing, food, communication, transportation, money, and/or restricted access to medical treatment. Members of law enforcement and victim service providers are well-positioned to conduct trauma-informed interviews with persons at-risk of trafficking and have been provided with a growing number of identification protocol since at least 2009; therefore, had the Defendants timely and properly implemented policies and procedures common and reasonably accepted by law enforcement concerning human trafficking

---

[29] See definitions above.
[30] Herein, the term sensitivity is defined as the ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive). The term specificity refers to the ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).
[31] These questions are not appropriate for private businesses during day-to-day operations.
[32] In particular up and down the I-95 corridor from New York to D.C. metro and down to Florida.

identification, investigation, and intervention, it is more likely than not that the injuries suffered by Jane Doe would have been significantly mitigated or prevented.

Instead, the ███████████████████████████████████████████████████████ and, more likely than not, acted with deliberate indifference to Jane Doe's sex trafficking victimization. For example, ███████████████████████████████████████████████████



Although Detective Bill Woolf specifically worked human trafficking cases[34], ███████████ ████████████████████████████████████████████████████.

---

[33] A common misconception among commercial sex consumers, which is directly in contrast with the expectations of law enforcement following the passage of the Trafficking Victims Protection Act (TVPA) in 2000.
[34] See, for example, Woolf Declaration.
[35]
██████████████████████████████████████████████

# VI.   JANE DOE

I utilized qualitative techniques to conduct several interviews with Jane Doe.

I interviewed Jane Doe twice on June 28th, 2022. The first session lasted approximately two hours and fifteen minutes. The second section lasted approximately two hours[36].

There was a break for approximately two hours between the two sessions on June 28th.

At multiple times throughout the two interviews, Jane Doe made reference to her comfort in speaking with me candidly and the novelty of the questions I asked compared to other people. For example, stating:

- "You are the first person who asked me about my past."
- "I have told you more than anyone, including Mr. Victor (her attorney in this case)."
- "As a woman, I feel comfortable telling you."
- "You, as a woman, I can tell you how I feel, and you will understand."
- "I don't know why I can feel that I can just talk with you."
- "I told you things I haven't told anyone else."
- "Thank you for the opportunity to release everything in my heart and taking time to speak with me."

However, at multiple times throughout the two interviews, Jane Doe expressed discomfort in recalling her alleged victimizations, for example audibly crying, pausing and taking deep breaths before answering, and vocal quivering. Statements of her discomfort include, but are not limited to:

- "When I think about it sometimes, I cannot breathe."
- "I put lemongrass oil[37] on my hands, so I can smell, when I think about it."
- "So many times in my life, I feel like a cow that people kill to eat[38]."
- "Sometimes I feel like I don't have any value anymore."
- "Right now I am shaking, remembering."

I interviewed Jane Doe once on June 29th, 2022 for approximately 30 minutes. Based on the information from our first two interviews the previous day, I had several follow-up questions. Given the length of the interviews from the day prior, I first asked Jane Doe how she felt, to ensure that she remained comfortable in speaking with me. Jane Doe made the following statements:

---

[36] NOTE: for 30 minutes of the second interview, she was in the presence of her current partner and he described some of his observations, while she listened.

[37] Although there is limited scientific evidence on the medicinal properties of lemongrass oil, a small number of experimental and exploratory studies have found some evidence to suggest it has a perceived anxiolytic effect. For example see Goes, Urulino, Almeida-Souza, Alves, and Teixeira-Silva. (2015). Effect of Lemongrass Aroma on Experimental Anxiety in Humans. Journal of Alternative and Complementary Medicine. Vol. 21, no. 12.

[38] Jane Doe made a similar analogy in her 2019 declaration, saying "During the time I felt worthless, as though I was a cow being butchered, with each man removing a piece of me when finished" (page 2).

19

- "I feel good. I feel like a weight has been lifted off of me."
- "I slept great."

I asked Jane Doe specific supplemental questions for less than 10 minutes each on June 30th, on July 1st, July 5th, July 6th respectively.

*Background*

Jane Doe has a narrative similar to many victims of international sex trafficking, which includes childhood sexual abuse, low self-esteem, and restricted opportunities for financial independence, as well as physical and emotional neglect.

Jane Doe stated that she was raised in ██████, Costa Rica by her mother, who was reportedly absent for much of her childhood.

While her mother was working long days and late nights at a restaurant, Jane Doe was cared for by her aunts, grandmother, friends, and neighbors. Jane Doe stated that she does not know the identity of her father.

On one occasion, when Jane Doe was around eight years old, she was molested by one of her babysitters—the step-father of her friend, a neighbor. Jane Doe recounted the incident with vivid detail and began audibly crying, with labored breathing, as she described what transpired during the incident. After disclosing the sexual abuse, Jane Doe stated that her mother did not believe her and did not advocate for her. Jane Doe believed that the man who molested her, and at least one other child, never faced any consequence.

Following the incident of childhood sexual abuse, Jane Doe did not recall much of her youth. She remembered needing to repeat fifth grade and that no one from her family attended her 6th grade graduation, but not much else.

Jane Doe stated that her mother refused to provide the nominal registration fees for her to advance into high school, which Jane Doe indicated begins in 7th grade in Costa Rica. Instead of attending school, Jane Doe reported that from approximately the age of 12 to 18, she would stay at home, cook, clean, and do laundry for her mother and her mother's partner.

Jane Doe reported that she was very thin as a child and her mother would mock her appearance, saying, for example, her knees looked like the knees of a horse. Jane Doe believes this contributed to her low self-esteem, which she said affected her throughout her youth and early adulthood.

Jane Doe reported that her second step-father, the father of her half-brother, was physically abusive toward her mother, her half-sister, and, at times, would be aggressive toward Jane Doe by grabbing her and shaking her. Jane Doe recalled that her half-sister, who was the child of her mother and her first step-father, told her father about the abuse, and eventually moved out of their house to live with her father. Jane Doe stated that she "did not have a father to tell."

As soon as Jane Doe was allowed to work, when she was 18 years old, she secured a job as a hostess at a restaurant/bar called ▮▮▮▮. While at work, Jane Doe met her first husband, ▮▮▮▮▮▮▮▮▮▮▮▮, who was involved with radio and television production, but worked at the same restaurant/bar periodically as an MC. Shortly after meeting her first husband, Jane Doe got pregnant and gave birth to her son ▮▮▮▮▮▮▮▮ on ▮▮▮▮▮▮▮. Jane Doe and ▮▮▮▮▮ ▮▮▮▮▮ were married the following year.

After several years of "being happily married," Jane Doe reported that her first husband became unfaithful, which precipitated their divorce[39]. According to Jane Doe, her first husband was offered an opportunity to have bariatric surgery for free to be broadcast on a television show. Jane Doe reported that her first husband weighed approximately 369 pounds when they first met and he lost about 180 pounds after the surgery. After the program on his drastic weight loss aired, Jane Doe stated that her first husband received multiple job opportunities with various brands and enjoyed local celebrity status. She also believed this is when his infidelity started[40].

In 2009, Jane Doe's divorce from her first husband was publicized in multiple tabloids[41] because of her husband's involvement in the entertainment industry. Jane Doe reported that the divorce was highly contentious. She claimed that her first husband was physically aggressive against her on multiple occasions and that he reportedly cleared their joint bank accounts, only offering to pay Jane Doe the equivalent of $100 per month in support. Since she was not working, Jane Doe claimed that she relied on assistance from her former mother-in-law and father-in-law, sold Avon, and pawned other possessions, such as televisions, in order to secure an apartment and provide basic support for herself and her son[42].

---

[39] According to media reports, Jane Doe's first husband claimed that she was unfaithful and repeatedly questioned the paternity of their son. At least one tabloid story from 2017 reported that a DNA test confirmed that Jane Doe's first husband was not the father of her son. When confronted with this information, Jane Doe shared a screenshot of an apparently recent picture of her son with her first husband, shared on social media from "16 hours ago." Jane Doe stated that she was familiar with the news story questioning the paternity of her son and claimed that the wife of her ex-husband paid for a test in a private clinic. Following the story, Jane Doe claimed that she repeatedly asked to take a DNA test with a government clinic for forensic medicine and that her ex-husband declined. Jane Doe claimed that for the government paternity test, both parents must be present. Jane Doe was emphatic and "100% certain" that her first husband is the father of her son.

[40] Note: In at least one tabloid story on the divorce, Jane Doe's first husband explicitly denies any infidelity following his weight loss.

[41] Jane Doe provided hyperlinks to six different stories/videos regarding her relationship and divorce with her first husband. I was able to find at least 10 additional stories/videos regarding their relationship/divorce. For example, one story published on September 18, 2011 discusses how Jane Doe's first husband was getting re-married that month to a woman he had been dating for a year.  On September 26, 2011, a story features multiple pictures of Jane Doe's son in attendance at her first husband's second wedding to another woman. On September 22, 2012, a story reports that Jane Doe's first husband attempted to prevent her from seeing her son. Another story published on October 12, 2012 reports that Jane Doe was granted custody of her son after being prevented from seeing him for two months. One story from January 25, 2017 states that Jane Doe's first husband was not the father of her son and that in her last contact with the press she was working as a nanny in the United States.  On April 23, 2019, a story discusses Jane Doe's first husband and his second wife, as well as his second wife's depression.

[42] According to a sworn declaration provided by Jane Doe's ex-husband, he claimed that Jane Doe engaged in consensual prostitution prior to her alleged trafficking (See Defendant's Sentencing Memorandum for Hazel Maria Sanchez Cerdas). In her Sentencing Memorandum, Jane Doe's alleged trafficker, Hazel Maria Sanchez Cerdas, referenced this declaration in an attempt to undermine Jane Doe's credibility as a victim/witness. However, even if this were accepted as true, consenting sex workers are at high-risk of being trafficked, and victims of trafficking, in particular victims of trafficking who also experienced childhood sexual abuse, are known to provide false

Approximately one year after their divorce, Jane Doe visited a local spa[43] in the hope of relaxing after a particularly stressful year.

*Alleged Human Trafficking*

While at the spa in 2010, Jane Doe claimed that she was approached by a woman named Nicole, who reportedly worked as a recruiter[44] for her alleged trafficker, Ms. Hazel Marie Sanchez Cerdas. Jane Doe claimed that Nicole told her that she could travel to the United States and work as an escort by accompanying men to dinners and events, but no sex would be involved unless Jane Doe consented and, if it did occur, it would be incidental to, not the purpose of, the escorting. Jane Doe stated that the woman had recognized her from the media coverage over her divorce and knew she was in need of money. Jane Doe's recollection of Nicole's offer was that it sounded like a "dream."

Nicole told Jane Doe that her "friend" would fly Jane Doe to the United States, provide her with food, housing, transportation, and pay "a lot of money[45]" to escort wealthy and famous men to dinner, parties, and events—Jane Doe referred to this as "the big promise." Although the offer seemed enticing, Jane Doe didn't immediately agree, and instead simply gave the woman her phone number. They spoke over the phone for several months before Jane Doe actually agreed to go to the United States. In retrospect, Jane Doe states that she felt like a "dummy" for believing in "the big promise" and was naïve, but was lulled into a false sense of security based on her limited work experience, financial difficulties, familial strife, limited understanding of employment and income in the United States, and the unconventional non-sexual, escort-like lifestyle that she lived with her husband in the entertainment industry (for example, being compensated for attending events).

*Prima facie*, both Hazel and Nicole presented themselves to be friends of Jane Doe[46]; for example, offering to take her out for coffee, help her with "anything" she needs, and advance her

---

[43] Jane Doe reports that she visited the spa shortly after the first Father's Day following her divorce, which was particularly emotional for her and her son.

information, retract information, omit information during initial stages of reporting or interviews with law enforcement. Given the commonalty of these responses to commercial sexual exploitation, this alone does not undermine the veracity of sex trafficking allegations.

[44] Jane Doe reports that the woman was paid at least $100 for each person she recruited.

[45] Although Jane Doe did not recall a specific sum that was suggested, she recalled being told that she would make more money than her ex-husband; enough to be financially secure and independent.

[46] Human traffickers frequently present themselves to victims during the initial recruitment stage and periodically through the victimization, as heroes, lovers, faux family, and friends (see, for example, Mehlman-Orozco, Kimberly. (2017). Projected heroes and self-perceived manipulators: understanding the duplicitous identities of human traffickers. Trends in Organized Crime. This is perhaps why they are erroneously perceived as consenting participants or co-conspirators by third parties. For example, during the sentencing hearing, Honorable Judge Liam O'Grady stated that the communications between Jane Doe and Ms. Sanchez Cerdas, demonstrated "voluntariness." While ostensibly this is true, this tactic is a very common occurrence among sex trafficking operations. For example, in written communications, victims of sex trafficking will often tell their trafficker the "love" him (for example, see the *People v. James Vernon Joseph, Jr.*  No. 5-160639-1).

travel fees. This façade started with their initial meeting and would periodically reappear[47] throughout the alleged trafficking period—a tactic commonly used by sex traffickers to facilitate trauma bonding[48].

Once she arrived in the United States, Jane Doe reported that she was met at Dulles Airport by a woman named "Sonia," who was also from Costa Rica, but a notoriously "tough area" called ████████. Sonia brought Jane Doe to Ms. Sanchez Cerdas's apartment.

Shortly after arriving, Jane Doe stated that  Ms. Sanchez Cerdas confiscated her purse, cellphone, and passport, instructed her to go into one of the bedrooms and change into provided lingerie to prepare for her first "client." When Jane Doe protested, she claimed that Ms. Sanchez Cerdas threatened her, "If you don't have sex with this guy, I know where you live, your son's school, where your son lives. If you don't do this, your son has to pay the consequence."

Jane Doe claimed this threat was the main reason she complied with Ms. Sanchez Cerdas's orders, followed by the threat of denunciation to authorities and threat to inform her family.

Similar to her recollection of the childhood sexual abuse incident that Jane Doe experienced when she was eight years old, she was able to describe her first commercial sex exchange in great detail and at times became audibly upset when recalling the detailed memories. Jane Doe described that night as the "first time (she) had to have sex with someone (she) don't like." Jane Doe stated that she didn't remember the man's height, but he had glasses and blue eyes. She claimed that he wasn't remarkably old and slightly overweight. He said that he was wearing a business suit and a wedding ring. Jane Doe recalled the man spoke with Ms. Sanchez Cerdas for about two minutes, but Jane Doe had no idea how much the man paid, because no one told her. During the commercial sex exchange, Jane Doe didn't kiss the man on the lips. He touched her breasts with his hands and mouth and digitally penetrated her. He asked to perform cunnilingus, but she refused, and she performed fellatio on him over a condom.

At this point, Jane Doe stated that she was only forced to perform sexual acts *without* a condom for ████████████████████████████████.

Jane Doe continued describing her first forced commercial sex exchange, stating the man had vaginal intercourse with her, while wearing a condom. She stated that it "felt like forever," but possibly took between 30 minutes to an hour, because she was forced to have sex with him twice. She said the man did not talk with her during the exchange or ask any questions. She reported that he was not gentle and she described the experience as "a little rough," but not as violent as some of the other men. She said that other men, after this first encounter, were more aggressive than her first exchange and tied her up, put bottles inside her vagina, choked her, pinched her, and hit her. Jane Doe's voice began breaking up and her breathing became labored as she listed the things men would do to her during her alleged trafficking victimization.

---

[47] See, for example, Government's Position of Sentencing for United States v. Hazel Marie Sanchez Cerdas aka Andrea No 1:19-CR-65-LO
[48] See definition in section above.

After the first incident was over, Jane Doe recalled crying herself to sleep in the same bedding that she was forced to have sex in.

During the first two weeks of Jane Doe's alleged trafficking, she said that she was forced to service an average of eight men per day, usually beginning around 10:00am and ending around 10:00pm. Although she initially did not know how much Ms. Sanchez Cerdas was charging for each exchange, she later learned it was between $150 to $250 per person, which was an income of $16,800 to $28,000 every two weeks. Jane Doe stated that she did receive some money, but it was approximately $2,400 to $2,500 each time she returned to Costa Rica, regardless of how many hours she worked, how many men she serviced, or how many days she spent in the United States.

At any given time, Jane Doe said that Ms. Sanchez Cerdas would have at least two women working for her and that, on average, Ms. Sanchez Cerdas would have sex with two men per day, while her employees would have sex with six to eight men per day, for a total average of 14 to 16 men per day. Based on these estimates, Ms. Sanchez Cerdas was earning between $2,100 to $4,000 per day, which amounts to $766,500 to $1,460,000 per year.[49]

Jane Doe reported that some of Ms. Sanchez Cerdas's "special friends," for example ████, drug dealers, and her website technician, were allowed to have sex with her and the other women without any financial payment, in exchange for their services to Ms. Sanchez Cerdas (e.g., security, drugs, and website development/tech support, respectively)[50]. Jane Doe reported that Ms. Sanchez Cerdas would generally speak of the ████████████████████████ ██████████████████████████████████████████████[51].

Although Jane Doe did not report the subsequent commercial sex exchanges with the same level of detail as her first, she did recall that some of Ms. Sanchez Cerdas's "special friends," including ████████████████, would visit the apartment repeatedly for commercial sex, as often as once or twice a week. Jane Doe stated that some of these "special friends" would not engage in conversation, but others would make small talk; for example, asking how long she would be in town? On one occasion, Jane Doe stated she told ████████████████ "I don't know, two or three weeks," to which he replied, "if you behave, maybe I could come to see you again."

---

[49] NOTE: These are estimates based on the following information: 1. Jane Doe reports that on average she was having sex with 8 men per day, Ms. Sanchez Cerdas was having sex with 2 men per day, and the other woman would have sex with around 6 men per day. 2. Jane Doe reports that they women were not afforded days off, 3. Jane Doe reports that at times she would have sex with as many as 17 men per day, 4. Jane Doe reports that Ms. Sanchez Cerdas would charge between $150 to $250 per person.
[50] This information, collected from Jane Doe's 2022 interview was corroborated by the ████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████[51]

Jane Doe reported that during her first week, she remembered looking out of the window and seeing ███████████. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[2].

Jane Doe stated that she was sex trafficked under Ms. Sanchez Cerdas's supervision from 2010 to 2015. Working predominately out of apartments in Northern Virginia, as well as in-call[53] hotels, outcall[54] hotels, and an apartment in New York.

In early 2015, Jane Doe claimed that she had the opportunity to escape after Ms. Sanchez Cerdas got in an altercation with one of the other girls and they both threatened to call the police. During the exchange, Jane Doe reclaimed her phone, purse, and identification and snuck out of the apartment to the hotel across the street. Jane Doe reported that she hid at the hotel for several weeks without Ms. Sanchez Cerdas's knowledge, before one of her commercial sex consumers visited, proclaimed his romantic feelings toward her, and offered to "rescue" her and "protect" her.

The regular commercial sex consumer, ███████████████, married Jane Doe in a civil ceremony and then moved her into his apartment. Shortly thereafter, however, Jane Doe's second husband claimed that he had to pay medical bills for his father and threatened to deport her if she did not consent to being sold for sex. Jane Doe stated that she was sold for sex by her second husband and forced to turn over the entirety of her earnings to him and for his benefit—consistent with a sex trafficking scheme. Her second husband commercially sexually exploited Jane Doe for approximately three years, from 2015 to 2018.

Jane Doe reported escaping her second alleged sex trafficking victimization after she was arrested for prostitution and another commercial sex consumer offered to help her. According to Jane Doe and the second commercial sex consumer, herein referred to as John Doe, assisted her in reporting everything to federal and local law enforcement in 2018 and, following a FBI investigation, Hazel Marie Sanchez was arrested in 2019.

---

[52] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[53] See definition in section above.

[54] *Ibid.*

# VII.  ADVERTISEMENTS SUGGESTIVE OF SEX TRAFFICKING NETWORK

In addition to the operational indicators of sex trafficking evidenced in this case, the commercial sex advertisements used to sell Jane Doe, and associated reviews from commercial sex consumers, made it clear that she was not an independent sex worker, but rather one person being sold by a larger network; thus at higher risk of being sex trafficked. According to The Erotic Review (TER)[55], a commercial sex consumer review website, Ms. Sanchez Cerdas was reviewed, under the commercial sex pseudonym[56]Andrea, by commercial sex consumers at least seven times in 2013, twice in 2015, three times in 2016, and five times in 2017. Her listed phone number, (571) 577-1879, was also linked on The Erotic Review to one review for a person named "Carla" from 2013 and four reviews for a person named "Crystal"— three from 2011 and one from 2015. Jane Doe also shared screenshots of commercial sex advertisements associated with Ms. Sanchez Cerdas's phone number—(571) 577-1879 — including one review of a woman named Sofia (see Figure 1).



Sofia Colombian girl - 571"577"1879 - 29

• Crystal city, Northern Virginia | Saturday, February 13, 2016 6:14 PM | •
**571-577-1879**

**Figure 1. Commercial Sex Advertisement Posted by Hazel in 2016**

Hazel's listed email address, andreafairfax@hotmail.com, was linked to reviews for three other women: one for "Valeria" from 2010; ten for "Diana"—one from 2010 and ten from 2011; and ten for "Karina"— one from 2010, four from 2011, and five from 2012.

The ads with Hazel's email address, contained several other phone numbers:
(571) 577-2335, (571) 471-2170, (917) 600-6214, and (571) 572-8545 (see Figures 2 and 3).

---

[55] ████████████████████████████████
████████████████████████████████████

[56] Tied to Ms. Hazel Marie Sanchez Cerdas through her contact information.



**Figure 2. Listing for "Diana" on The Erotic Review with Hazel's Email**



**Figure 3. Listing for "Karina" on The Erotic Review with Hazel's Email**

In conducting searches with the four additional phone numbers, over 130 reviews were identified and one of the phone numbers was linked to another email address, hazel_28@hotmail.com.

For the phone number (571) 577-2335, there were seven reviews on The Erotic Review for a woman named "Valeria" in 2011, three reviews for a woman named "Nikki" in 2011, and one review for a woman named "Sasha" in 2011.

For the phone number (571) 471-2170, there was only one additional woman reviewed, "Paloma." Jane Doe repeatedly mentioned "Paloma" as someone who she was victimized alongside. There were 127 reviews on The Erotic Review associated with this number, dating from September 2006 to July 2011. Paloma's review also mentioned the email hazel_28@hotmail.com (see Figure 4).



**Figure 4. Listing for "Paloma" on The Erotic Review with Hazel's Email**

There were no other reviews associated with the phone number (917) 600-6214, other than "Karina," and there were no other reviews associated with the number (571) 572-8545, other than "Karina" and "Valeria."

In addition to the searches I performed, other phone numbers and an email address, were referenced in  advertisements included in the investigation of Jane Doe's allegations. For example, ███████████████████████, as well as ████████████████████, were listed in the Affidavit in Support of an Application for a Search Warrant for ████████████ ████████████████████████. A more rigorous search of commercial sex advertisements and reviews closer in time to the alleged trafficking period, 2010-2015, may have yielded additional results.

However, even seven years later, there is evidence to suggest that Hazel's operation may have been part of a larger syndicate that operated out of New York and continues to post commercial sex advertisements currently. Among the posted reviews of Hazel's services from commercial sex consumers, the most reviewed women were Hazel aka "Andrea" with 67 reviews and "Paloma" with 127 reviews. Hazel's first review was posted in October 2009 with a location of "Fairfax" and "Paloma's" first review was posted in September 2006 in "Upper East Side, New York." In fact, approximately half of "Paloma's" commercial sex consumer reviews came from her time working in New York for a different woman, who is also reportedly from Costa Rica, known as "Fiorella"

Mentions of "Fiorella" are found across multiple commercial sex consumer reviews for "Paloma" from 2009 to 2010 (see Appendix H). It wasn't until mid 2010 that "Paloma" moved down to Virginia and was advertised under Hazel. Jane Doe also reported being brought to New York and sold for sex at an apartment in New York, but does not recall the name of the person who lived in the apartment.

In addition to the shared oversight over Paloma at different times and visits to New York, Hazel's operation was reportedly advertised with the website AndreaandFriends.com, while Fiorella's operation was previously advertised with the website FiorellaandFriends.com. At the

time of this report, Fiorella's most recent advertisements were posted July 5, 2022 at
https://fiorellafriends.blogspot.com/.

Ultimately, the advertisements, in concert with information provided in this case, suggest that
Jane Doe's alleged victimization was part of a much larger network, which spanned the I-95
corridor, a known hotbed for sex trafficking movement (see Figure 5).



**Figure 5. Potential Advertisement Network of Present Case**[57]

Although commercial sex consumer reviews are posted anonymously, they have been used
by many law enforcement organizations to catalyze investigations since the early 2000s, as well
as, more recently, by academics and anti-trafficking organizations for research into trends,
demographics, and indicia[58].

---

[57] Based on information received from Jane Doe and commercial sex consumer reviews from The Erotic Review.
[58] For example, see: Janson, Lara, et. Al. 2013. "Our Great Hobby": An Analysis of Online Networks for Buyers of
Sex in Illinois. Chicago Alliance Against Sexual Exploitation.
http://www.icasa.org/docs/misc/caase%20report%20online%20buyers%20of%20sex%20in%20illinois.pdf OR
Pilny, Andrew and Jeffrey Proulx. 2017. The Influence of Prototypical Communication in Dark Online
Organizations: How to Speak Like a Monger. Journal of Language and Social Psychology.
https://www.researchgate.net/profile/Andrew_Pilny/publication/318885232_The_Influence_of_Prototypical_Comm
unication_in_Dark_Online_Organizations_How_to_Speak_Like_a_Monger/links/59a454b50f7e9b4f7df37455/The-
Influence-of-Prototypical-Communication-in-Dark-Online-Organizations-How-to-Speak-Like-a-Monger.pdf

# VIII. CONCLUSION

Sex trafficking charges are notoriously difficult to prove in criminal court[59]. However, even in the absence of an arrest and conviction, there are common policies and procedures that are reasonably accepted by law enforcement concerning human trafficking identification, investigation, and intervention, which can significantly mitigate or prevent victimization.

Although Jane Doe's alleged trafficker, Ms. Sanchez Cerdas, was not ultimately convicted of sex trafficking, the application of common policies and procedures that are reasonably accepted by law enforcement could have led to the identification of Jane Doe's alleged sex trafficking victimization[60].

Moreover, given the Defendants' demonstrable and specific familiarity with human trafficking indicia, which generally accepted in the field of law enforcement, and



If the Defendants had timely and properly implemented policies and procedures common and reasonably accepted by law enforcement concerning human trafficking identification, investigation, and intervention, it is more likely than not that the injuries suffered by Jane Doe would have been significantly mitigated or prevented.

The women working for Ms. Sanchez Cerdas, including Jane Doe, met several "strong indicia" of trafficking and the



Jane Doe, for example, was deceived about the nature of the job and being forced to have sex, sometimes without protection with an average of eight men per day but as many as 17 men per day; she had her travel and identification documents confiscated; she was held in isolation, and she believed that she and her son were being surveilled.

As evidenced in their reviews,



---

[59] For example, see Mehlman-Orozco, Kimberly and Sherriff William Snyder. 2019. Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie. USA Today. Retrieved from: https://www.usatoday.com/story/opinion/2019/04/04/robert-kraft-lawyers-sex-trafficking-conviction-difficult-column/3325857002/

[60] NOTE:

## APPENDICIES

### APPENDIX A – CURRICULUM VITAE

DR. KIMBERLY B. MEHLMAN-OROZCO

(703) 362-9405 ▪ kim@mehlmanorozco com ▪ www.mehlmanorozco.com

EDUCATION

**Doctor of Philosophy**                    Criminology, Law and Society
                                            George Mason University
*Dissertation:* The "Crimmigration" Affect: An Analysis of 287(g) and Latino/a Representation in the U.S.
Juvenile Justice System
*Expertise:* Human Trafficking, Human Smuggling, Immigration, Survey Methods and Systematic Review

**Master of Arts**                          Justice, Law, and Crime Policy
                                            George Mason University
*Thesis:* Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern
Virginia

**Bachelor of Science**                     Administration of Justice
                                            George Mason University
*Cum Laude*

TEACHING EXPERIENCE

**Surviving and Thriving Beyond Sex Trafficking** SP18
                                            Ph.D. Research Course
                                            Sustainability Education
                                            Prescott College

**CRIM307 Social Inequality, Crime, and Justice** FA17
                                            Criminology, Law and Society
                                            George Mason University

**CRIM405 Law and Justice Around the World** SP17, SP18
                                            Criminology, Law and Society
                                            George Mason University

**CRIM308 Human Rights and Justice**        FA16
                                            Criminology, Law and Society
                                            George Mason University

**CCJS100 Intro to Criminal Justice**       FA12-SP14
                                            Department of Criminology & Criminal Justice
                                            University of Maryland College Park

**CCJS370 Race and Crime**                  FA12-SP14
                                            Department of Criminology & Criminal Justice
                                            University of Maryland College Park

**CCJS432 Law of Corrections**

FA12
Department of Criminology & Criminal Justice
University of Maryland College Park

**CCJS418J Foreign Nationals and Crime**

FA12-SP13
Department of Criminology & Criminal Justice
University of Maryland College Park

**CRIM490 Foreign Nationals and Crime**

SU09, SU10, SU11, SU12
Criminology, Law and Society
George Mason University

**GED, Work Place Essential Skills,
and Adult Basic Education**

SU05-SU06
Adult Detention Center
Prince William County

RESEARCH EXPERIENCE

**Executive Director**

WI18– Present
Freedom Light

**Partner/Human Trafficking Expert Witness**

FA16– WI18
Mahn, Mehlman & Associates

**Human Trafficking Subject Matter Expert**

SU16-FA17
RAND Corporation

**Executive Director/Human Trafficking Consultant**

WI12– FA16
The Justitia Institute

**Director**

FA10 – WI12
Latino Policy Institute
Roger Williams University

**Research Associate**

SU11 – WI12
Cochrane Collaboration College for Policy
George Mason University

**Lead Clinical Trials Search Coordinator**

SU10 – WI12
Justice Health Field
The Cochrane Collaboration

**Senior Research Associate**

SU08 – SU11
OJJDP Census of Juveniles on Probation
George Mason University

**Graduate Research Assistant**

SU10 – FA10
Violence and Victimization Research Division
National Institute of Justice (On Contract)
Office of Justice Programs

| | |
|---|---|
| **Senior Fellow** | SU08 – FA10<br>The Lloyd Society |
| **Graduate Research Assistant** | SU06 – SU08<br>Trinidad & Tobago Crime Reduction Project<br>George Mason University |
| **Graduate Research Assistant** | WI07-SP07, SP08<br>OJJDP Vaccines for Children Project<br>George Mason University |

PUBLICATIONS

**Mehlman-Orozco, Kimberly B**. (2019). "Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen." USA Today.

**Mehlman-Orozco, Kimberly B.** and Sheriff William D. Snyder. (2019). "Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie." USA Today.

**Mehlman-Orozco, Kimberly B.** and William D. Snyder. (2019). "Legalizing prostitution could end sex-trafficking investigations." The Hill.

**Mehlman-Orozco, Kimberly B.** (2019). "How to Fight Sex Trafficking." Politico.

**Mehlman-Orozco, Kimberly B.** (2019). The Jihadi Next Door: How ISIS is Forcing, Defrauding, and Coercing Your Neighbor into Terrorism. SkyHorse.

**Mehlman-Orozco, Kimberly B.** (2018). "Sex trafficking bill likely to do more harm than good." The Baltimore Sun.

**Mehlman-Orozco, Kimberly B.** (2018). "Why cracking down on websites won't stop online sex trafficking." *Thomson Reuters Foundation*.

**Mehlman-Orozco, Kimberly B.** (2018). "Legislation Aiming to Stop Sex Trafficking Would Hurt Investigations." *Homeland Security Today*.

**Mehlman-Orozco, Kimberly B.** (2017). "Trafficking victims get lost under unjust criminal convictions." *The Hill*.

**Mehlman-Orozco, Kimberly B.** (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." *Trends in Organized Crime*.

**Mehlman-Orozco, Kimberly B.** (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. ABC-CLIO/Praeger.

**Mehlman-Orozco, Kimberly**. (2017). "Why we should question the FBI's recent human trafficking sting." *Thomson Reuters*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalize sex work to bring trafficking victims out of the shadows." *The Hill*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalizing sex work would help bring victims out of the shadows." *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why the Stop Enabling Sex Traffickers Act is the Wrong Solution." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Identifying Victims of Human Trafficking." *Dimensions of Dental Hygiene.*

Syme, Sheryl, Camardese, Susan, and **Kimberly Mehlman-Orozco.** (2017). "Human Trafficking: Red Flags for Dental Professionals." *Decisions in Dentistry.*

**Mehlman-Orozco, Kimberly B.** (2017). "Vilifying Backpage.com won't help fight sex trafficking" *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2017). "Child Trafficking: The Tragedy of 'Princess'" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "To sue or not to sue third-party businesses for sex trafficking?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Hunting the Internet's Sex Predators." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Will shutting down Backpage.com end the scourge of child sex trafficking in America?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Sex Trafficking: A Surprising Rescue Story." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "What every parent should know about sex trafficking." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** and Simon Hedlin**.** (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." *The Houston Chronicle.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why Do We Criminalize Young Victims of Sex Trafficking?" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Plight of Sex-Trafficking Survivors." *The Gay and Lesbian Review Worldwide.*

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Trafficking is often hidden in plain sight." *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "Will Legalized Prostitution End the Sex Trafficking Scourge?" *The Huffington Post.*

**Mehlman-Orozco, Kimberly B.** (2016). "What happens after a human trafficking victim is rescued?" *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Reality of Sex Trafficking in Washington's Red Light District." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** (2016). "America's Symbolic, Not Effective, Anti-Trafficking Policy.

*Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2016). America's Anti-Trafficking Efforts: Hollow victories for public accolade. *Connection Newspapers*: Chantilly, Centerville, Great Falls, Herndon, McLean, & Vienna.

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital." *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2015). "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. *Social Inclusion.*

**Mehlman-Orozco, Kimberly B.** (2015). "Tor and the Bitcoin: An Exploration into Law Enforcement Surveillance Capability Online". *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B**. (2014). "Human Trafficking in the Philippines: A Blemish on Economic Growth". *Diplomatic Courier, Recovery in the Philippines.*

**Mehlman-Orozco, Kimberly B.** (2014). "Devoid of Research: An Evaluation of Human Trafficking Interventions". *Diplomatic Courier, Special Issue: Breaking the Cycle of Human Trafficking.*

Martinez, Ramiro, and **Mehlman-Orozco, Kimberly B.** (2014). "Hispanic Immigration and Crime". Oxford Handbook of Ethnicity, Crime, and Immigration. Eds. Michael Tonry and Sandra Bucerius. Oxford University Press.

**Mehlman-Orozco, Kimberly B.** (Contributing Author) (2010) "Breaking It Down: Justice, Law & Society Abstracts for Policymakers and Practitioners". *Center for Justice Law and Society.*

REPORTS

**Mehlman-Orozco, Kimberly B.** (May, 2017). Expert Witness Report. *State of Ohio v. Michael Moore.* CR 16-3191.

**Mehlman-Orozco, Kimberly B.** (2011). The Effects of In-State Tuition for Non-Citizens: A Systematic Review of the Evidence. *Latino Policy Institute at Roger Williams University.* http://www.rwu.edu/depository/lpi/lpi-report.pdf

**Mehlman-Orozco, Kimberly B.** (2008). Race and Reporting Burglary, Robbery, and Assault in Trinidad and Tobago. (Completed under a grant from the Trinidad and Tobago Government*).*

SCHOLARLY PRESENTATIONS

**Mehlman-Orozco, Kimberly B.** (2019). Keynote Speaker: National Capital Region Threat Intelligence Consortium  (NTIC) Human Trafficking Seminar.

**Mehlman-Orozco, Kimberly B.** (2019). Law Enforcement's Role in Combating Human Trafficking and Assisting Victims. Police Executive Research Forum (PERF).

**Mehlman-Orozco, Kimberly B.** and Marisa Trasatti (2019). Human Trafficking: The Silent Risk. The RIMS (Risk Management Society) Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Social Policy and Justice Panelist. Harvard College Project of Asian and International Relations. Harvard University.

35

**Mehlman-Orozco, Kimberly B.** (2018). Women in Homeland Security Human Trafficking Symposium Panelist. Marymount University.

**Mehlman-Orozco, Kimberly B.** (2017). Human Trafficking Symposium Panelist. Liberty University School of Law.

Martin, Favian, **Mehlman-Orozco, Kimberly**, and Wooditch, Alese. (2014). Mexican Migration to the United States: An Exploratory Study into Illegal Border Crossings. Academy of Criminal Justice Sciences. Philadelphia, PA

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Systematic Review Methods," Presented at the annual colloquium of the Cochrane and Campbell Collaborations: Keystone, CO.

**Mehlman-Orozco, Kimberly B.** (2010). "Open Access Systematic Reviews for Juvenile Probation Information," Presented at the first annual OJJDP Probation Summit: Washington, D.C.

**Mehlman-Orozco, Kimberly B.,** Chirieleison, J., Sebold, C. M., Douds, A., Gallagher, A.M., and Gallagher, C.A. (2010). "Characteristics of Juveniles on Probation: Collecting Data from Atlantic to Pacific". Presented at the 2010 American Probation and Parole Association Conference: Washington, D.C.

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Search Methods: PubMed and More," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

Gallagher, C.A., Douds, A.S., **Mehlman-Orozco, Kimberly B.,** Chirieleison, J., and Olaghere, A. (2010). "Justice Health Bibliographic Data Mapping," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

**Mehlman-Orozco, Kimberly B.** (2010). "Smuggling and the Likelihood of Detention among Undocumented Migrants," Law and Society Association Conference: Chicago, IL.

Douds, A.S. and **Mehlman-Orozco, Kimberly B.** (2010). "FASD in Justice Facilities: What does the research tell us?", Meeting of the Interagency Coordinating Committee on Fetal Alcohol Spectrum Disorders: Rockville, MD.

Gallagher, Catherine, Taxman, Faye, Kinner, Stuart, Doyle, Jodie, Pardo-Rengifo, Monica, **Mehlman-Orozco, Kimberly B.,** Olaghere, Ajima, Royle, Nick, Gabriel Cuervo, Luis. (2009). "Knowledge mapping for research prioritization: examples from the Network for Justice Health". 17th Cochrane Colloquium, Singapore.

**Mehlman-Orozco, Kimberly B.** (2009). "Justice Health Systematic Review Methods," Presented at the International Network for Justice Health Meeting: Orlando, FL.

**Mehlman-Orozco, Kimberly B.** (2008). "Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia," American Society of Criminology Conference: St. Louis, MO.

OTHER PRESENTATIONS

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking Provided to the Advancing the Business of Healthcare Medical Coding Chapter in Woodbridge, Virginia (2 CEUs).

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking for the Canadian Police College Human Trafficking Investigator's Course, Royal Canadian Mounted Police and Halifax Regional Police, Canada.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Annual Speaker for the College of Humanities and Social Sciences Degree Celebration, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Presenter for the Well Library Honors Event, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Training Presentation on Human Trafficking Red Flags for Prevent Abuse and Neglect through Dental Awareness (P.A.N.D.A).

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker for Human Trafficking Awareness Event with Kappa Delta Phi International Sorority, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Mother's Union International Conference Human Trafficking Forum.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Keeping Our Youth Safe Conference. Bernadette's House.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for Girls at High-Risk of Sex Trafficking. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Woodbridge Woman's Club.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Soroptimist International, Alexandria Chapter.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Republican Women of Clifton.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking in Northern Virginia. Westminster at Lake Ridge.

**Mehlman-Orozco, Kimberly B.** (2016). Keynote Speaker. Soroptimist Human Trafficking Awareness Event.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker on Human Trafficking. Trinity Episcopal Church.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker on Mapping Suspected Human Trafficking Networks through Advertisements. Homeland Security Investigations, DHS, Buffalo, NY.

**Mehlman-Orozco, Kimberly B.** (2013). Exhibitor. Governor's Summit on Human Trafficking. Richmond, VA.

**Mehlman-Orozco, Kimberly B.** (2013). Invited Guest Speaker on Labor Trafficking. St. Francis of Assisi Catholic Church.

**Mehlman-Orozco, Kimberly B.** (2011). Keynote Speaker. First Annual Quetzal Award Gala. Guatemalan Center of New England.

EXPERT WITNESS CASES—CONSULTATION AND/OR TESTIMONY

| | |
|---|---|
| Forthcoming | Woodhull Freedom Foundation et al. v. United States. |
| 2020 | United States v. Cornelius Galloway, United States District of New Mexico |
| 2018 | RCMP Federal Serious and Organized Crime R vs. Downey & Beals C/O Human Trafficking 2016-465660, Halifax, Canada |
| 2018 | United States of America vs. Savanah April Via, U.S. District Court for the District of Arizona |
| 2018 | Commonwealth of Virginia v. Corey Cardoza, Henrico County |
| 2018 | People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County |
| 2017-2018 | United States of America v. Miguel Scott Arnold, Terrence Hawkins, Tevin Bynoe, Emonie Murphy, and Joshua Guity-Nunez, United States District Court for the Middle District of Pennsylvania. |
| 2017- 2018 | Doe v. Subh Properties, et al., Civil Litigation, State of Maryland |
| 2017-2018 | State of Ohio v. Michael Moore, Lucas County Court |
| 2017-2018 | People of the State of California Plaintiff v. Tracy Sims Superior Court of California, County of Los Angeles |
| 2017 | Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California |
| 2017 | In re: REFLEX MEDIA, INC., a Nevada corporation, Claimant, vs. VIBE MEDIA, INC. d/b/a CityVibe.com, a California |

corporation; SOPHIA THOMPSON, an individual;
PEAKRIDGE d/b/a SugarModels.com, an Anguilla company;
DANIEL ROMAN a/k/a Daniel Romanesse, an individual; ALI
ASKARI, an individual; and DOES 1 through 10, inclusive

| | |
|---|---|
| 2016-2017 | J.S., S.L., and L.C. v. Village Voice Media Holdings LLC, Supreme Court of the State of Washington |
| 2016-2017 | People of the State of California Plaintiff v. Joseph, et. al. Contra Costa County Court |
| 2016 | People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles |
| 2016 | People of the State of California Plaintiff v. Mixon-Givens Santa Clara County Court |

## SELECTION OF MEDIA

| | |
|---|---|
| August 9, 2019 | ABC. This Week with George Stephanopoulos. Panel discussion on Jeffrey Epstein. |
| July 9, 2019 | CBS News. Sex trafficking expert discusses Jeffrey Epstein case and sexual abuse. |
| May 10, 2019 | Hollywood Reporter. Sex Trafficking mars the Mystique of Cannes Film Festival. |
| April 12, 2019 | The Hill. Expert says it's 'very unlikely' Robert Kraft prostitution case would yield human trafficking convictions. |
| January 11, 2019 | The Seattle Times. Documentary puts new attention on R. Kelly sex allegations. |
| August 22, 2018 | The Crime Report. Backpage Founders: We're Victims of Attack on Free Speech. |
| May 5, 2018 | Delaware Online. Human Trafficking Court shut down, to be merged with other treatment courts in Delaware. |
| May 1, 2018 | Delaware Online. Despite good intentions, Delaware slow to address human trafficking. |
| April 24, 2018 | ABC. Will new law protect women from sex trafficking? |
| April 23, 2018 | The Ringer. How Sex Ads Became a Battleground for the Future of the Internet. |
| April 22, 2018 | Miami Herald. He pimped a minor at Santa's Enchanted Forest. He got slapped with federal prison. |

| | |
|---|---|
| April 13, 2018 | Yahoo Lifestyle. Women's March lambasted for criticizing shutdown of Backpage.com. |
| April 10, 2018 | Miami Herald. Florida's sex industry 'in a panic' after feds shut down notorious Backpage website. |
| April 9, 2018 | The Crime Report. With Backpage Closed, Where Will The Sex Slave Trade Go? |
| March 22, 2018 | Washington Post. Bill enabling prosecutors, victims to pursue websites that host sex traffickers heads to White House. |
| March 2, 2018 | Governing. 3 Cities Lead Fight Against Human Trafficking. |
| February 1, 2018 | Vanity Fair. The Republican Party is Having Another Todd Akin Fiasco. |
| February 1, 2018 | New York Magazine. Missouri GOP Senate Hopeful Goes Off the Deep End on the Sexual Revolution and Human Trafficking. |
| January 31, 2018 | Kansas City Star. Josh Hawley blames sex trafficking on 'sexual revolution' of 1960s in leaked audio. |
| January 25, 2018 | Homeland Security Today. Expert Delves Into Real Face of Human Trafficking: Victims and Perpetrators. |
| January 23, 2018 | Huffington Post. Study Finds More Than 9,000 Brothels Masquerading As Legit Businesses. |
| January 11, 2018 | International Business Times. Human trafficking: Why we are all guilty of supporting the modern slave trade. |
| January 8, 2018 | Majority Report Radio. America's Slaves of the New Millennium with Dr. Kimberly Mehlman-Orozco. |
| December 21, 2017 | Fast Company. Hotels Are Key In The Fight To End Human Trafficking. |
| December 12, 2017 | WNPR. The Colin McEnroe Show. Child Labor In America And Abroad. |
| November 4, 2017 | C-SPAN. Hidden in Plain Sight Book Talk. |
| September 22, 2017 | Gray Media. Interview by Kyle Midura. Sex Trafficking Internet Crackdown Proposal. |
| August 8, 2017 | i24 news. Interview for Stateside with David Shuster. Model allegedly kidnapped for dark web auction. |
| August 2, 2017 | Newsy. Interview for "The Why" on human trafficking on the Internet. |

| | |
|---|---|
| July 30, 2017 | Al Jazeera. Segment Produced by Ruairi Casey. World Day Against Human Trafficking. |
| July 25, 2017 | Fox News Radio. Interviewed by Eben Brown. "Security America" segment on human smuggling deaths in San Antonio. |
| July 25, 2017 | Dallas News. Interviewed by Sarah Mervosh. New trick of the sex trade: Pimps can use retail gift cards to buy Backpage.com ads. |
| July 24, 2017 | WJLA. Interviewed by Stephen Loiaconi. Human smuggling deaths underscore need for immigration reform, experts say. |
| July 18, 2017 | The Washington Post. Interviewed by Tom Jackman. Under attack, Backpage.com has its supporters as anti-trafficking tool. But many differ. |
| June 11, 2017 | PJ Media. Interviewed by Karl Herchenroeder. Expert Notes Gap in Human-Trafficking Laws as Senators Press for Fund Renewal. |
| April 19, 2017 | WYPR. Interviewed by Tom Hall. Misinformation Sparked #DCMissingGirls Outrage, But It Highlights Real And Overlooked Issues. |
| March 30, 2017 | CBS. Interviewed by Jennifer Earl. Mom's warning about "human trafficking" at IKEA goes viral; what you need to know. |
| March 29, 2017 | Women's Health. Interviewed by Korin Miller. This Mom Claims She Encountered Human Traffickers At IKEA And People Are Freaking Out. |
| February 10, 2017 | Miami Herald. Interviewed by David Ovalle. Florida lawsuit targets website decried as hub for human trafficking. |
| February 3, 2017 | Miami Herald. Interviewed by David Ovalle. The 'adult' section might be closed but Miami sex workers still on the job. |
| January 1, 2017 | OutSmart Magazine. Interviewed by Dr. Laura McGuire on Human Trafficking. Hidden in Plain Sight: Researcher Dr. Mehlman-Orozco Discusses the Realities of Human Trafficking. |
| February 3, 2015 | NBC. Interviewed by Tracy Connor. Shoe Bomber has 'Tactical Regrets' Over Failed American Airlines Plot. |
| January 19, 2015 | CNN. Interviewed by Pam Brown. 'Jihad Jane' moved by 'love' and feminine 'pride.' |
| August 15, 2013 | USA Today, Interviewed by Yamiche Alcindor. Dozens of States Pass Laws to Fight Human Trafficking. |
| June 6, 2013 | USA Today. Interviewed by Yamiche Alcindor. Blue Campaign by DHS aims to combat human trafficking. |

| | |
|---|---|
| August 12, 2012 | Fox 5 News (DC/MD/VA). Television interview on in-state tuition report on Maryland. Interview by reporter Shawn Yancy. |
| May 18, 2011 | Chronicle of Higher Education. Interviewed for an in-state tuition story by Katherine Mangan, "In-State Tuition for Illegal Immigrants Can Be a Plus for Both States and Students." |
| March 24, 2011 | NBC 10 (RI). Television interview on Latino population growth, "Digging Deeper: Hispanics on the Rise." |
| February 18, 2011 | The Yale Herald. Interviewed for a story on racial profiling against immigrants by police. Story by Lucas Iberico-Lozada, "East Haven Police Accused of Brutality, Racism." |
| June 2, 2010 | Style Weekly. Interviewed for a human trafficking story by Peter Galuszka, "The New Slavery: Virginia becomes haven for human trafficking." |

OTHER PROFESSIONAL TRAINING

**"Freedom Together" D.C., M.D., and V.A. Regional Anti Human Trafficking Task Force Conference**
Spring 2018                         Conference                                   D.C., M.D., and V.A. Task Forces

**Virginia Forum on Human Trafficking**                     Dept. of Criminal Justice Services
Fall 2015                            Conference

**Regional Conference of Human Trafficking Task Forces**                                         DMV Anti-Trafficking Working
Fall 2015                            Conference                                   Group

**Maryland Freedom Conference**                             Towson University
Winter 2015                          Conference

**Sharing Lessons, Sharing Responsibility: Combating Human Trafficking**                         Migration Policy Institute
Spring 2013                          Conference

**Freedom Network Annual Conference**                       Freedom Network
Spring 2013                          Conference

**Human Trafficking Panel Discussion**                      George Washington Law
Spring 2013                          Working Group

**Analytic Statistics and Meta Analysis**                   Stata
Spring 2011                          Paid Training

**Systematic Review and Meta Analysis**                     GMU
Spring 2009, Fall 2010               Independent Graduate Study

**PubMed, NLMGateway, ToxNet and ClinicalTrials.gov**       National Library of Medicine
Summer 2009                          Search Certifications

**Ovid, ProQuest, and Web searches**                        AHRQ

42

Summer 2009                                    Search Certifications

**Introduction to ArcGIS Workshops**                       George Mason University
Fall 2009-Summer 2010

**Hand Searching Systematic Review Workshop**              Cochrane Collaboration
Fall 2009                       Search Certifications

<u>A</u>WARDS

    *Independent Publisher Award, 2019*    Silver Medal for Current Events (<u>Jihadi Next Door</u>).

    *Independent Publisher Award, 2018*    Bronze Medal for Social Issues/Humanitarian (<u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>).

    *Dissertation Completion Award,* 2012    George Mason University, College of Humanities and Social Sciences.

    *Deans Challenge,* 2009    George Mason University, College of Humanities and Social Sciences.

<u>S</u>ERVICE

    Reviewer    Justice Quarterly, WI18-Present

    Advisory Board Member    Empower Her Network, FA17-Present

    Survey Methodologist Advisor    United Against Slavery, FA17-Present

    Advisory Board Member    Dressember (Anti-trafficking foundation), SP17-Present

    Panel of Expert Witnesses    Los Angeles Superior Court, WI17-Present

    Member    Prince William County Human Trafficking Task Force, SU13-Present

    Member    Prince George's County Human Trafficking Task Force, SU12-Present

    Reviewer    Journal of Human Trafficking, FA2014-Present

    Member and Former President    Soroptimist International of Woodbridge, FA15-SP18

    Reviewer    American Journal of Evaluation, FA2014-FA2015

    Member    Prince George's County Human Trafficking Task Force, SU13-2015

    Reviewer    Columbia University Press, FA2013

    President and Founding Officer    Student Center for Immigration Research, George Mason University, FA08 – FA10

| | |
|---|---|
| Member | Criminology, Law & Society Student Association, George Mason University, FA09 – WI12 |
| Volunteer | Prince William County Jail, Classification Department, 500 hours, SP 2005 |

PROFESSIONAL MEMBERSHIP

National Society for Collegiate Scholars
Phi-Alpha Delta Pre-Law Fraternity
Alpha Chi Honors Fraternity
American Society of Criminology
National Criminal Justice Honors Fraternity
Alpha Phi Sigma Honors Society

## APPENDIX B – EXPERT WITNESS TESTIMONY

*I have testified/issued a report in the following cases, but have been retained in many others:*

**Criminal Prosecution**

People of the State of California Plaintiff v. Mixon-Givens Santa Clara County Court

People of the State of California Plaintiff v. Joseph, et. Al. Contra Costa County Court (Case No: 5-160639-1)[61]

People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County[62]

Commonwealth of Virginia v. Corey Cardoza, Henrico County[63]

United States v. Cornelius Galloway, United States District of New Mexico[64]

**Criminal Defense**

United States of America v. Emonie Murphy, U.S. District Court for the Middle District of Pennsylvania

People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles (Case No: 6CJ10198-01)[65]

*I have issued expert witness reports in the following cases:*

**Criminal Prosecution**

State of Ohio v. Michael Moore, Lucas County Court (Case No. CR 16-3191)
Criminal Defense

United States of America v. Landrum et. Al. Via. U.S. District Court for the District of Arizona (Case No. 4:16-cr-01560-RM-JR)

---

[61] Testified at grand jury on 4/13/2016 and at trial on 7/12/2017. Prosecutor's name is Aron DeFerrari: ADeFerrari@contracostada.org.
[62] Testified at Frye motion for another expert witness on behalf of the prosecution.
[63] Testified at Daubert hearing and prevailed as an admitted expert. Case settled before trial (see attached letter of reference in Appendix E).
[64] Testified at Daubert hearing and prevailed as admitted expert. Ruling attached separately from report as Exhibit I.
[65] Testified in trial on 11/7/2016 and 12/2/2017.

**Criminal Defense**

United States of America v. Emonie Murphy, U.S. District Court for the Middle District of Pennsylvania

People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312[66]

People of the State of California v. Rachele Eschenburg. Superior Court of the State of California (Case Number: FCR350232)

**Civil Defense**

M.B. v. Roosevelt Inn LLC (MARCH TERM, 2017 NO.: 00712)

Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California.[67]

Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB

Hedi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe, v. U.S.A Taekwondo, Inc. and Steven Lopez. United States District Court for the District of Colorado. Civil Action No. 1: 18-cv-00981-CMA-MEH

S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES

S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608

C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629

C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631

MADELYN CASILAO, HARRY LINCUNA, and ALLAN GARCIA, on behalf of themselves and all others similarly situated, Plaintiffs, v. HOTELMACHER LLC, dba HOLIDAY INN  EXPRESS; STEAKMACHER, LLC, dba  MONTANA MIKE'S STEAKHOUSE;  SCHUMACHER INVESTMENTS, LLC, dba WATER ZOO; APEX USA, INC.; WALTER  SCHUMACHER; and CAROLYN SCHUMACHER, Defendants. UNITED STATES DISTRICT COURT  WESTERN DISTRICT OF OKLAHOMACase No.:  CIV-17-800-SLP

---

[66] Declaration only, not report.
[67] Also deposed in this case. Dismissed on summary judgement.

46

**Civil Plaintiff**

Woodhull Freedom Foundation et al. v. United States[68]

---

[68] Not an expert witness report, but rather a declaration: https://www.eff.org/document/declaration-dr-kimberly-mehlman-orozco-support-woodhull-et-al-motion-preliminary-injunction

# APPENDIX C – ACKNOWLEDGEMENT OF PRO BONO WORK FOR  HUMAN TRAFFICKING SURVIVORS



Jose Z. Marin
Attorney at Law

Jose Marin Law
Address: 2537 Irving Street
San Francisco, CA 94122
Phone: (415) 753-3539
Web: www.JoseMarinLaw.com
E-Mail: Jose@JoseMarinLaw.com

March 16, 2021

Dr  Kimberly Mehlman-Orozco
15920 Fairway Drive
Dumfries, Virginia 22025

Dear Dr  Mehlman-Orozco,

I wanted to thank you for your unparalleled commitment to working with human trafficking survivors  It is rare to find an expert who is willing to dedicate this much of her time, share her analysis and insights into the case, and provide such detailed, persuasive expert reports—all pro bono  This type of philanthropy truly stands out

Your passion for educating the institutions that have power over survivors' fates is inspirational  The expert report you contributed to a recent T-Visa case was instrumental to our success! You had a lasting impact on our client and her children's lives  They now have a path toward permanent residency and citizenship in the United States after surviving terrible trauma from human trafficking

It was wonderful to work with you and I look forward to collaborating on future cases  I would recommend you to any attorney who assists human trafficking survivors

Sincerely,

Melanie Kehr, Esq

48

## APPENDIX D – LETTER OF REFERENCE ON EXPERT WITNESS TESTIMONY

   

OFFICE OF THE
COMMONWEALTH'S ATTORNEY FOR HENRICO COUNTY

Shannon L. Taylor
Commonwealth's Attorney

June 7, 2018

Dr. Kimberly Mehlman-Orozco
3721 Dalebrook Drive
Dumfries VA 22025

      RE: Commonwealth v. Corey Cardoza
      CR17-2160F
      Trial Date: June 5, 2018 – Convicted of Two Counts of Commercial Sex Trafficking

Dear Dr. Mehlman-Orozco:

      On behalf of the Henrico County Commonwealth Attorney's Office, I am writing to sincerely thank you for your invaluable service and commitment to our successful prosecution of Corey Cardoza. Without your capable and professional testimony, I am certain we would not have been able to convince the jury to convict Mr. Cardoza. Your wiliness to come to our jurisdiction on several occasions sets you apart from many experts I have dealt with in the past, and I look forward to working with you in the future.

      I have enclosed the Supreme Court form for your List of Allowances. The form should be self-explanatory, but if you need assistance please do not hesitate to contact me. From what I understand, you must attach an itemized list of your expenditures upon returning the form to our office.

      Once again, I thank you for your outstanding service to our community and, moreover, to the victims in this matter.

               With Sincere Gratitude,

               B.J. McGee
               Assistant commonwealth's Attorney

CC: BQS, File

4301 East Parham Road, Henrico, Virginia 23228  –  P.O. Box 90775, Henrico, Virginia 23273-0775
Telephone: (804) 501-4218  –  Fax: (804) 501-4110 or 5028
Juvenile & Domestic Div.: (804) 501-4338  –  Victim/Witness Program: (804) 501-1680
Website: www.co.henrico.va.us/com-atty

## APPENDIX E – MATERIALS REVIEWED AND CONSIDERED

In addition to the materials specifically cited or mentioned in my report, I considered the following documents in forming my opinions:

1. COMPLIANT
2. AMENDED COMPLAINT
3. ANSWER TO SECOND AMENDED COMPLAINT
4. MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)
5. STATEMENT OF JANE DOE FROM 11/16/2019
6. CONFIDENTIAL THERAPIST LETTER 11/27/2018
7. CONFIDENTIAL THERAPIST LETTER 6/17/2019
8. NORTHERN VIRGINIA FAMILY SERVICES REPORT 6/26/2019
9. JANE DOE STATEMENT IN SUPPORT OF THE I-485 APPLICATION FOR PERMANENT RESIDENCE OR TO ADJUST STATUS 12/1/2021
10. GOVERNMENT'S POSITION ON SENTENCING 8/2/2019 FOR HAZEL MARIE SANCHEZ CERDAS (CASE 1:19-CR-65-LO)
11. HAZEL MARIE SANCHEZ CERDAS SENTENCING HEARING TRANSCRIPT (CASE 1:19-CR-65-LO)
12. DEFENDANT'S SENTENCING MEMORANDOM CASE 1:19-CR-65
13. 
14.
15.
16.
17.
18.
19.
20. DECLARATION OF WILLIAM WOOLF

## APPENDIX F – 2022 FEE SCHEDULE



### Dr. Kimberly Mehlman-Orozco, Ph.D.

**Remote Research, Review, Consultation, In-Person Deposition, and/or Trial Testimony**

$750 per hour

**Travel/Expenses**

Non-working travel time is billed at $350 per hour from portal to portal. There is a one-hour minimum travel charge. The client is responsible for all reasonable[69] and customary travel expenses, which include but are not limited to: flight/train, hotel, parking, GSA rate per diem, and taxi/rental car. Automobile mileage is billed at the GSA rate[70].

**Retainer**

$10,000

**Cancellation Fees**

A flat rate of $1,500 is incurred when scheduled meetings, depositions, and/or trial dates are cancelled within seven calendar days prior to the event.

**Billing**

Retainer will be applied to final invoice. Payment is due within 30 days of invoice receipt.

---

[69] Reasonableness of expenses will be determined by conformity with GSA schedule.
[70] As of January 1, 2022: 58.5 cents per mile.
*All rates subject to review on an annual basis.

## APPENDIX G – DELPHI OPERATIONAL INDICATORS

### Indicators of trafficking of adults for sexual exploitation

**INDICATORS OF DECEPTIVE RECRUITMENT**
Strong Indicator
Deceived about the nature of the job or location
Medium Indicators
Deceived about conditions of prostitution
Deceived about content or legality of work contract
Deceived about family reunification
Deceived about housing and living conditions
Deceived about legal documentation or obtaining legal
migration status
Deceived about travel and recruitment conditions
Deceived about wages/earnings
Deceived through promises of marriage or adoption
Weak Indicator
Deceived about access to education opportunities

**INDICATORS OF COERCIVE RECRUITMENT**
Strong Indicators
Abduction, forced marriage, forced adoption or selling of
victim
Debt bondage
Threats of violence against victim
Violence on victims
Medium Indicators
Confiscation of documents
Isolation, confinement or surveillance
Threat of denunciation to authorities
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of money

**INDICATORS OF RECRUITMENT BY ABUSE
OF VULNERABILITY**
Medium Indicators
Abuse of difficult family situation
Abuse of illegal status
Abuse of lack of education (language)
Abuse of lack of information
Control of exploiters
Difficulties in the past
Difficulty to organise the travel
Economic reasons
False information about law, attitude of authorities
False information about successful migration
Family situation
General context

Personal situation
Psychological and emotional dependency
Relationship with authorities/legal status
Weak Indicator
Abuse of cultural/religious beliefs

**INDICATORS OF EXPLOITATION**
Medium Indicators
Bad living conditions
Excessive working days or hours
Hazardous work
Low or no salary
No respect of labour laws or contract signed
No social protection (contract, social insurance, etc.)
Very bad working conditions
Wage manipulation

**INDICATORS OF COERCION AT DESTINATION**
Strong Indicators
Confiscation of documents
Debt bondage
Forced tasks or clients
Isolation, confinement or surveillance
Threats of violence against victim
Violence on victims
Medium Indicators
Forced into illicit/criminal activities
Forced to act against peers
Forced to lie to authorities, family, etc.
Threat of denunciation to authorities
Threat to impose even worse working conditions
Threats to inform family, community or public
Under strong influence
Violence on family (threats or effective)
Withholding of wages

**Indicators of abuse of vulnerability at
destination**
Medium Indicators
Dependency on exploiters
Difficulty to live in an unknown area
Economic reasons
Family situation
Personal characteristics
Relationship with authorities/legal status
Weak Indicator
Difficulties in the past

52

## APPENDIX H –COMMERICAL SEX CONSUMER REVIEWS OF "PALOMA"





Review: **Paloma**
TER ID: 151366

Posted: April, 2007 by ITZ0161

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | her appartment |

**General Details**

After seeing her pictures and reading some of her reviews, i had to take the dive. Well worth it. Typical two call system (took a few tries to connect at first), and she may also work somewhat with Fiorella in scheduling. Went to her appt and she buzzed me up. Door was slightly open and she was waiting behind it in great red see thru number and greeted me with a hot kiss .. .

**The Juicy Details**

This feature is for VIP Members Only

Review: **Paloma**
TER ID: 151366

Posted: June, 2007 by JEFFFROMNYC

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | Manhattan East Side |

**General Details**

This was the second time I had seen Paloma. I have a real thing for Latina providers, especially those who are a bit more mature. I find that they are often the hottest ones out there. In Paloma's case, this couldn't be more true. As in my first visit, I was greeted at the door of her small but clean and cozy studio apartment (the same one where Fiorella works) by Paloma wearing nothing but a thong. Read on for what happened next...

**The Juicy Details**

This feature is for VIP Members Only

Review: **Paloma**
TER ID: 151366

Posted: October, 2007 by BIG BROOZER

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 51st Street |

**General Details**

I have been seeing Fiorella for years now and now and again she recommends some of her friends to me. The last time I saw her she said I should see Paloma next. So when i was in town again i called Fio and she set me up with her at Fio's place. VIP's read on...

**The Juicy Details**

This feature is for VIP Members Only



Review: **Paloma**
TER ID: 151366

Posted: February, 2008 by MARCX

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | Midtown |

**General Details**

This is the second time I have seen Paloma. I was introduced to her by Fiorella a while back and he first time was great. The second time was AWSOME. I gave her a call and we chatted for a little while and set up an appointment for later that day. She was going to be in the city later in the day, so I said I would visit when I was finished with work. I arrived and the sparks began.

**The Juicy Details**

This feature is for VIP Members Only

54



## Review: Paloma
TER ID: 151366

**Posted:** February, 2008 by **FERNYC**

✉ PM Reviewer    ➤ Report A Problem

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | Manhattan Apt |

### General Details

I have seen Fiorella in previous opportunities and she had suggested her friend Paloma.
The time came to meet Fiorella again and Paloma pickd the call and mentioned her availability for that day.
Personally, I was a litle skeptical about this whole situation, expecting an awful situation a scheduled Paloma for an afternoon meeting.
The usual two calls systems as her counterpart.
Once in the rang the bell to her apartment and I was buzzed in.
Got into the elevator to as soon as I came out from the elevator the door unlocked and there she was...(read the juicy details below...)

## Review: Paloma
TER ID: 151366

**Posted:** June, 2009 by **TADLER**

✉ PM Reviewer    ➤ Report A Problem

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | her apartment |

### General Details

on recent business trip to NYC I was in the mood for a low cost escort experience, so I searched TER and found Paloma. She works for someone that manages escorts from Costa Rica and some other Latina places. Very good time- better than expected.

## Review: Paloma
TER ID: 151366

**Posted:** July, 2009 by **HITMAN228488**

✉ PM Reviewer    ➤ Report A Problem

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | Midtown East |

### General Details

Have been going to see Paloma and her friends (Fiorella's friends) for some time. Awesome bunch of girls, particularly Paloma. When you go see her, she opens up always dressed incredibly sexy, always with a warm, sensual smile and always treats you like a king.

## Review: Paloma
TER ID: 151366

**Posted:** May, 2010 by **PACKET**

✉ PM Reviewer    ➤ Report A Problem

| Appearance | Performance | Attitude | Atmosphere | Session Location |
|---|---|---|---|---|
| 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | 🔒 VIP only | Midtown |

### General Details

Since I started mongering again, I've been going to Fiorella's and have
sampled a few of the ladies. I like it there and feel comfortable. Good
value. I noticed that Paloma was back in town and never had the opportunity to see her. Was in town for business and called to see her
availability. Got an appt. for an hour later and headed up to the apartment. VIP's read on ......