—————Doe v. FPO, et al.—————

1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION


 3    -------------------------------------------x
                                                 :
 4    JANE DOE,                                   : Civil Action No.
                                                 :
 5                        Plaintiff,              : 1:21-cr-1150
                                                 :
 6             versus                             : January 13, 2023
                                                 :
 7    FAIRFAX COUNTY POLICE OFFICER #1, et al.,   :
                                                 : P. Hairabedian
 8                        Defendants.             : Testimony
      -------------------------------------------x
 9
                   TRANSCRIPT OF JURY TRIAL - EXCERPT
10             BEFORE THE HONORABLE ANTHONY J. TRENGA
                    UNITED STATES DISTRICT JUDGE
11
                        A P P E A R A N C E S
12
      FOR THE PLAINTIFF:     VICTOR M. GLASBERG, ESQ.
13                           NICKERA S. RODRIGUEZ, ESQ.
                             Victor M. Glasberg & Associates.
14                           121 S. Columbus Street
                             Alexandria, VA 22314
15    FOR THE DEFENDANT:     HEATHER K. BARDOT, ESQ.
      (Barbazette and        KARA A. SCHMIDT, ESQ.
16    Mardocco)              McGavin, Boyce, Bardot, Thorsen &
                             Katz, P.C.
17                           9990 Fairfax Boulevard.
      FOR THE DEFENDANT:     Suite 400.
18    (Baumstark and         Fairfax, Virginia 22030
      Roessler)
19                           KIMBERLY P. BAUCOM, ESQ.
                             JAMIE M. GREENZWEIG, ESQ.
20                           12000 Government Center Parkway.
                             Suite 549.
21                           Fairfax, VA 22035-0064

22

23    OFFICIAL U.S. COURT REPORTER:   MS. TONIA M. HARRIS, RPR
                                      United States District Court
24                                    401 Courthouse Square
                                      Fifth Floor
25                                    Alexandria, VA 22314
```

—Doe v. FPO, et al.—

2

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Defense:

Patrick Hairabedian

        Direct examination by Ms. Baucom........... 04


                        MISCELLANY

Preliminary matters.................................. 04
Certificate of Court Reporter....................... 30

— Doe v. FPO, et al.—

3

1  (Jury trial Excerpt testimony of Patrick Hairabedian.)

2

3          THE COURT:  All right.  Let's bring Mr. Hairabedian,

4  please, without the jury.

5          THE CSO:  Okay.

6          THE COURT:  Face the deputy clerk, please raise your

7  right hand.

8              (Witness seated.)

9  (PATRICK HAIRABEDIAN, Defendant's witness sworn.)

10          THE CSO:  You may be seated.

11          THE COURT:  Mr. Hairabedian, I wanted to -- I wanted

12  to have an opportunity to talk to you before you testified.  I

13  understand you're going to be called as a witness by some of

14  the defendants.  And I understand the subject matter of what

15  you're going to be asked about involves possible criminal

16  activity.  Have you spoken with a lawyer about whether or

17  not -- about your possibility of your testifying here?

18          THE WITNESS:  No, sir, I have not.

19          THE COURT:  All right.  Have you -- are you aware of

20  your rights under the Fifth Amendment not to provide testimony

21  that may subject yourself to criminal exposure?

22          THE WITNESS:  I have a basic understanding of that,

23  sir.

24          THE COURT:  And have you considered whether or not

25  you should testify in light of your right not to?

———Doe v. FPO, et al.———

4

1          THE WITNESS:  I didn't think I had a choice.

2          THE COURT:  All right.

3          THE WITNESS:  -- to testify here, period.

4          THE COURT:  Would you like to -- would you like to

5   consult with counsel before deciding whether or not you should

6   testify?

7          THE WITNESS:  I'm okay with talking as long as I --

8   I'm able to ask you or confirm with you whether or not I'm

9   required to answer a question.  I would be comfortable with

10  proceeding, sir.

11         THE COURT:  All right.  Well, I can't be your

12  lawyer.  All right?  And you're going to have to make a

13  determination whether to testify or whether the testimony you

14  would give may tend to incriminate you if there's some basis

15  for you thinking that that might be the case.  Those are

16  judgments typically you're going to have to make typically

17  with the advice of a lawyer, but I'm not going to be able to

18  do that for you.

19         THE WITNESS:  Yes, sir.  I'm comfortable with

20  proceeding.  I may just request to take the Fifth if I believe

21  that that's something that could be damaging to me personally.

22         THE COURT:  All right, sir.  Counsel, do you have

23  any questions of Mr. Hairabedian?

24         MR. GLASBERG:  I don't have a question.  I have a

25  thought.

———Doe v. FPO, et al.———

5

1          THE COURT:  Yes.

2          MR. GLASBERG:  And my friend and counsel, Steve

3   Cochran, who also represented Cindy Alvarado at her

4   deposition, might be in a position to give Mr. Hairabedian

5   advice.  I haven't spoken with him about this, but that might

6   be arranged before Tuesday.

7          THE COURT:  All right.  Ms. Bardot.

8          MS. BARDOT:  Your Honor, I don't know how

9   Mr. Cochran represents --

10          THE COURT:  I understand the issue with Mr. Cochran.

11   Do you have any other questions for Mr. Hairabedian about this

12   or want me to inquire further in respect --

13          MS. BAUCOM:  If I may, Your Honor.

14          THE COURT:  Yes.

15          MS. BAUCOM:  Have you had discussions with

16   Mr. Glasberg about your testimony today?

17          THE WITNESS:  In what way?

18          MS. BAUCOM:  Any discussions with Mr. Glasberg about

19   your testimony today?

20          THE WITNESS:  What about testimony?  Whether I'm

21   going to testify or what -- what are you --

22          MS. BAUCOM:  Sure.  Have you had discussions with

23   Mr. Glasberg about whether you're going to testify today?

24          THE WITNESS:  I was told that there was going to

25   possibly be -- that I was going to testify today or possibly

—————Doe v. FPO, et al.—————

6

1    Tuesday.  I was also told that -- by a woman named Kimberly --

2    I'm not --

3              MS. BAUCOM:  That's me.

4              THE WITNESS:  Yes, ma'am.  Okay.  By her as well.

5              MS. BAUCOM:  That you needed to be here today?

6              THE WITNESS:  Yes, ma'am.

7              MS. BAUCOM:  Okay.  And what conversations have you

8    had with Mr. Glasberg about pleading the Fifth Amendment?

9              THE WITNESS:  I understand the basic premise of it.

10             MS. BAUCOM:  Oh, that's not my question.  My

11   question is:  What conversations have you had with

12   Mr. Glasberg about the possibility of pleading the Fifth

13   Amendment today?

14             THE WITNESS:  None.

15             MS. BAUCOM:  When you were in the hallway, you

16   weren't talking to Mr. Glasberg about the Fifth Amendment?

17             THE WITNESS:  About that being something that can be

18   said?

19             MS. BAUCOM:  Right.

20             THE WITNESS:  Besides saying the word or whether to

21   say it?  Is that --

22             MS. BAUCOM:  About pleading the Fifth Amendment,

23   weren't you having a conversation with Mr. Glasberg in the

24   hallway about pleading the Fifth Amendment during your

25   testimony today?

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

———Doe v. FPO, et al.———

7

1          THE WITNESS:  Well, there was -- there was a

2     statement made that if I need to, I may use that.  There was

3     no -- you asked me if I was having any sort of discussions

4     about whether or not to use it, and that was not the case.

5          MS. BAUCOM:  And so the entire substance of the

6     conversation that you had in the hallway with Mr. Glasberg was

7     just him approaching you and telling you that if you needed to

8     plead the Fifth, you could?

9          THE WITNESS:  There was discussion about me possibly

10    having to testify today, when it might happen, general

11    conversation.  He was walking around the -- stepping on some

12    of the tiles on the floor and he was telling me an old joke,

13    so that's --

14         MS. BAUCOM:  Did Mr. Glasberg tell you about the

15    testimony that's been introduced through his client in this

16    case?

17         THE WITNESS:  No, ma'am.

18         MS. BAUCOM:  Didn't tell you about that?

19         THE WITNESS:  No.

20         MS. BAUCOM:  I don't have any other questions.

21         THE COURT:  All right.  I'm going to allow the

22    witness to testify.  Let's bring the jury in.

23         THE CSO:  Yes, Judge.

24         MR. GLASBERG:  Judge, may I note an objection on

25    relevance grounds to the testimony that we've been talking

—Doe v. FPO, et al.—

8

1  about so I don't have to repeat it on --

2         THE COURT:  Yes.

3         MR. GLASBERG:  Thank you.

4         (Jury present.)

5         THE COURT:  Please be seated.  Ms. Baucom, will you

6  call your next witness.  Who's your next witness?

7         MS. BAUCOM:  Patrick Hairabedian.

8         THE COURT:  All right.  Mr. Hairabedian is in the

9  witness box.  Would you be sworn, please -- you've been sworn.

10 You've been sworn.  You're under oath.

11        THE WITNESS:  Yes, sir.

12        THE COURT:  All right.  Ms. Baucom.

13        MS. BAUCOM:  Thank you.

14                    **DIRECT EXAMINATION**

15 BY MS. BAUCOM:

16 Q.   Can you state your name, please, sir.

17 A.   Patrick Hairabedian.

18 Q.   And can you spell your last name, please?

19 A.   It's H-A-I-R-A-B-E-D-I-A-N.

20 Q.   Do you know the plaintiff in this case?

21 A.   Yes.

22 Q.   How do you know her?

23 A.   We live together.

24 Q.   Do you currently live together?

25 A.   Yes.

—Doe v. FPO, et al.—

9

1    Q.    How long have you lived with her?

2    A.    I lived with her since 2019 or so.  I don't remember the

3    exact specific date, but I believe it was in 2019.

4    Q.    Do you share household expenses?

5    A.    No.

6    Q.    Who pays for the household expenses?

7    A.    I do.

8    Q.    The plaintiff works, correct?

9    A.    No.

10   Q.    When did you meet the plaintiff for the first time?

11   A.    I believe it was in early 2015.

12   Q.    If I told you March 2015, does that sound correct?

13   A.    Probably couldn't dispute that.  Like I said, I don't

14   remember the exact specific date, so I would agree with that.

15   Q.    And you met her because you responded to a prostitution

16   ad that she had posted on Backpage; is that correct?

17   A.    Yes.

18   Q.    And you saw her as a prostitution client for some period

19   of time, correct?

20   A.    Yes.

21   Q.    Where did you meet her for the first time?

22   A.    In a hotel in Fairfax, Virginia, by the Fair Oaks mall.

23   Q.    By the Fair Oaks mall, is that what you said?

24   A.    Yes, ma'am.

25   Q.    And at the time she was living in an apartment that was

———Doe v. FPO, et al.———

1  at the apartment complex next to the Avalon behind the Silver

2  Diner; is that correct?

3  A.   I don't know where she lived at that time.

4  Q.   Well, at some point, you became aware of where she lived,

5  correct?

6  A.   At some point.  I thought you asked me if it was --

7  Q.   And -- I did, I did.  But at some point, you came to know

8  where she was living, correct?

9  A.   Yes.

10 Q.   And at that point she was living in the apartment complex

11 behind the Silver Diner, correct?

12 A.   At one point.  Like I said, I don't remember the specific

13 date, but she was living in an apartment in Fairfax close to

14 the Silver Diner, yes, ma'am.

15 Q.   And she remained at that apartment until at least

16 May 2017; is that correct?

17 A.   I really hesitate to -- I'm not going to deny it.  I

18 don't remember the specific month or date, ma'am.  But she was

19 in an apartment there, yes, ma'am.

20 Q.   Well, if I told you that you lived with her in that

21 apartment during the summer of 2015 and the summer of 2016, do

22 you dispute that?

23 A.   Formally lived with her, no.  I would dispute that I

24 formally -- excuse me, formally lived with her because I did

25 not until 2019.  I did stay with her -- I did spend the night

—Doe v. FPO, et al.—

1   there many times, but I did not physically formally live

2   there.  That was not my permanent address, ma'am.

3   Q.   Your permanent address was at your home with your wife,

4   correct?

5   A.   At that time, that -- my wife and I, at the time, were

6   separated.

7   Q.   And you stayed with the plaintiff, correct?

8   A.   I owned a home in Ashburn.

9   Q.   That wasn't my question.  You stayed with the plaintiff

10  when you were separated from your wife, correct?

11  A.   For some period of times.  Sometimes I didn't.

12  Q.   Okay.  And if I told you that you stayed with the

13  plaintiff during the summer of 2015 and the summer of 2016,

14  based on your testimony today, you don't have any reason to

15  dispute that, correct?

16  A.   Well, when you say "stayed with," I'm not understanding

17  how --

18            (Simultaneously speaking.)

19  Q.   (Indiscernible) -- apartment?

20  A.   -- having spent the night at that time, no, I would not

21  dispute that I did spend the night many times.

22  Q.   Okay.  And so, starting in the summer of 2015 when you

23  would spend the night with the plaintiff in her apartment,

24  that was the apartment behind the Silver Diner, correct?

25  A.   Yes.

—————Doe v. FPO, et al.—————

12

 1    Q.    And she lived there with her son, Sebastian, correct?

 2    A.    At one point she did, yes, ma'am.

 3    Q.    And what point was that?

 4    A.    I apologize.  Again, the dates are very confusing to me,

 5    but I know her son came in November.  I do know that because I

 6    know she was going to go pick him up at Dulles Airport.  And

 7    it was on a date in November.

 8    Q.    And if I told you that the plaintiff's testimony in this

 9    lawsuit has been that Sebastian came to live with her in

10    November of 2015, does that sound right to you?

11    A.    Again, I could be off on the year, but November was -- I

12    know that November was the month, yes, ma'am.

13    Q.    And you were married at the time, correct?

14    A.    I was separated, ma'am.

15    Q.    You were still married at the time?

16    A.    I was separated, ma'am.

17    Q.    My question, sir, is were you married at the time?

18    A.    I was separated.

19          MS. BAUCOM:  Your Honor, could you please instruct

20    him to answer the question.

21          THE COURT:  I think he did say he was married.

22          MS. BAUCOM:  Okay.

23    BY MS. BAUCOM:

24    Q.    And at some point after seeing the plaintiff for a period

25    of time in her prostitution business, you developed a dating

—— Doe v. FPO, et al. ——

13

1  relationship; is that correct?

2  A.   When you say "dated," yes, I did date her at some point,

3  yes, ma'am.

4  Q.   And you eventually moved in with her again or stayed with

5  her again in the November 2016 time frame, is that correct?

6  A.   I stayed with her some nights, ma'am.

7  Q.   Not every night?

8  A.   Not every night.

9  Q.   Where did you stay on the other nights?

10  A.   At my home.  I stayed, you know, it's -- many -- I mean

11  there's few options.  I was not living with her.  I had my

12  home in Ashburn.

13  Q.   I understand that and that's where you wife lived?

14  A.   When I was separated, yes.

15  Q.   That's where your wife lived, though?  You understand

16  what wife is, right?

17          You have a wife, correct?

18  A.   I'm sorry.

19  Q.   You have a wife, correct?  You were married to somebody?

20  A.   I was separated, ma'am.

21  Q.   And she lived in that house in Ashburn, correct?

22  A.   Yes, ma'am.

23  Q.   Okay.  And the time frame around November 2016, the

24  plaintiff was engaged in prostitution to make money to support

25  herself, correct?

—————Doe v. FPO, et al.—————

1  A.   I did not know that to be that she was in prostitution.

2  My understanding, according to the last I saw from the FBI,

3  was she was a victim of human trafficking at that time.

4  Q.   In November of 2016?

5  A.   Well, that's -- I came to find out that her -- her -- the

6  work that you're referring to her as a prostitute then was

7  referred to her or deemed by the Department of Justice, FBI,

8  that she was a victim of human trafficking.

9  Q.   Right.  And my question was, are you saying specifically

10  in November of 2016 you --

11  A.   I don't know the exact date, but any time that you are

12  referring to the word "prostitution" I'm referring -- I'm

13  explaining to you that she was -- it's in black and white --

14  she was deemed after an investigation by the FBI to be a

15  victim of human trafficking.

16         MS. BARDOT:  Your Honor, I'm going to object to him

17  testifying about what he believes --

18         THE WITNESS:  I've seen it --

19         MS. BARDOT:  Excuse me.

20         THE WITNESS:  -- Your Honor.  I've seen it, Your

21  Honor.

22         THE COURT:  All right.

23         MS. BARDOT:  If I may --

24         THE WITNESS:  I've seen the document.  That's all.

25         THE COURT:  All right.

—Doe v. FPO, et al.—

15

1          MS. BARDOT:  I'm going to object to him testifying

2     as to what he believes the FBI concluded about anything.

3          THE COURT:  All right.  Well, he's answering the

4     question.  Go ahead.

5     BY MS. BAUCOM:

6     Q.   Is it your contention, sir, that the plaintiff has never

7     engaged in voluntary prostitution?

8     A.   Depending on your definition of voluntary.

9     Q.   Okay.  My definition of voluntary is someone who agrees

10    to act as a prostitute and accepts money for that work.  Is

11    it --

12    A.   Under duress.

13    Q.   No.  Is it your contention today that the plaintiff has

14    never engaged in voluntary prostitution?

15    A.   During what time period or what are you asking?

16    Q.   Any time period?

17    A.   You asked me of 2016.

18    Q.   That was my last question.  This is a new question.

19    A.   Okay.  So can you repeat the question?

20    Q.   Sure.  Is it your contention today that the plaintiff has

21    never engaged in voluntary prostitution?

22    A.   I don't believe it to be voluntary when you're doing it

23    under duress --

24    Q.   Okay.

25    A.   -- is my personal definition.

—Doe v. FPO, et al.—

16

1   Q.   Can you think of any time that the plaintiff, to your

2   knowledge, has engaged in voluntary prostitution?

3   A.   In my -- under my assumption of what duress is, being put

4   under duress, no, I don't believe so.

5   Q.   And so, is it your contention, I guess, when you started

6   seeing the plaintiff, as a prostitute, in March of 2015 that

7   she was being trafficked during that period of time?

8   A.   It was deemed by the Federal Bureau of Investigation --

9   Q.   Sir --

10  A.   -- she was being trafficked.

11  Q.   I'm not --

12  A.   -- if the Federal Bureau of Investigation --

13          MS. BAUCOM:  Your Honor, I'm sorry.

14          THE WITNESS:  -- she was being trafficked.  I'm

15  answering your question.

16          THE COURT:  Mr. Hairabedian, just listen to the

17  question and answer that question.  Go ahead.

18  BY MS. BAUCOM:

19  Q.   Sir, my question, without talking about the FBI, my

20  question is:  When you first met the plaintiff in March 2015,

21  to have sex with her as a prostitute, is it your contention

22  that she was being trafficked at that time?

23  A.   When I -- on that specific date when I met her, I did not

24  know that that was the case, no, ma'am.

25  Q.   Okay.  You've been seeing the plaintiff for approximately

——— Doe v. FPO, et al.———

1   a year-and-a-half before November 2016, correct?

2   A.   If we're going by the date of March of 2015 to November

3   of 2016, you're asking me -- what is that about a year and

4   eighth months?  Is that according to what you're asking?  So

5   what's your question?

6   Q.   So about a year-and-a-half?

7   A.   I didn't hear the question, ma'am.

8   Q.   My question was, that you saw the plaintiff for

9   approximately a year-and-a-half prior to November 2016?

10  A.   If I met her -- if that date is accurate, March, which

11  I'd have no reason to say it wasn't, I would assume that,

12  then, yes, ma'am.

13  Q.   Okay.  During the time frame of March to May of 2015,

14  when you were seeing the plaintiff, you were also aware that

15  she had married a man named Benjamin Lugo, correct?

16  A.   I don't know the exact date that she got married and I

17  can't -- I can't recall the specific date that she told me she

18  was going to get married.

19  Q.   And so, is it your testimony then in March of 2015 she

20  was not married to Benjamin Lugo, but that at some point after

21  that she did marry Benjamin Lugo?

22  A.   I remember I did see her at one point and she told me

23  that she was going to be getting married to Benjamin Lugo,

24  yes, ma'am.  So I don't know what date that was, but had to

25  have happened before whatever the marriage date is.

———————Doe v. FPO, et al.———————

18

```
 1   Q.   And when you met her and first saw her at her apartment,
 2   she was not living with Benjamin Lugo, correct?
 3   A.   I don't recall the date that I met her.
 4   Q.   I'm not asking --
 5                 (Simultaneously speaking.)
 6   A.   -- the first time I ever went to her apartment was he
 7   there?  No, ma'am, he was not there.
 8   Q.   And the first time you went to her apartment was
 9   Sebastian there?
10   A.   Um, no.
11   Q.   Did you ever --
12   A.   Her dog was there.
13   Q.   I'm sorry?
14   A.   Her dog was there.
15   Q.   There was a dog there?
16   A.   Yeah.
17   Q.   Okay.  Did you ever go to the plaintiff's apartment
18   behind the Silver Diner and see Benjamin Lugo?
19   A.   Not at that specific apartment I didn't see his
20   belongings.
21   Q.   And to your knowledge, Benjamin Lugo was living in
22   Sterling, Virginia?
23   A.   I don't know where he lived, ma'am.  I was told he was in
24   and out of the apartment.  It wasn't my business to know where
25   specifically he was.
```

———Doe v. FPO, et al.———

19

1   Q.   Do you remember being interviewed by Detective Nicole

2   Christian in May 2017?

3   A.   Is that -- the name sounds familiar.

4   Q.   Do you remember telling Detective Christian that Benjamin

5   Lugo lived in Sterling, Virginia?

6   A.   I may have.  I wouldn't dispute it if it's in a report.

7   Q.   And you told Detective Christian that Benjamin Lugo was a

8   drug dealer?

9   A.   That was my knowledge.  Again, I don't recall the

10   specific conversation, those words coming out, but I would not

11   dispute that.

12   Q.   The plaintiff told you that the reason she head married

13   Benjamin Lugo was for immigration purposes, correct?

14   A.   I'm sorry, you're asking if the plaintiff said that to

15   me?

16   Q.   Yes.

17   A.   No.

18   Q.   And specifically she told you that she had come into the

19   country from Costa Rica in April or May of 2015 and was

20   questioned by U.S. immigration officials regarding why she was

21   coming into the country, correct?

22   A.   I believe she had, at one point, told me there was some

23   questions about why she was coming into customs like anybody

24   would be asked.

25   Q.   Okay.  And do you have any reason to dispute that that

———Doe v. FPO, et al.———

20

1  happened in April or May of 2015?

2  A.   That what happened?  That --

3  Q.   Questioned by immigration officials in April or May of

4  2015?

5  A.   I wouldn't know, ma'am, I wasn't there.

6  Q.   Do you have any reason to dispute that that's the time

7  frame that that happened?

8  A.   I have no idea.  I really have nothing to base it on,

9  ma'am.

10  Q.   And if plaintiff told you that she was coming -- sorry.

11  The plaintiff told you that she told the immigration officials

12  that she was coming to the U.S. for a religious event,

13  correct?

14  A.   Possibly could have said that.  Again, I don't recall a

15  specific conversation.  I was not -- I was not --

16  Q.   And the plaintiff told you that the immigration officials

17  told her that she couldn't stay for as long as she wanted to

18  and they gave her a time frame during which she had to leave

19  the United States, correct?

20  A.   Could have, could not, again, I don't remember the

21  specific conversation, ma'am.

22  Q.   And the plaintiff told you, did she not, that she went to

23  her apartment, next to the Avalon and that Benjamin Lugo came

24  over as a client after that, correct?

25  A.   Ma'am, I'm really not trying to be difficult with you.  I

———Doe v. FPO, et al.———

21

1  don't remember the conversation of -- from -- you're saying

2  2015, seven years ago, almost eight years ago?  I don't recall

3  those specific words, ma'am.

4  Q.   And if plaintiff told you --

5  A.   If it's in a police report from there, then I will not

6  dispute that whatever the officer wrote down, ma'am.

7  Q.   Okay.  So the plaintiff told you that she was crying when

8  Benjamin came over and she told Benjamin, "I need to get

9  married because they're not going to let me back in."

10         Is that correct, that's what the plaintiff told you?

11  A.   You're asking if that's in a report?

12  Q.   No, sir.  I'm asking if that's what the plaintiff told

13  you --

14  A.   I thought the conversation was about my conversation with

15  the detective you were just asking me, so, I'm getting lost

16  here.

17  Q.   New question.

18  A.   Okay.

19  Q.   Did the plaintiff tell you that she was crying when

20  Benjamin came to see her and that she told him, "I need to get

21  married because they're not going to let me back in."  And so

22  they married each other.

23         Did the plaintiff tell you that?

24  A.   I don't recall that, no.

25  Q.   Do you have any reason to dispute that?

—Doe v. FPO, et al.—

22

1   A.   I don't have any reason to dispute that, no, ma'am.

2   Q.   So --

3   A.   So I don't recall the conversation.

4   Q.   -- if I told you that you told Detective Nicole

5   Christian, in May of 2017, that the plaintiff told you that

6   she married Benjamin Lugo for immigration purposes because the

7   immigration officials told her she wasn't going to be able to

8   stay in the United States, you don't have any reason to refute

9   that, correct?

10  A.   To refute whether or not it was actually said or whether

11  it's in the report?  That's where I'm getting confused.

12  Q.   Whether you said that to Nicole Christian?

13  A.   There were -- so here's where -- I'm a little bit

14  concerned personally about implications.  There was a lot of

15  things that I said out of anger, and if you're asking me if it

16  was in the report, this is where I would be a little bit

17  confused to say that, you know, something may or may not have

18  been -- may have come from anger in what I was saying to the

19  detective at that time.

20  Q.   So your testimony is that you've told Detective Christian

21  that the plaintiff married Benjamin for immigration purposes

22  in order to stay in the United States would have been just

23  something you said out of anger?

24  A.   There was -- my -- if we're talking about the same thing,

25  my clothes were ripped up, I mean, to shreds.

—Doe v. FPO, et al.—

23

1    Q.   Sir, that's not my question.

2    A.   I was beyond ticked off and there were some things that I

3    said --

4          MS. BAUCOM:  Your Honor, could you instruct the

5    witness?

6          THE COURT:  Let him finish.

7          THE WITNESS:  I'm sorry.  There were some things

8    that I said out of anger to the detective who told me that I

9    was there to discuss with her, you know, the issue of my

10   clothes after I had been ignored for -- I think I called the

11   police department ten times because I was upset about it, and

12   I kept getting pushed off by Fairfax County and I was annoyed

13   at -- I think it's Jane Doe, is what I have to say.  So there

14   were a lot of things that came out of my mouth, ma'am.

15   BY MS. BAUCOM:

16   Q.   The plaintiff provided you with details of her marriage

17   arrangement with Benjamin Lugo, didn't she?

18   A.   Details of what?  The date that they were married?  What

19   do you mean by "detail"?

20   Q.   No, I can clarify.  Specifically that she had paid

21   Benjamin Lugo or agreed to pay him $10,000 to marry her,

22   correct?

23   A.   I don't recall having that conversation with her, no.

24   Q.   And the plaintiff told you that as of -- or you knew that

25   as of May 2017 she had paid him $6,600 and that she still owed

————— Doe v. FPO, et al. —————

1    him $3,400, correct?

2    A.   Again, this is where a lot of things came out of my

3    mouth that were --

4    Q.   I'm not asking what came out of your mouth, sir.  I'm

5    asking --

6    A.   Okay.  Well, I'd like to plead the Fifth then.

7              MS. BAUCOM:  Your Honor --

8              THE WITNESS:  You're asking me to incriminate

9    myself.

10             MS. BAUCOM:  May we approach, Your Honor?

11             (Side bar.)

12             MS. BAUCOM:  Your Honor, the information that I have

13   from the criminal investigation is that Mr. Lugo told the

14   detective --

15             MS. BARDOT:  Mr. Hairabedian.

16             MS. BAUCOM:  I'm sorry -- told the detective these

17   are very specific details about the plaintiff's arrangement

18   with Mr. Lugo, which she had agreed to pay him $10,000, that

19   she had only paid $6,600 --

20             THE COURT:  Right.

21             MS. BAUCOM:  -- so on and so forth.  That's not

22   incriminating to Mr. Hairabedian.  And I would object to him

23   being able to assert the Firth Amendment to the question of

24   whether the plaintiff --

25             THE COURT:  This is a law enforcement officer?

————Doe v. FPO, et al.————

1          MS. BAUCOM:  My question was whether the plaintiff

2     told Mr. Hairabedian that information and he's pled the Fifth.

3          MS. BARDOT:  Whether the plaintiff told

4     Mr. Hairabedian that she had done something illegal has

5     nothing to do with him that can possibly incriminate him.

6          THE COURT:  Well, I thought these are statements

7     that he told Nicole Christian that the plaintiff told him.

8          MS. BAUCOM:  Right.  And I'm trying to elicit from

9     him --

10          THE COURT:  Now -- now he's saying -- I was angry

11     and I --

12          MS. BARDOT:  He said he pled the Fifth.  That's the

13     problem.

14          THE COURT:  Right.  There is a false statement

15     claim.

16          MR. GLASBERG:  That's an issue that I understand to

17     be at issue.

18          THE COURT:  Right.

19          MS. BAUCOM:  My question was what the plaintiff told

20     him, not what he told the detective.

21          THE COURT:  Well, I'm going to let him assert the

22     Fifth on all of this.  What do you want to get out of -- you

23     are going to put Christian on, right?

24          MS. BAUCOM:  Well, at this point, I think she's

25     unavailable, and his statements come in for the truth through

—Doe v. FPO, et al.—

26

1    Detective Christian.

2              MR. GLASBERG:  That's something that needs to be

3    determined.

4              THE COURT:  All right.  What else do you want to do

5    with him?

6              MS. BAUCOM:  I have pages of questions for him.

7              THE COURT:  He is not helping you.  I will tell you

8    that.

9              MS. BAUCOM:  I would agree with that.

10             Your Honor, I wanted to ask him about the

11   circumstances of his living with her, his involvement in her

12   arrest for prostitution in November of 2016, that that caused

13   conflict between the two of them because after that the

14   plaintiff chose not to work as a prostitute anymore and he

15   needed to support her financially, which he agreed to do.

16   That coming up in spring 2017, they got into fights because

17   the plaintiff accused him of wanting to go back to his wife,

18   and as a result of that they had this fight.

19             It is my contention that the plaintiff falsely

20   accused him of rape.  And I want to get into his knowledge of

21   what was going on with the plaintiff at that time.  I have

22   text messages between Mr. Hairabedian and the plaintiff, which

23   we've already looked at through the plaintiff today.  She's

24   authenticated those text messages where he's making statements

25   about her working as a prostitute and all of that is

———— Doe v. FPO, et al. ————

27

1    admissible under the motions in limine and it's not proper

2    subject to a Fifth Amendment assertion.

3            THE COURT:  Well, we'll see.  I will tell you the

4    jury is not liking your examination.  All right.  You're

5    really alienating this jury.  You need to understand that.

6            MS. BAUCOM:  Your Honor, would it be possible to

7    break for the evening?

8            THE COURT:  Yeah, why don't -- I think you need to

9    rethink what you want to do with this witness.

10           MS. BAUCOM:  All right.

11           MR. GLASBERG:  I'm not going to restate my relevance

12   and prejudice objections.  They are on the record and I

13   recognize.

14           THE COURT:  He's local here, isn't he?

15           MS. BARDOT:  He's under subpoena for the entire

16   time.

17           MR. GLASBERG:  He's under subpoena, but he needs to

18   get back to California [sic].

19           THE COURT:  Well, he'll show up on Tuesday.

20           MR. GLASBERG:  Yes, he'll show up on Tuesday.

21           (Open court.)

22           THE COURT:  Ladies and gentlemen, we're going to

23   recess for the weekend.  We've been going a long time today

24   and the Court has had to deal with a lot of issues outside of

25   your presence.  We have some others to deal with, so I'm going

———— Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ————
EASTERN DISTRICT OF VIRGINIA

— Doe v. FPO, et al. —

28

1   to excuse you until Tuesday at 9:30.

2        I will also tell you, much to my regret, that the

3   CDC, which monitors the COVID indices here, has placed

4   Alexandria in the high category again, which, under our

5   mandatory mask policy, triggers the obligation for people in

6   the courthouse to wear masks.  So I'm going to ask that

7   beginning Tuesday, that you wear masks here in the courthouse.

8        I am going to allow the witness to testify --

9   witnesses to testify without masks and the lawyer examining

10  the witness to testify [sic] without masks.  Otherwise,

11  everyone else will be wearing masks.  All right?

12        It's going to be a long weekend.  Monday is a

13  holiday, so we're not sitting, so Tuesday.  But, again, I just

14  want to emphasize how important it is that you not engage in

15  any research or engage in any kind of discussions with anyone

16  about anything that you've heard in the courtroom.  So with

17  that, you're excused until Monday morning -- I mean, sorry,

18  until Tuesday morning.  Thank you.

19        (Jury excused.)

20        THE COURT:  All right.  Mr. Hairabedian, we're going

21  to reconvene on Tuesday morning at 9:30.  You're required to

22  return here at that time.  I would also suggest that you may

23  want to consult with a lawyer.  I would not recommend

24  Mr. Cochran, Mr. Glasberg.  All right?  All right.

25        THE WITNESS:  Thank you, sir.

—Doe v. FPO, et al.—

29

1          THE COURT:  All right.  Anything else before we

2    adjourn?  All right.  I'll see everybody at 9 o'clock on

3    Tuesday.

4          MS. GREENZWEIG:  Your Honor --

5          THE COURT:  Yes?

6          MS. GREENZWEIG:  -- there is a matter that came up a

7    little bit earlier.

8          THE COURT:  All right.  You're excused,

9    Mr. Hairabedian.

10          THE WITNESS:  Thank you.

11          (Witness excused.)

12    (P. Hairabedian's testimony concluded for the day.  Further

13    proceedings were held but not included herein.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the **Jury Trial -**

7    **Excerpt** in the case of the **JANE DOE versus FAIRFAX COUNTY**

8    **POLICE OFFICER #1, et al.**, Civil Action No.: 1:21-cr-1150,

9    in said court on the 13th day of January, 2023.

10           I further certify that the foregoing 30 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this January 31, 2023.

17

18

19

20

21   _____
                                        Tonia M. Harris, RPR
22                                      Official Court Reporter

23

24

25

                                                                30